ACCEPTED
03-13-00790-CV
4062436
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/6/2015 4:56:11 PM
JEFFREY D. KYLE
CLERK

## No. 03-13-00790-CV

## IN THE COURT OF APPEALS

## FOR THE THIRD DISTRICT OF TEXAS

## AT AUSTIN, TEXAS

FILED
*February 6, 2015*
Third Court of Appeals
Jeffrey D. Kyle
Clerk

## T. MARK ANDERSON, AS CO-EXECUTOR OF THE ESTATE OF TED M. ANDERSON, AND CHRISTINE ANDERSON, AS CO-EXECUTOR OF THE ESTATE OF TED M. ANDERSON

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/6/2015 4:56:11 PM
JEFFREY D. KYLE
Clerk

*Appellants/Cross-Appellees,*

**v.**

## RICHARD T. ARCHER, DAVID R. ARCHER, CAROL ARCHER BUGG, JOHN V. ARCHER, KAREN ARCHER BALL, AND SHERRI ARCHER

*Appellees/Cross-Appellants.*

## BRIEF OF APPELLEES/CROSS-APPELLANTS

**Laurie Ratliff**
**State Bar No.  00784817**
**Frank N. Ikard Jr.**
**State Bar No. 10386000**
**Lauren Davis Hunt**
**State Bar No. 24059657**
**IKARD GOLDEN JONES, P.C.**
**400 West 15th St., Suite 975**
**Austin, Texas 78701**
**Telephone: (512) 472-6695**
**Telecopier: (512) 472-3669**
**Laurieratliff@igjlaw.com**

**ATTORNEYS FOR APPELLEES/CROSS-APPELLANTS**
***Oral argument requested***

# IDENTITY OF PARTIES AND COUNSEL

**I.     Appellees/Cross-Appellants:**

Richard T. Archer
David R. Archer
Carol Archer Bugg
John V. Archer
Karen Archer Ball
Sherri Archer

**II.    Counsel for Appellees/Cross-Appellants:**

Laurie Ratliff
Frank N. Ikard, Jr.
Lauren Davis Hunt
IKARD GOLDEN JONES, P.C.
400 West 15th Street, Suite 975
Austin, Texas  78701
Telephone: (512) 472-6695
Telecopier: (512) 472-3669
Laurieratliff@igjlaw.com

**III.   Appellants/Cross-Appellees:**

T. Mark Anderson, as Co-Executor of the Estate of Ted M. Anderson
Christine Anderson, as Co-Executor of the Estate of Ted M. Anderson

**IV.    Counsel for Appellants/Cross-Appellees:**

Gerald D. McFarlen
THE LAW OFFICE OF GERALD D. MCFARLEN, P.C.
28 Fabra Oaks Road
Boerne, Texas 78006
Telephone:  (830) 331-8554
Telecopier:  (210) 568-4305
gmcfarlen@mcfarlenlaw.com

# TABLE OF CONTENTS

IDENTITIES OF PARTIES AND COUNSEL ..................................................... i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES ............................................................................v

STATEMENT OF THE CASE.................................................................... xiii

ISSUES PRESENTED................................................................................ xiv

INTRODUCTION ...........................................................................................1

STATEMENT OF FACTS ..............................................................................3

SUMMARY OF THE ARGUMENT ............................................................ 23

ARGUMENT AND AUTHORITIES............................................................24

I.      The Archers followed well-established Texas law when they sued Ted
        Anderson for tortious interference with their inheritance [Responsive to
        Issue 1]........................................................................................................24

        A.      Appellants' briefing error waives Issue 1 ...........................................25

        B.      Appellants concede Ted tortiously interfered with the Archers'
                inheritance...........................................................................................26

        C.      Texas law recognizes a cause of action for tortious interference
                with inheritance....................................................................................27

        D.      Legal malpractice privity rule does not apply in tortious
                interference with inheritance cases .................................................28

II.     The Archers are entitled to their attorney's fees and litigation expenses incurred in the Bexar County litigation as damages [Responsive to Issues 2-4] ...................................................................30

     A.     Texas law recognizes recovery of attorney's fees incurred in a prior litigation as damages ............................................... 31

     B.     Appellants waived their argument about segregation of attorney's fees in the trial court and in their brief on appeal .............................. 36

     C.     Segregation of attorney's fees does not apply in an attorney's-fees-as-damages case ....................................... 37

     D.     Appellants waived their sufficiency of the evidence argument.......... 40

     E.     The evidence is factually and legally sufficient as to the reasonableness and necessity of the Archers' attorney's fees ............ 41

     F.     The district court erred in denying the Archers' motion for partial JNOV on the full amount of attorney's fees proved as a matter of law [Cross Issue 1]..................................................................... 45

          1.     No evidence supports jury's thirty-percent reduction in the amount of attorney's fees the Archers paid in prior litigation... 47

          2.     The Archers proved the entire amount of their attorney's fees paid in the Bexar County litigation as a matter of law ............. 51

III.     The district court properly granted Appellants' motion for partial JNOV and awarded the Archers the amount paid to settle with the charities [Responsive to Issue 5].........................................................................55

     A.     Appellants' briefing error waives appellate review..........................56

     B.     Appellants' post-verdict motions waive appellate review................56

     C.     The Archers proved the settlement with the charities amount as a matter of law [Cross Issue 2] ..........................................................60

      1.     No evidence supports awarding zero damages for the settlement with the charities ......................................................61

      2.     The Archers proved as a matter of law that they paid $588,054 to settle with the charities .......................................63

IV.   The district court properly calculated prejudgment interest [Responsive to Issues 6 & 7] .........................................................65

    A.    Appellants waived their prejudgment interest accrual date argument ...........................................................................65

    B.    Prejudgment interest cannot be tolled...............................68

PRAYER FOR RELIEF ...........................................................................70

CERTIFICATE OF COMPLIANCE.........................................................72

CERTIFICATE OF SERVICE ..................................................................73

APPENDIX .......................................................................... Tabs A-L

# TABLE OF AUTHORITIES

CASES

*Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. National Dev. & Research Corp.*,
299 S.W.3d 106 (Tex. 2009).......................................................................... 31, 32

*Alice Leasing Corp. v. Castillo*,
53 S.W.3d 433 (Tex. App.—San Antonio 2001, pet. denied).......................... 52, 61

*Allman v. Butcher*,
314 S.W.3d 671 (Tex. App.—Dallas 2010, no pet.) .................................. 52, 60, 63

*Allstate Prop. & Cas. Ins. v. Gutierrez,*
281 S.W.3d 535 (Tex. App.—El Paso 2008, no pet.)................................................ 57

*AMX Enters., L.L.P. v. Master Realty Corp.*,
283 S.W.3d 506 (Tex. App.—Fort Worth 2009, no pet.)........................................ 69

*Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*,
48 S.W. 3d 225 (Tex. App.—San Antonio 2001, pet. denied).............................. 68

*Estate of Arlitt v. Patterson*,
995 S.W.2d 713 (Tex. App.—San Antonio 1999, pet. denied)
*disapproved on other grounds by Belt v. Oppenheimer, Blend, Harrison & Tate*,
192 S.W.3d 780 (Tex. 2006).......................................................................... 34

*Arlington Home, Inc. v. Peak Envtl. Consultants, Inc.*,
361 S.W.3d 773 (Tex. App.—Houston [14th Dist.] 2012, pet. denied)................. 61

*B&W Supply, Inc. v. Beckman*,
305 S.W.3d 10 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ..................... 54

*Barcelo v. Elliott*,
923 S.W.2d 575 (Tex.1996)............................................................................ 29

*Bluestar Energy, Inc. v. Murphy*,
205 S.W.3d 96 (Tex. App.—Eastland 2006, pet. denied) ............................... 58, 59

*Brandes v. Rice Trust, Inc.*,
966 S.W.2d 144 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)................. 28

*Brandon v. Am. Sterilizer Co.*,
880 S.W.2d 488 (Tex. App.—Austin 1994, no writ) .............................................. 41

*Bray v. Tejas Toyota, Inc.*,
363 S.W.3d 777 (Tex. App.—Austin 2012, no pet.) .............................................. 58

*Brookshire Grocery Co. v. Smith*,
99 S.W.3d 819 (Tex. App.—Beaumont 2003, pet. denied).................................... 65

*Bullock v. American Heart Ass'n*,
360 S.W.3d 661 (Tex. App.—Dallas 2012, pet. denied)........................... 25, 26, 37

*Cain v. Bain*,
709 S.W.2d 175 (Tex. 1986)............................................................................. 41, 42

*Cantu v. Moore*,
90 S.W.3d 821 (Tex. App.—San Antonio 2002, pet. denied)............................... 49

*Chandler v. Welborn*,
156 Tex. 312, 294 S.W.2d 801 (1956).................................................................. 27

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005)............................................................. 46, 47, 60, 61

*City of San Antonio v. Hardee*,
70 S.W.3d 207 (Tex. App.—San Antonio 2001, no pet.)...................................... 59

*Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*,
271 S.W.3d 238 (Tex. 2008)................................................................................. 29

*Cupples Coiled Pipe, Inc. v. Esco Supply Co.*,
591 S.W.2d 615 (Tex. Civ. App.—El Paso 1979, writ ref'd n.r.e) .................. 35, 36

*Dalton S.S. Corp. v. W.R. Zanes & Co.*,
354 S.W.2d 621 (Tex. Civ. App.—Fort Worth 1962, no writ) ........................ 35, 36

*Dow Chem. Co. v. Francis*,
46 S.W.3d 237 (Tex. 2001)................................................... 47, 51, 52, 60, 63

*First Nat'l Bank v. Fojtik*,
775 S.W.2d 632 (Tex. 1989)................................................................. 58

*First State Bank v. Keilman*,
851 S.W.2d 914 (Tex. App.—Austin 1993, writ denied).......................... 49, 50, 62

*Green v. Kaposta*,
152 S.W.3d 839 (Tex. App.—Dallas 2005, no pet.) ............................... 41

*Gulf States Utils. v. Low*,
79 S.W.3d 561 (Tex. 2002)................................................................. 49

*Hawkins v. Walvoord*,
25 S.W.3d 882 (Tex. App.—El Paso 2000, pet. denied)......................... 67

*Helena Chemical v. Wilkins*,
18 S.W. 3d 744 (Tex. App.—San Antonio 2000),
*affirmed,* 47 S.W. 3d 486 (Tex. 2001) ................................................ 68

*Helping Hands Home Care, Inc. v. Home Health of Tarrant County, Inc.*,
393 S.W.3d 492 (Tex. App—Dallas 2013, pet. denied)........................... 46

*Horizon/CMS Healthcare Corp. v. Auld*,
34 S.W.3d 887 (Tex. 2000)................................................................. 59

*Jansen v. Fitzpatrick*,
14 S.W.3d 426 (Tex. App.—Houston [14th Dist.] 2000, no pet.)............. 59

*Johnson & Higgins of Texas Inc. v. Kenneco Energy, Inc.*,
962 S.W.2d 507 (Tex. 1998)............................................................... 66, 69

*Keyes Helium Co. v. Regency Gas Servs., L.P.*,
393 S.W.3d 858 (Tex. App.—Dallas 2013, no pet.) ............................. 25, 26, 37, 56

*King v. Acker*,
725 S.W.2d 750 (Tex. App.—Houston [1st Dist.] 1987, no writ) ............. 27, 30

*Lesikar v. Rappeport*,
33 S.W.3d 282 (Tex. App.—Texarkana 2000, pet. denied) ........................31, 35-38

*Marin Real Estate Partners, L.P. v. Vogt*,
373 S.W.3d 57 (Tex. App.—San Antonio 2011, no pet.)........................... 25, 26, 56

*Marshall v. Marshall*,
547 U.S. 293 (2006) ................................................................................................ 28

*Mason v. Mason*,
No. 07-12-00007, 1014 WL 199649
(Tex. App.—Amarillo Jan. 13, 2014, no pet. (mem. op.)........................................ 57

*Massey v. Columbus State Bank*,
35 S.W.3d 697 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) ......... 32, 33, 34

*Matthews v. Candlewood Builders, Inc.*,
685 S.W.2d 649 (Tex. 1985)............................................................................ 36, 37

*Matthews v. DeSoto*,
721 S.W.2d 286 (Tex. 1986)................................................................................... 68

*Meduna v. Holder*,
No. 03-06-00484-CV, 2008 WL 1911184
(Tex. App.—Austin Apr. 30, 2008, pet. denied) (mem. op.) ............................................28

*Mills v. Jackson*,
711 S.W.2d 427 (Tex. App.—Fort Worth 1986, no writ) ................................. 49, 50

*Naschke v. Gulf Coast Conference*,
187 S.W.3d 653 (Tex. App.—Houston [14th Dist.] 2006, pet. denied)................. 35

*Nationwide Mut. Ins. v. Holmes*,
842 S.W.2d 335 (Tex. App.—San Antonio 1992, writ denied) ............................ 32

*Neill v. Yett*,
746 S.W.2d 32 (Tex. App.—Austin 1988, writ denied) ........................................28

*New Amsterdam Cas. Co. v. Texas Indus., Inc.*,
414 S.W.2d 914 (Tex. 1967)................................................................................... 31

*Noell v. City of Carrollton*,
431 S.W.3d 682 (Tex. App.—Dallas 2014, pet. denied)....................... 21, 31, 35, 36

*Northeast Tex. Motor Lines, Inc. v. Hodges*,
138 Tex. 280, 158 S.W.2d 487 (1942)........................................................... 58, 59

*Pacesetter Pools, Inc. v. Pierce Homes, Inc.*,
86 S.W.3d 827 (Tex. App.—Austin 2002, no pet.)................................................ 34

*Peterson v. Dan Witter Reynolds, Inc.,*
805 S.W.2d 541 (Tex. App.—Dallas 1991, no writ)........................................ 35. 36

*Pilgrim's Pride Corp. v. Burnett*,
No. 12-10-00037-CV, 2012 WL 381714
(Tex. App.—Tyler Feb. 3, 2012, no pet.) (mem. op.) ............................................ 69

*Powell v. Narried*,
463 S.W.2d 43 (Tex. Civ. App.—El Paso 1971, writ ref'd n.r.e.) ......................... 38

*Rendleman v. Clarke*,
909 S.W.2d 56(Tex. App.—Houston [14th Dist.] 1995, writ dism'd as moot) 40, 41

*Rice v. Gregory*,
780 S.W.2d 384 (Tex. App.—Texarkana 1989, writ denied)............................ 36-38

*Rogers v. Texas Bd. of Architectural Examiners*,
390 S.W.3d 377 (Tex. App.—Austin, no pet.) ...................................................... 29

*In re Estate of Russell*,
311 S.W.3d 528 (Tex. App.—El Paso 2009, no pet.)............................................. 28

*Smith v. East*,
411 S.W.3d 519 (Tex. App.—Austin 2013, pet. denied) ...................................... 58

*Smith v. Patrick W.Y. Tam Trust*,
235 S.W.3d 819 (Tex. App.—Dallas 2007), *rev'd on other grounds*,
296 S.W.3d 545 (Tex. 2009)........................................................................... 50, 51

*Southwest Airlines v. Jaeger*,
867 S.W. 2d 824 (Tex. App.—El Paso 1993, writ denied) ..................................... 69

*Standard Fire Ins. v. Stephenson*,
963 S.W.2d 81 (Tex. App.—Beaumont 1997, no pet.) .................................... 32, 33

*Sunbeam Envtl. Servs., Inc. v. Texas Workers' Comp. Ins. Facility*,
71 S.W.3d 846 (Tex. App.—Austin 2002, no pet.) ............................................... 26

*Tana Oil & Gas Corp. v. McCall*,
104 S.W.3d 80 (Tex. 2003) ............................................................................... 35, 36

*Texas Beef Cattle Co. v. Green*,
883 S.W.2d 415 (Tex. App.—Beaumont 1994), *rev'd on other grounds*,
921 S.W.2d 203 (Tex. 1996) ............................................................................. 33, 38

*Texas Dept. of Transp. v. Guerra*,
858 S.W.2d 44 (Tex. App.—Houston [14th Dist.] 1993, writ denied) ........... 47, 61

*Texas & N.O.R. Co. v. Burden*,
146 Tex. 109, 203 S.W.2d 522 (1947) ............................................................. 47, 61

*Tiller v. McLure*,
121 S.W.3d 709 (Tex. 2003) ................................................................................ 61

*Turner v. Turner*,
385 S.W.2d 230 (Tex. 1964) ............................................................................. 32, 37

*In re Estate of Valdez*,
406 S.W.3d 228 (Tex. App.—San Antonio 2013, pet. denied) ............................ 28

*Volkswagen of Am., Inc. v. Ramirez*,
159 S.W.3d 897 (Tex. 2004) ......................................................... 41, 42, 46, 47

*Wein v. Sherman*,
No. 03-10-00499-CV, 2013 WL 4516013
(Tex. App.—Austin August 23, 1013, no pet.) ................................................. 35, 36

*Wilmer-Hutchins Indep. Sch. Dist. v. Smiley*,
97 S.W.3d 702 (Tex. App.—Dallas 2003, pet. denied) .................................... 65, 66

*Wilson v. Texas Parks & Wildlife Dept.*,
853 S.W.2d 825 (Tex. App.—Austin 1993), *rev'd on other grounds*,
886 S.W.2d 259 (Tex. 1994)............................................................... 26

*Woollett v. Matyastik*,
23 S.W.3d 48 (Tex. App.—Austin 2000, pet. denied) ........................................... 49

## STATUTES AND RULES

TEX. ESTATES CODE § 54.001(a)....................................................................... 29

TEX. ESTATES CODE § 256.002 ................................................................. 66, 67

TEX. ESTATES CODE § 256.204 ....................................................................... 67

TEX. FIN. CODE §304.101............................................................................... 66

TEX. FIN. CODE §304.104............................................................................... 66

TEX. FIN. CODE §304.108(b) .......................................................................... 69

TEX. R. APP. P. 9.4(i)(1) ................................................................................ 72

TEX. R. APP. P. 9.4(i)(2)(B)............................................................................ 72

Tex. R. App. P. 33.1(a)(A)............................................................................... 57

TEX. R. APP. P. 38.1(i)................................................................ 25, 37, 41, 56, 65, 66

TEX. R. APP. P. 38.2(b)................................................................................... 60

TEX. R. APP. P. 38.3 ...................................................................................... 26

TEX. R. CIV. P. 324(c) ................................................................................... 60

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF TORTS §774B (1979) .................................................. 27

RESTATEMENT (SECOND) OF TORTS §914 (1979) .................................................... 32

RESTATEMENT (SECOND) OF TORTS §914(2) (1979) .............................................. 32

# STATEMENT OF THE CASE

*Nature of the case:* This is a tortious interference with inheritance case. Appellees/Cross-Appellants Richard T. Archer, David R. Archer, Carol Archer Bugg, John V. Archer, Karen Archer Ball, and Sherri Archer sued Ted M. Anderson and others for their actions that caused Appellees' uncle, John R. "Jack" Archer, to sign numerous estate planning documents that disinherited the Archers. Jack signed all of the disinheriting estate planning documents after a stroke that rendered him mentally incapacitated. Ted died during the litigation, and the co-executors of his estate substituted as defendants.

*Trial court disposition:* After a week and a half trial, the jury returned a verdict finding that Ted had tortiously interfered with the Archers' inheritance and awarded $2,006,150 in damages. CR646-53; App. A. The district court implicitly granted Appellants' motion for partial JNOV and awarded the Archers an additional $588,054 in undisputed damages in the Final Judgment. CR1470-71; App. B. The district court, however, denied the Archers' motion for partial JNOV that sought the full amount of their damages that were established as a matter of law. CR1209; App. H.

*Relief sought:* The Archers request that this Court affirm the Final Judgment on liability. By cross-issue, the Archers request that the Court modify and render judgment on the total damages the Archers proved as a matter of law. Alternatively, the Archers seek affirmance of the Final Judgment on liability and damages.

# ISSUES PRESENTED

1.  Does Texas jurisprudence recognize a cause of action for tortious interference with inheritance? [Responsive to Issue 1]

2.  Did the district court properly admit evidence of, and award as damages, the Archers' attorney's fees and litigation expenses incurred in prior litigation? [Responsive to Issues 2, 3, and 4]

3.  Did the district court properly award the Archers additional damages that were conceded by Appellants in post-verdict motions? [Responsive to Issue 5]

4.  Did the district court properly exercise its discretion in its pre-judgment interest calculation? [Responsive to Appellants' Issues 6 and 7]

## Appellees/Cross-Appellants' Cross-issues:

1.  Did the district court err in denying the Archers' motion for partial JNOV when the Archers established the entire amount of their attorney's fees incurred in prior litigation as a matter of law?

2.  Did the district court properly grant Appellants' motion for partial JNOV and award the Archers $588,054 as additional damages?

TO THE HONORABLE THIRD COURT OF APPEALS:

Appellees/Cross-Appellants Richard T. Archer, David R. Archer, Carol Archer Bugg, John V. Archer, Karen Archer Ball, and Sherri Archer ("the Archers") file their Appellees/Cross-Appellants' Brief requesting that the Court affirm the district court's Final Judgment on liability. By cross-issue, the Archers request that the Court modify and render judgment awarding them their the total damages proved as a matter of law. Alternatively, the Archers seek affirmance of the Final Judgment on liability and damages

## INTRODUCTION

In this tortious interference with inheritance rights case, the Archers seek to recover the attorney's fees and other monies they were forced to pay in litigation involving their uncle, Jack Archer. Jack's life-long estate plan left the bulk of his more than $7.5 million estate to his nearest relatives, the Archers. Ted Anderson, however, had other plans for Jack's estate. Shortly after Jack suffered a catastrophic stroke that rendered Jack mentally incapacitated, Ted Anderson obtained a power of attorney from Jack and assembled and instructed a team of attorneys to rewrite and cause Jack to sign three new wills, two trusts, and numerous property assignments. The new estate planning documents not only disinherited the Archers and left Jack's entire estate to charities, but also made a will contest virtually impossible.

Ted and his cohorts forced the Archers into costly and protracted legal wranglings in a guardianship proceeding and related lawsuits that lasted more than 5 years and cost the Archers more than $3.4 million to reverse.

In the end, the Archers successfully reinstated Jack's original estate plan and inherited Jack's estate. Having successfully restored their inheritance from their uncle, the Archers brought the underlying tortious interference with inheritance lawsuit to recover the more than $3.4 million in attorney's fees and other monies paid in the guardianship litigation as damages.

After an eight-day trial, the jury found that Ted tortiously interfered with the Archers' inheritance and awarded $2,006,100 in damages. In post-verdict motions, Appellants conceded that the Archers proved more damages than the jury awarded. As a result, the district court's Final Judgment awarded $588,054, as conceded by Appellants, in addition to the jury's verdict. The district court, however, did not grant the Archers' post-verdict motion seeking all of the damages they proved as a matter of law.

The Archers seek an affirmance of the Final Judgment on liability and by cross-issue seek a modification and rendition of judgment on the total amount of damages that were proved as a matter of law. Alternatively, the Archers seek affirmance of the Final Judgment on liability and damages.

## STATEMENT OF FACTS

**The Archer Family.** John R. "Jack" Archer lived in Corpus Christi, but spent considerable amounts of time on his 1000-acre ranch in Blanco County. 3RR84-85. Jack was very successful in the oil and gas business and amassed an estate worth more than $7.5 million. 3RR78, 88; 11RRPlx28, Plx29; 12RRPlx241.[1] In addition to his home in Corpus and his ranch, Jack owned a house in Ireland, an airplane, a large coin collection, a collection of valuable jewels, and bank accounts located all over the world. 3RR85-86, 172-73.

Jack was married four times, but was single when he died. 3RR78-79. He had no children. 3RR78-79. Jack's nearest relatives were his only brother, Richard T. Archer, and Richard's six children: Michael, John, David, Carol, Sherri, and Karen. [2]

The Archer family was close-knit. For more than twenty years before Jack's stroke, Jack and Richard's family spent the majority of holidays together either at Jack's ranch, at his home in Corpus, or at Richard's home in Tyler. 3RR77-78, 83-84; 4RR70. Jack remained close to the Archer children's mother, Joanne, even after she and Richard divorced. 3RR84; 4RR70.

---

[1] Plaintiffs' Exhibit 241 is not in numerical order in the Reporter's Record. App. C. It is found before Plx222.

[2] Richard died while this lawsuit was pending.

3

The Archer children were also very close to their Uncle Jack. 3RR83-84. Jack considered the Archer children as "part his children." 4RR71. Similarly, the Archer children saw their Uncle Jack as a second father. 3RR88. Each Archer child had particular activities they enjoyed doing with Uncle Jack. 3RR83-84. The Archer children always knew that Jack wanted the ranch to stay in the family. 3RR103. Appellant Ted Anderson admitted that Jack "really liked his nieces and nephews." 7RR60.

Jack and Richard established a trust for the Archer children, known as the "ADI Trust." 3RR89-90, 94-95; 11RRPlx3. Richard was the trustee of the ADI Trust and the Archer children were the beneficiaries. 3RR89, 95. The Archer children did not receive regular distributions from the trust. 3RR89. Instead, the trust was used for significant expenses such as college tuition or down payments on houses when the Archer children became adults. 3RR89-90.[3]

**Jack's life-long estate plan:** Jack's fondness for his brother and his nieces and nephews was reflected in his estate planning. In his 1991 Last Will and Testament, Jack left the bulk of his estate, including his ranch, to Richard and Richard's six children, five of whom are Appellees/Cross-Appellants in this case.[4]

---

[3] Attached as Appendix D is a timeline of Events. 12RRPlx233. App. D.

[4] Michael Archer is not a party to this case. 3RR74-75.

3RR99-100, 101; 11RRPlx9 at 2-3 ("1991 Will"). Jack's 1991 Will also designated twelve charities to split sixty percent of his mineral interests. 3RR100-01; 11RRPlx9 at 9. The 1991 Will named Richard as executor. 11RRPlx9 at 4. Jack also named Richard as primary beneficiary of his life insurance policies and bank accounts. 3RR92-93; 11RRPlx2, Plx4-6, Plx8.

**Jack's stroke.** On August 25, 1998, at the age of 71, Jack suffered a debilitating, large right hemisphere stroke, leaving him physically impaired and mentally incapacitated. 4RR148; 11RRPlx39 at PLF089274, Plx88. Medical experts described the stroke as "very severe," "very significant," and one that left Jack "very impaired." 4RR148, 159, 227. After his stroke, Jack remained in the hospital for three weeks and then went to a rehab hospital before returning to his home. 3RR108; 11RRPlx39.

Following Jack's stroke, Richard and the Archer children went to Corpus Christi to assist with Jack's care. 3RR105-06. Richard went to Corpus Christi to care for Jack seventeen times from the date of his stroke until the early summer of 1999. 7RR85; 11RRPlx10. Richard had Jack's house modified, obtained a van to transport him, and found caregivers for Jack. 3RR106, 110, 111; 7RR85; 11RRPlx11. The Archer children also went to Corpus Christi to help in the months after Jack's stroke. 3RR106, 110.

**Ted Anderson initiates process to disinherit the Archers.** Within weeks after Jack's stroke, Ted Anderson began a series of actions that caused Jack to sign new estate planning documents that disinherited the Archers.

First, on September 24, 1998, while Jack was still in the rehab hospital after his stroke, Ted, who was an attorney, drafted and caused Jack to sign two powers of attorney. 6RR103; 7RR52, 64; 11RRPlx139, Plx140, Plx148. The durable power of attorney designated Ted as Jack's attorney-in-fact with very broad powers. 11RRPlx139. The medical power of attorney gave Ted the power to make medical decisions for Jack. 6RR109, 111; 11RRPlx140.

Ted later claimed to never have needed the durable power of attorney. According to Ted, "I really haven't had to use it. Jack signed everything we needed signed." 7RR55; 11RRPlx112 at 25. Ted, however, regularly used the medical power of attorney to communicate with Jack's doctors. 11RRPlx53, Plx54, Plx67.

On the day Jack signed the powers of attorney, Jack had reported to the health care providers that he had been working at this ranch in Blanco all day and that he had not spent the night in the hospital. 6RR104; 11RRPlx43 at PLF083957. Neither of Jack's statements was true. Medical evidence also showed that, soon after he signed the powers of attorney, Jack expressed confusion about the documents he had signed. 4RR201-202; 11RRPlx43 at PLF083938.

One of the Archers' medical experts opined, that based on the severity of his stroke as reflected in the medical records dated September 24, 1998, Jack did not have capacity. 4RR200. Further, Appellee Carol Archer Bugg visited her uncle while he was in the rehab hospital and observed that Jack was not in any condition to make decisions on his own. 3RR110.

In December 1998, Ted obtained the original of Jack's 1991 Will from the attorney who drafted it. 6RR111-12; 11RRPlx141. Ted then made his first attempt to disinherit the Archers. In early 1999, Ted tried to get Jack to place 600 acres of his ranch in a charitable remainder trust. 6RR122-24; 11RRPlx145. Putting Jack's ranch into a charitable remainder trust would have disinherited the Archers. 6RR132. Jack, however, managed to communicate to Ted that he did not want to sell the ranch. 11RRPlx145.

Ted also began alienating the Archer family from Jack. By early 1999, the Archers' access to Jack was being limited. 3RR127. In February 1999, Jack purportedly typed and signed a letter to Richard asking Richard not to visit him. 11RRPlx51. Jack, however, never told Richard not to visit. 7RR82-83. Expert testimony indicated the signature on the letter was not Jack's and, moreover that, after his stroke, Jack could not have been able to type. 4RR203-04; 11RRPlx44. The Archers' phone calls to Jack were not returned. 3RR129. They received no information on his medical condition during the spring of 1999. *Id.* The Archers

7

also discovered that the caregivers Richard hired had been fired. 7RR85. By the end of the summer of 1999, the Archer family did not know where Jack was living. 3RR136. The Archers even hired a private investigator to locate Jack, but to no avail. 3RR137.

Meanwhile, Ted continued his scheming. Ted hired two estate planning attorneys, Buster Adami and Richard Leshin, to assist him in changing Jack's estate plan. 6RR110-11, 127; 11RRPlx142, Plx143, Plx146. In June 1999, Adami prepared a codicil to Jack's 1991 Will that added J.R. Hamilton and T. Mark Anderson along with Richard as co-executors of Jack's estate. 11RRPlx147. The codicil required the three co-executors to act jointly or by majority. *Id.* In July 1999, anticipating that the Archers might file a guardianship proceeding, Adami wrote the Nueces County judges informing them that Jack was managing his affairs through Ted and encouraging them to not grant an *ex parte* guardianship. 11RRPlx150. As detailed below, at Ted's direction, Leshin prepared the post-stroke wills and trusts that disinherited the Archers. 6RR120.

Ted's efforts to disinherit the Archers by having Jack sell his ranch to charities continued. This time, however, Ted enlisted his recently hired estate planning attorneys, Leshin and Adami, to pressure Jack to sell. 6RR128-32; 11RRPlx151; App. E. In July 1999, Ted wrote Adami about getting Jack to put his ranch in a foundation for the benefit of the charities. 11RRPlx151. Ted wrote, "[h]e [Jack]

8

may switch and turn but I hope that we can continue to encourage him in this direction and since Richard [Leshin] helped me with the limited partnership for the ranch Jack might feel comfortable with suggestions from Richard [Leshin]." 11RRPlx 151. Ted's letter goes on to speculate about the size of Jack's estate being at $3 million.

Ted surrendered his law license in June 1999. 11RRPlx148. He resigned as Jack's attorney-in-fact in November 1999. 11RRPlx153. Neither event, however, limited Ted's actions.

**The Archers seek legal advice:** Concerned for Jack's well-being when they could not locate Jack or find out his condition, the Archers sought legal advice. 3RR132-33. In October 1999, the law firm of Ikard & Golden filed an application for temporary guardian in Blanco County and got Richard appointed as temporary guardian of Jack's person and estate. 3RR140; 11RRPlx14-16. Richard made it clear, however, that he did not want serve as permanent guardian of Jack's estate; rather, he wanted a third party as permanent guardian. 7RR86-87; 11RRPlx20.

On December 29, 1999, a hearing was held on the Archers' temporary guardianship application in Blanco County. 11RRPlx155. Attorneys from four law firms, including Adami and Leshin, along with a court-appointed attorney ad litem, represented Jack at the hearing. 11RRPlx155 at 3. In response to the Archers' request for Jack to testify regarding his wishes, all five of Jack's attorneys agreed on

the record that Jack needed a guardian of his person and his estate. 6RR139-40; 11RRPlx155 at 15-23.

The agreement for a temporary guardianship meant that all of Jack's attorneys agreed that Jack lacked the mental and physical capabilities to care for himself and to manage his own affairs. 6RR140-42; 11RRPlx160. Seemingly, the matter was resolved.

**Ted continued his plan to disinherit the Archers.** Despite the agreement for a temporary guardian, and despite his resignation as Jack's attorney-in-fact under the power of attorney, Ted continued to seek to change Jack's estate plan. 6RR135.

In early January 2000, Ted sought Leshin's advice on Jack's estate planning, and in particular, on how to avoid a future guardianship. 11RRPlx154, Plx157. Leshin advised that any estate planning would have to wait until Jack was no longer subject of a guardianship proceeding. 6RR143; 11RRPlx157. Leshin also advised Ted on a scheme that "will make a contest of the disposition of [Jack's] assets more difficult." 11RRPlx157. According to Leshin, if the temporary guardianship over Jack were dismissed, Jack's assets could be transferred to a revocable trust to avoid a future guardianship and court supervision. 6RR136-37; 11RRPlx154. Jack was not copied on any of Leshin's estate planning letters. 11RRPlx154, Plx157.

To effectuate the estate plan Leshin concocted, on March 16, 2000, Ted fired all of the attorneys who represented Jack in the Blanco County guardianship who

had agreed Jack needed a guardian.  6RR149-50; 11RRPlx162.  Ted hired a trial attorney, Doug Hearne, Sr., who repudiated the agreement that Jack needed a temporary guardianship.  6RR159; 12RRPlx216, Plx217.

March 2000 Will.  On the same day he fired Jack's attorneys, Ted sent Jack's 1991 Will to Leshin.  6RR74; 11RRPlx163.  On March 19, 2000, Jack signed the March 2000 Will that Leshin drafted that left all of Jack's assets to charities, entirely disinheriting the Archers.  6RR151; 11RRPlx166.  The March 2000 Will contemplated that a trust would be established to hold Jack's assets, but that, if the trust were not set up before Jack died, all of his assets would go to the charities.  11RRPlx166 at 1.  Jack did not read the will before signing it; Leshin read it to him at the will signing. 7RR30.

April 2000 Will.  Soon after Jack signed the March 2000 Will, Ted directed Leshin to prepare another will and a trust.  7RR32-33; 11RRPlx170. On April 26, 2000, Jack signed the April 2000 Will, the Jack Archer Trust Indenture ("Trust"), and several property assignments that transferred all of Jack's assets into the Trust.  6RR153-54; 11RRPlx171-76.  The Trust was to terminate on Jack's death and its assets to be distributed among that the twelve named charities.  11RRPlx171 at 2-3.  Ted, who was no longer licensed to practice law, explained the Trust and had Jack sign the Trust before Leshin arrived at the will signing.  11RRPlx177.  According to Leshin, one of the purposes of the April 2000 Will was to make a will contest even

11

more difficult for the Archers, by increasing the number of wills to challenge. 7RR39; 11RRPlx177.

For the March 2000 Will, the April 2000 Will, and the Trust, Leshin received all of his instruction for the document's terms from Ted. 7RR27-28, 32, 36-38, 41-42; 11RRPlx165, Plx167. Leshin never talked to Jack about the documents until the signings. *Id.* Ted decided when Jack would sign documents and was present for every signing. 6RR95-96, 156; 7RR43; 11RRPlx167.

Although he represented Jack for three years, Leshin never had a phone conversation with Jack or had any written correspondence with him. 7RR26-27. Leshin's file and billing records confirmed that his only communications on Jack's matter were with Ted. 6RR113-14, 118-20, 135; 11RRPlx142, Plx144, Plx149, Plx152, Plx158, Plx161, Plx169, Plx182, Plx184-87, Plx191, Plx195, Plx196. On the occasions when Leshin met with Jack, Ted was always present. 7RR26.

Although Ted was Leshin's source of information on Jack, Leshin did not know that Jack had had a stroke. 7RR20. Leshin made no assessment of Jack's capacity when Jack signed the estate planning documents. 6RR158; 7RR37. Instead, Leshin relied solely on Ted's representations regarding Jack's capacity. 7RR21, 37.

Contrary to Leshin's testimony that Ted orchestrated all of Jack's post-stroke wills, and that the records showed that Ted's name was "all over everything," Ted

12

contended that he had nothing to do with the wills. 6RR71-73, 61; 7RR63. When pressed in his deposition about his involvement, Ted refused to answer the questions. 7RR67-68.

In May 2000, Jack signed a new durable power of attorney and medical power of attorney naming Ted as attorney-in-fact and specifically disqualified the Archer family from serving. 6RR159-60; 11RRPlx179, Plx180.

Jack's medical condition around the 2000 will signings. Jack signed the March 2000 Will on March 19, 2000, and the April 2000 Will and Trust on April 26, 2000. 11RRPlx166, Plx171-76. Jack was admitted to an inpatient psychiatric hospital from March 28 through April 19, 2000. 7RR33; 11RRPlx71-74. The psychiatric hospital notes described Jack's symptoms as "delusional paranoia" and being "oriented to person only." 11RRPlx73 at PLF069710, Plx74 at PLF069715. While in the psychiatric hospital, Jack reported (incorrectly) that the year was 1928, that he was in his thirties, that his parents were still living, and that he was in Ohio. 11RRPlx71 at PLF038490. The psychiatric hospital notes are replete with entries describing Jack as confused, disoriented, and having delusional and suicidal thoughts. 11RRPlx71 at PLF038490, PLF038492, PLF038493, PLF038494. One of Jack's doctors, Dr. Still, opined that Jack was incapacitated in May 2000. 7RR88-89.

Jack was again admitted to a psychiatric hospital in June 2000. 11RRPlx81, 82. The records are filled with statements that Jack was suffering from paranoia, confusion, disorientation, and having delusional thoughts. 11RRPlx82 at PLF064633, PLF 064634, PLF064637, PLF064638.

Leshin testified that he did not know that Jack was admitted to a psychiatric hospital for delusions and paranoia only nine days after signing the March 2000 Will. 7RR31, 35-36. Further, when Jack signed the new estate planning documents in March and April of 2000, Jack had had no contact with his family and was only around Ted Anderson and Pam Rucker, a former girlfriend. 3RR153-54.

**Bexar County Guardianship and related litigation.** By repudiating the Blanco County temporary guardianship, Ted forced the Archers to file a new guardianship proceeding. 11RRPlx18. In May 2000, David Archer and Carol Archer Bugg filed the Bexar County guardianship proceeding, seeking an independent person as guardian of Jack's estate and person. 3RR144-46; 11RRPlx18. Jack's attorneys contested the guardianship, contending Jack was competent and did not need a guardianship. 3RR147.

While the Bexar County guardianship was pending, the Archers discovered for the first time, that they had been disinherited and that the several people had taken money from Jack since his stroke. 6RR23; 11RRPlx21, 12RRPlx218. In

14

particular, the Archers learned that the attorneys Ted hired were being paid from Jack's assets without court approval. 7RR106; 11RRPlx21.

Medical evidence detailed impact of Jack's stroke. During the guardianship proceeding, the Archers also learned about the extent of Jack's medical condition.

In addition to the psychiatric hospital records, Jack's medical records chronicled the severe impact that his August 1998 stroke had on his mental capacity. One of Jack's treating physicians, Dr. Faulk, wrote in November 1999 that Jack was "obviously unable to control his estate in his current condition, and will require assistance in having his wishes carried through." 11RRPlx68. A court-appointed doctor, Dr. Lichtenstein, who examined Jack in September 2000, reported that Jack's stroke rendered him mentally and physically incapacitated and in need of a guardian. 11RRPlx88. Dr. Lichtenstein examined Jack again in June 2001 and reaffirmed his earlier opinion. 11RRPlx104. Dr. Still testified that in May 2001 Jack was not able to speak. 7RR91. Dr. Faulk, opined in June 2001 that Jack was "incapacitated to handle any of his affairs" "by any standard medical or legal." 11RRPlx105. Jack's in-chambers interview with the Bexar County probate judge in January 2001 and his July 2001 deposition further demonstrated Jack's severely diminished capacity. 4RR220-21; 11RRPlx27, 11RRPlx93 at 61-86.

The Archers' medical expert witnesses, Dr. Richard Coons and Dr. William Dailey, both opined that Jack was incapacitated and in need of a guardian from the

15

date of his stroke in August 1998 onward. 4RR200, 248-49; 5RR109-10; 11RRPlx105. Dr. Dailey testified that Jack's lack of mental capacity would have been obvious to lay people who came in contact with Jack. 4RR276.

Probate court appoints temporary guardians. The probate court appointed Pam Rucker, Jack's former girlfriend, as temporary guardian of his person. 11RRPlx189. As temporary guardian, Pam refused to allow the Archers to visit Jack and forced the family to seek court-ordered visitation to see their uncle. 3RR151; 7RR120-21.

The probate court appointed J.R. Hamilton as temporary guardian of Jack's estate. 11RRPlx190. Hamilton's April 2001 accounting listed Jack as having no assets, and that all of his assets were held in trust. 12RRPlx218. The accounting gave the Archers their first indication that they had been disinherited. 3RR149; 12RRPlx218.

May 2001 Will. While the Bexar County guardianship proceeding was pending, Ted had Jack sign another will and an amendment to the Trust. 11RRPlx192, Plx194. The May 2001 Will and the trust amendment removed Hamilton as executor and successor trustee, and replaced him with Ted's son, T. Mark Anderson. 6RR160-61; 11RRPlx192, Plx194. Jack signed another guardianship directive that disqualified the Archer family from serving as guardian. 11RRPlx193.

Archers change their attorney's fees agreement.  After learning that they had been disinherited, the Archers changed their attorney's fee arrangement with their law firm from hourly to a contingent fee in November 2001.  6RR22. The contingency fee was based on getting the Archers reinstated as beneficiaries.  It reinstated, the law firm would receive a percentage of the value of Jack's estate, including monies brought into Jack's guardianship estate through lawsuits against Ted and the attorneys he had hired.  6RR23-26; 11RRPlx22 at 2-3.

**Lawsuits filed in the Bexar County guardianship.**  The Archers filed several lawsuits within the guardianship to challenge the validity of the Trust and to try to recover the hundreds of thousands of dollars that had been taken from Jack since his stroke.  3RR154-55; 4RR38-39.

Lawsuit over the validity of the Trust and settlement with the charities.  The existence of competing wills – one leaving Jack's estate to the Archers and three wills and a trust leaving Jack's entire estate to the charities – set the stage for a will contest.  6RR64-65, 68-69.  Rather than pursue a costly, contentious will contest, the Archers filed a declaratory judgment action to determine the validity of the Trusts while Jack was still alive.  3RR157-58; 6RR70-71; 11RRPlx23.  Contrary to Appellants' assertion, the Archers did not "sue the Christian Charities."  Appts. Br. at 14. As named beneficiaries in the Trust, the charities were necessary parties to the declaratory judgment action.  6RR62-63.

Lawsuits against parties who had wrongfully taken money from Jack: The Archers filed three lawsuits against individuals who had taken advantage of Jack after his stroke. These lawsuits were filed in November 2001 by Appellee Sherri Archer Loveday, derivatively on Jack and his guardianship estate's behalf, against the following defendants 3RR154-55; 4RR38-39; 7RR121-22:

1)   Hearne Sr., Leshin, Adami, and Anderson for legal malpractice 12RRDx12;

2)   Ted Anderson and Pam Rucker for breach of fiduciary duty and for intentional infliction of emotional distress 12RRDx13; and

3)   J.R. Hamilton, as temporary guardian of Jack's estate, and the bond company for breach of duty by failing to obtain court approval of expenses and for paying expenses from Jack's trust 7RR117-18, 123; 12RRDx14.

Lawsuit for tortious interference with inheritance. The Archers also filed a lawsuit for tortious interference with inheritance against Ted, Hearne Sr., and Leshin in February 2003. CR98-117. The probate court abated the lawsuit until after Jack died because generally, a tortious interference with inheritance claim does not ripen until death. 6RR15-17.

Contrary to Appellants' characterization, the Archers were very successful in the Bexar County guardianship and related litigation. Appts. Br. at 10. First, as a result of the lawsuit against Pam Rucker, she resigned as guardian, and the probate court appointed Appellee Carol Archer Bugg as Jack's permanent guardian of the person.; 3RR164-6; 7RR123-24; 11RRPlx25. The Archers also got J.R. Hamilton

18

removed as temporary guardian of Jack's estate. 7RR117-18, 120. The probate court granted the Archers' request for an independent guardian of the estate and appointed Robert McIntyre as guardian of Jack's estate. 3RR166; 7RR102-03; 12RRPlx240.

Second, by challenging the validity of the post-stroke Trust and settling with the charities, the Archers nullified the estate-planning documents that Ted, and others working with Ted, had Jack sign that disinherited the family. 7RR102-03. The Archers and the charities reached a settlement before Jack died and thus, avoided a will contest. 4RR35-36; 11RRPlx23. The charities agreed to not file Jack's post-stroke wills for probate, leaving Jack's 1991 Will in place. 11RRPlx23 at 9-13. The Archers had to give much more to the charities than Jack's 1991 will left to the charities. The Archers paid the twelve designated charities $588,054 over and above what Jack's 1991 Will left them. 3RR159-61; 11RRPlx24, Plx30, 12RRPlx241[5].

Finally, the lawsuits filed against Hearne Sr., Adami, and Hamilton resulted in hundreds of thousands of dollars being returned to Jack's guardianship estate in settlements with. 6RR60-62; 12RRPlx241.

---

[5] Plaintiffs' Exhibit 241 is not in numerical order in the Reporter's Record. App. C. It is found before Plx222.

**Remainder of Jack's life.**  As a result of the Archers' efforts, Jack returned to living on his ranch, near his brother Richard.  7RR102-03.  Carol remained his guardian for the rest of his life.  3RR166-68.  Jack was never put in a psychiatric hospital after Carol became his guardian.  3RR168.  After the Archers moved Jack back to his ranch, Jack never heard from Ted.  3RR169.

Jack died on April 17, 2006.  3RR170; 11RRPlx28. Jack's 1991 Will was probated and the Archers received the inheritance Jack intended for them to have. 3RR174; 11RRPlx27, Plx36. Regaining their inheritance, however, came at a significant monetary cost.

**The Travis County case**.  In the underlying lawsuit here, the Archers sought the difference between what they actually received from Jack's estate and what they would have received had Ted not tortiously interfered. CR654-710.  The Archers sought as damages the amount paid to get themselves reinstated as beneficiaries:  1) their attorney's fees paid in the Bexar County litigation of $2,865,928 and 2) the amount paid to settle with the charities of $588,054, for a total of $3,453,982. 6RR79; 7RR102-03; 12RRPlx241. App. C.

The Archers originally brought the tortious interference lawsuit in the Bexar County guardianship.  Once Jack died, the Bexar County probate court lost jurisdiction over the tortious interference lawsuit and dismissed it.  6RR15-16. The

Archers then refiled in Travis County based on defendant Doug Hearne Sr.'s residence in Travis County. 6RR15-17; CR5-25.

Ted died on March 28, 2006, while this lawsuit was pending. T. Mark Anderson and Christine Anderson, the Co-Executors of Ted M. Anderson's Estate, substituted as defendants.

**May 2013 trial.** After settlements with Leshin and Hearne Sr.'s estate, the Archers proceeded to trial on May 13, 2013 against T. Mark Anderson and Christine Anderson, as co-executors of Ted's estate. On May 23, the jury returned its verdict and found that Ted tortiously interfered with the Archers' inheritance. Appellants do not dispute this finding on appeal. The jury awarded damages as follows:

| Plaintiff's Uncontroverted Evidence of Damages | | Jury's Damage Award | |
|---|---|---|---|
| Attorney's fees & litigation expenses | $2,865,928 | Attorney's fees & litigation expenses | $2,865,928 – 30% = $2,006,150 |
| Settlement with charities | + $588,054 | Settlement with charities | $0 |
| **$3,453,982** | | **$2,006,150** | |

CR1470-71; 6RR42, 56-58, 11RRPlx24; 12RRPlx241. App. B, C.

**Post-verdict motions.** The Archers filed a motion for partial JNOV, seeking the $588,054 paid to the charities and the full amount of their attorney's fees paid in the prior litigation. CR749-1197; 1140-96; 1198-1208. The district court denied the Archers' motion on July 17, 2013. CR1209; App. H.

Appellants also filed motions for partial JNOV, conceding that the Archers proved the settlement with the charities of $588,054. CR1210-1218, 1264-1275; App. I, J.

The district court implicitly granted Appellants' motion for JNOV, and signed a Final Judgment that awarded the Archers $588,054 in addition to the $2,006,150. CR1470-1471; App. B. Applying settlement credits and prejudgment interest, the district court's Final Judgment awarded the Archers $2,564,899.90 plus interest. CR1470-1471; 1461; App. B, K.

Appellants filed their notice of appeal. CR 1507-1509. The Archer Family filed their notice of appeal to raise their cross-issues, seeking the full amount of their damages proved as a matter of law. CR1510-1512.

Appellants filed no supersedeas bond.

## SUMMARY OF THE ARGUMENT

Appellants raise four primary issues on appeal. Appellants have waived in the district court or in their brief on appeal at least some part of their argument under each issue.

The jury found that Ted tortiously interfered with the Archers' inheritance. That fact finding is not challenged on appeal. Instead, Appellants contend that Ted's tortious conduct is not actionable. Contrary to Appellants' argument, Texas law has long recognized a cause of action for tortious interference with inheritance when a person by fraud, duress, or other tortious means prevents another person from receiving an inheritance from a third party that she would otherwise have received.

The district court correctly awarded the Archers their attorney's fees incurred in prior litigation as a result of Ted's tortious conduct as damages. As Texas Supreme Court precedent holds, attorney's fees and litigation expenses incurred in prior litigation with a third party are recoverable as actual damages.

In addition to their attorney's fees, the district court properly awarded an additional $588,054 to jury's verdict of $2,006,150. Appellants conceded in their post-verdict motions that the Archers established the $588,054 as the amount paid to settle with the charities.

Finally, the district court properly calculated prejudgment interest. Well-established law prohibits tolling of prejudgment interest as argued by Appellants.

23

By cross issue, the Archers seek the entire amount of their attorney's fees paid in the prior litigation that were proved as a matter of law. Appellants offered no evidence or expert witness to controvert the Archers' attorney's fees evidence.

For these reasons and those set out below, the district court correctly signed a final judgment on liability. The Archers request modification and rendition of judgment on their full damages proved as a matter of law. Alternatively, the Archers request the Court affirm the Final Judgment on liability and damages.

## ARGUMENT AND AUTHORITIES

**I.    The Archers followed well-established Texas law when they sued Ted Anderson for tortious interference with their inheritance. [Responsive to Issue 1]**

Appellants do not challenge, and thus concede, that Ted tortiously interfered with the Archers' inheritance. Appellants urge this Court to conclude, however, that there is no cause of action for tortious interference with inheritance. Appellants' briefing error waives this Court's review. Even considering Appellants' waived argument, Texas law has long recognize tortious interference with inheritance as a cause of action.[6]

---

[6] Appellants only filed a general denial. CR62-65. Appellants raised the affirmative defense of whether tortious interference with inheritance is a recognized cause of action for the first time in their amended motion for partial JNOV filed July 25, 2013, more than two months after the verdict. CR1264-1275. App. J.

## A.      Appellants' briefing error waives Issue 1.

According to Appellants, 1) Texas law does not recognize a cause of action for tortious interference with inheritance, and 2) if the tort exists, it does not apply to attorneys.  Appellants have waived both arguments.

In support of their first argument, Appellants cite no authority for their contention that tortious interference with inheritance does not exist.  TEX. R. APP. P. 38.1(i). Their only authorities cited—*King v. Acker* and *Meduna v. Holder*— demonstrate that the tort *does* exist.  Appellants make no argument to distinguish these and other controlling authority.  Appts. Br. at 21. *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 81 (Tex. App.—San Antonio 2011, no pet.).  Thus, this argument is waived.

In their second argument that tortious interference with inheritance does not apply to attorneys, Appellants rely on evidence from the appellate record, but do not cite to any place in the over 9,000-page record. (The Clerk's Record is 2917 pages and the Reporter's Record is 6311 pages).   Appts. Br. at 21-23.  Accordingly, Appellants have waived Issue 1.  *See* TEX. R. APP. P. 38.1(i) (brief must contain a clear and concise argument with appropriate citation to authorities and to the record).  The failure to provide substantive analysis or cite authority waives the complaint. *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d at 81. This Court has no duty

to review a voluminous record without guidance from an appellant to determine if an issue raised constitutes reversible error. *Keyes Helium Co. v. Regency Gas Servs., L.P.*, 393 S.W.3d 858, 861 (Tex. App.—Dallas 2013, no pet.); *Bullock v. American Heart Ass'n*, 360 S.W.3d 661, 665 (Tex. App.—Dallas 2012, pet. denied) (appellate court has no duty or right to perform an independent review of the record and applicable law to determine whether there was error).

Accordingly, this Court should overrule Issue One. Alternatively, if this Court considers Issue 1, both of Appellants' arguments fail.

## B. Appellants concede Ted tortiously interfered with the Archers' inheritance.

The jury found that Ted Anderson tortiously interfered with the Archers' inheritance from Jack Archer. CR646-53, 650. App. A. Appellants do not challenge the jury's liability finding. Appts. Br. at 21-23.[7] Unchallenged jury findings are binding on appeal. *Wilson v. Texas Parks & Wildlife Dept.*, 853 S.W.2d 825, 832 (Tex. App.—Austin 1993), *rev'd on other grounds*, 886 S.W.2d 259 (Tex. 1994); *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d at 81. Thus, Issue 1 is a legal question answered by well-established law in Texas that requires no review of the evidence.

---

[7]Appellants further cannot raise sufficiency in their Reply Brief. TEX. R. APP. P. 38.3; *Sunbeam Envtl. Servs., Inc. v. Texas Workers' Comp. Ins. Facility*, 71 S.W.3d 846, 851 (Tex. App.—Austin 2002, no pet.).

## C. Texas law recognizes a cause of action for tortious interference with inheritance.

Appellants fail to cite a single case to support their argument that the tortious interference with inheritance does not exist. Appts. Br. at 21-23.

Tortious interference with inheritance was first recognized in *King v. Acker*, 725 S.W.2d 750, 754 (Tex. App.—Houston [1st Dist.] 1987, no writ). App. F. There, King's second wife forged a power of attorney and a will, while King was in a coma and then attempted to transfer $400,000 in stock from King to herself. *Id.* 751-52. A jury found that the second wife tortiously interfered with children's and first wife's inheritance. *Id.* at 752.

On appeal, the court held "that a cause of action for tortious interference with inheritance rights exists in Texas." *Id.* at 754. The Houston First Court of Appeals in part relied on the Restatement of Torts which states that,

> One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.

*Id.* (citing RESTATEMENT (SECOND) OF TORTS §774B (1979)). The court also recognized that in equity, "the law affords a remedy for every invasion of a legal right." *King v. Acker*, 725 S.W.2d at 754 (citing *Chandler v. Welborn*, 156 Tex. 312, 319, 294 S.W.2d 801, 807 (1956)) ("where there is a right, there is a remedy").

27

In the twenty-eight years since *King v. Acker*, neither the Texas Supreme Court, nor any court of appeals, has found that tortious interference with inheritance is not a valid cause of action.

This Court has twice recognized the tort. In *Neill v. Yett*, this Court acknowledged the holding in *King v. Acker*, but did not comment substantively on the tort because the cause of action was barred by limitations. 746 S.W.2d 32, 35 (Tex. App.—Austin 1988, writ denied). In *Meduna v. Holder*, this Court set out the jury instruction for a tortious interference claim. No. 03-06-00484-CV, 2008 WL 1911184 at *2 (Tex. App.—Austin Apr. 30, 2008, pet. denied) (mem. op.) (trial court submitted issue on whether party had "tortiously interfered with Ruth's inheritance- 'by undue influence, fraud, or other wrongful means, intentionally prevent[ing] another from receiving an inheritance or gift that she would otherwise have received.'").

Other courts of appeals have likewise recognized tortious interference with inheritance. *In re Estate of Valdez*, 406 S.W.3d 228, 233 (Tex. App.—San Antonio 2013, pet. denied); *In re Estate of Russell*, 311 S.W.3d 528, 535 (Tex. App.—El Paso 2009, no pet.); *Brandes v. Rice Trust, Inc.*, 966 S.W.2d 144, 149-50 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). The United States Supreme Court has also concluded that Texas law recognizes tortious interference with inheritance. *Marshall v. Marshall*, 547 U.S. 293, 313 (2006).

28

Finally, the Texas Estates Code confirms the existence of tortious interference with inheritance. Estates Code § 54.001 provides that "the filing or contesting in probate court of a pleading relating to a decedent's estate does not constitute tortious interference with inheritance of the estate." TEX. ESTATES CODE § 54.001(a) (former Probate Code §10C). Section 54.001(a) permits a party to assert a will contest without the proponents of the challenged will accusing the contestants of tortious interference with inheritance. Section 54.001(a) would be meaningless if tortious interference with inheritance was not a viable, recognized cause of action in Texas. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) (Court must not interpret a statute in a manner that renders any part of the statute meaningless or superfluous); *Rogers v. Texas Bd. of Architectural Examiners*, 390 S.W.3d 377, 387 (Tex. App.—Austin, no pet.) (same).

**D. Legal malpractice privity rule does not apply in tortious interference with inheritance cases.**

In their second argument, Appellants contend that a tortious interference with inheritance claim cannot be brought against an attorney. Appts. Br. at 21-23. Appellants rely on a single case, *Barcelo v. Elliott*, that has no application here.

In *Barcelo v. Elliott*, the Texas Supreme Court held in a legal malpractice case that an attorney drafting a will or a trust owes no duty of care to the beneficiaries. *Barcelo v. Elliott*, 923 S.W.2d 575, 579 (Tex. 1996). The rule in *Barcelo* applies

29

when 1) an attorney who 2) drafted a will or trust 3) is being sued for legal malpractice. None of these facts is present here.

First, when the Archers sued Ted, he was no longer an attorney. He had resigned his license to practice law four years before the Archers brought their tortious interference lawsuit. 11RRPlx148. Second, Ted did not draft the wills or trusts at issue. 6RR164-65. It was undisputed that Leshin prepared the post-stroke wills and trusts that Jack signed. 11RRPlx167, Plx177. Third, the Archers did not sue Ted for legal malpractice; they sued Ted for tortious interference with inheritance. CR98-117, 654-719. Finally, tortious interference with inheritance is not based on the existence of a duty. *See King v. Acker*, 725 S.W.2d at 752-54 (duty is not an element of tortious interference with inheritance).

Accordingly, because tortious interference with inheritance is long-recognized in Texas jurisprudence, this Court should overrule Issue 1.

**II.   The Archers are entitled to their attorney's fees and litigation expenses incurred in the Bexar County litigation as damages. [Responsive to Issues 2-4]**

Appellants raise three arguments to the district court's award of attorney's fees and expenses paid by the Archers in prior litigation as damages:  1) attorney's fees cannot be recovered as damages, (Appts. Br. at 23-27);  2) the Archers had a duty to segregate attorney's fees and failed to meet their burden, (Appts. Br. at 27-

29); and 3) the evidence is legally and factually insufficient to show the reasonableness and necessity of the Archers' attorney's fees, (Appts. Br. at 29-31).

As set out below, well-established Texas law refutes Appellants' first argument. Appellants have waived their second and third arguments.

**A. Texas jurisprudence recognizes recovery of attorney's fees incurred in prior litigation as damages.**

Because of Ted's tortious conduct in having Jack change his estate plan and disinherit the Archers, the Archers had to hire attorneys and pursue litigation to reinstate their uncle's original estate plan set out in Jack's 1991 Will. The Archers put on undisputed evidence that they incurred $2,865,928 in attorney's fees and litigation expenses in the Bexar County guardianship litigation to get themselves reinstated as Jack intended. 6RR42, 52-53; 12RRPlx241. App. C. Texas law allows the Archers to recover those attorney's fees and litigation expenses incurred in prior litigation with a third party as actual damages. *Lesikar v. Rappeport*, 33 S.W.3d 282, 306 (Tex. App.—Texarkana 2000, pet. denied).

Texas follows the "American Rule" that attorney's fees are only recoverable if provided by contract or by statute. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. National Dev. & Research Corp.*, 299 S.W.3d 106, 120-23 (Tex. 2009); *New Amsterdam Cas. Co. v. Texas Indus., Inc.*, 414 S.W.2d 914, 915 (Tex. 1967). The American Rule does not apply, however, where a party is seeking attorney's fees incurred in a prior case that were caused by a third party. *Akin, Gump*, 299 S.W.3d

31

at 120; *Noell v. City of Carrollton*, 431 S.W.3d 682,715-16 (Tex. App.—Dallas 2014, pet. denied). Attorney's fees may be recoverable, however, under equitable principles. *Nationwide Mut. Ins. v. Holmes*, 842 S.W.2d 335, 341 (Tex. App.—San Antonio 1992, writ denied).

The Texas Supreme Court in *Turner v. Turner* addressed an equitable exception to the general rule called the "tort of another exception." 385 S.W.2d 230, 233 (Tex. 1964). App. G. Under the "tort of another exception,"

> One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

RESTATEMENT (SECOND) OF TORTS §914 (1979); *see also Turner*, 385 S.W.2d at 234.

Under *Turner*, a plaintiff can recover attorney's fees as damages if: 1) the plaintiff was involved in litigation with a third party (the "first suit"); 2) the plaintiff incurred reasonable and necessary attorney's fees in good faith during the litigation; 3) the litigation was the natural and proximate consequence of defendant's tortious conduct; and 4) the plaintiff sought recovery of attorney's fees from defendant in a later suit (the "second suit"). *See Turner*, 385 S.W.2d at 234; *see also* RESTATEMENT (SECOND) OF TORTS § 914(2) (1979); *Standard Fire Ins. v. Stephenson*, 963 S.W.2d 81, 90 (Tex. App.—Beaumont 1997, no pet.); *Massey v. Columbus State Bank*, 35 S.W.3d 697 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

32

Applying the rule in *Turner*, the Archers were involved in litigation with third parties [the "first suit" is the declaratory judgment action involving the charities in the Bexar County guardianship] (11RRPlx23); the Archers incurred reasonable and necessary attorney's fees in good faith during the litigation [through a contingency fee contract] (12RRPlx241); the prior litigation was a natural and proximate consequence of Ted's tortious conduct in interfering with Jack's estate plan and causing Jack to disinherit the Archers entirely in favor of the charities (3RR76-78); and the Archers sought recovery of the attorney's fees and other monies they were forced to pay in the prior litigation from Ted in a later lawsuit [the "second suit" is the underlying lawsuit] (CR654-719).

Numerous cases have cited the rule in *Turner* and awarded attorney's fees as damages. In *Standard Fire Ins. v. Stephenson*, a surviving spouse sued her deceased husband's workers' compensation carrier for bad faith following the husband's work-related death. The wife prevailed in the bad faith case (the second suit) and was awarded as damages her attorney's fees paid to pursue the workers' compensation claim (the first suit). 963 S.W.2d at 90 (citing *Texas Beef Cattle Co. v. Green*, 883 S.W.2d 415, 430 (Tex. App.—Beaumont 1994), *rev'd on other grounds*, 921 S.W.2d 203 (Tex. 1996).

In *Massey v. Columbus State Bank*, the plaintiff incurred over $100,000 in attorney's fees in defending false and defamatory complaints lodged by the

33

defendant (the first suit.) Citing *Turner*, the court of appeals concluded that "as a result of these wrongful acts, the Bank was forced to spend $104,000 responding to and defending against all of these complaints and grievances. The trial court properly allowed these attorney's fees as an element of actual damages." (in the second suit). 35 S.W.3d at 702.

In *Arlitt v. Patterson*, following a six-year will contest, the family sued their attorneys for negligence in connection with the attorney's estate-planning services. Citing *Turner*, the court of appeals recognized that "contractual or statutory authorization is not necessary to recover attorney's fees and costs as damages." 995 S.W.2d 713, 721 (Tex. App.—San Antonio 199, pet. denied), *disapproved on other grounds by, Belt v. Oppenheimer, Blend, Harrison & Tate*, 192 S.W.3d 780 (Tex. 2006). The court reversed a summary judgment denying the attorney's fees.

Other cases recite the rule, but conclude the party requesting attorney's fees as damages failed to meet one of the requirements. This Court, citing *Lesikar* and *Massey*, recognized that, in equity, attorney's fees may be awarded as damages. *Pacesetter Pools, Inc. v. Pierce Homes, Inc.*, 86 S.W.3d 827, 833-34 (Tex. App.—Austin 2002, no pet.). The Court, however, concluded that equitable principles did not apply where one tortfeasor sought to recover its attorney's fees from another tortfeasor. Because attorney's fees as damages must involve an innocent party, the attorney's fees were denied. *Id.*

34

In *Lesikar v. Rappeport*, the defendants breached fiduciary duties owed to the plaintiff by wrongfully transferring oil and gas leases to themselves. *Lesikar*, 33 S.W.3d at 306. The defendants' conduct forced plaintiff to incur attorney's fees to contest the transfers. The court of appeals set out the standard for recovering attorney's fees as damages because of the wrongful act of a defendant that forces a plaintiff to incur attorney's fees. *Id.* Plaintiff was ultimately not awarded fees because she failed to put on evidence of the reasonableness and necessity of her attorney's fees. *Id.* at 307.

Appellants cited cases miss the mark. Their cases do not meet the elements to recover attorney's fees as damages: *Wein v. Sherman* involved an attempt to attorney's fees in a "first suit" and not in a "second suit." No. 03-10-00499-CV, 2013 WL 4516013 at *__ (Tex. App.—Austin August 23, 1013, no pet.); *Tana Oil & Gas Corp. v. McCall*, 104 S.W.3d 80, 81-83 (Tex. 2003) involved an attorney seeking to recover attorney's fees for defending himself; *Naschke v. Gulf Coast Conference*, 187 S.W.3d 653, 655 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) involved an incorrect charge in an attorney's fees as damages case; *Peterson v. Dan Witter Reynolds, Inc.,* 805 S.W.2d 541, 549 (Tex. App.—Dallas 1991, no writ) has been rejected by later Dallas cases, *Noell v. City of Carrollton*, 431 S.W.2d 682, 715-16 (Tex. App.—Dallas 2013, pet denied); and *Cupples Coiled Pipe, Inc. v. Esco Supply Co.*, 591 S.W.2d 615, 619 (Tex. Civ. App.—El Paso 1979, writ ref'd

n.r.e.) and *Dalton S.S. Corp. v. W.R. Zanes & Co.*, 354 S.W.2d 621, 624 (Tex. Civ. App.—Fort Worth 1962, no writ) both requested attorney's fees in a "first suit" and did not involve a "second suit."

Accordingly, under *Turner* and the other cases set out above, the Archers are entitled to recover their attorney's fees as damages from earlier litigation in Bexar County caused by Ted's undisputed tortious conduct.

## B. Appellants waived their argument about segregation of attorney's fees.

Assuming segregation is an issue in an attorney's fees as damages case, which the Archers dispute, Appellants waived any argument about the segregation of attorney's fees.

Appellants objected to the Archers' attorney's fees evidence solely on the ground that the Archers could not recover attorney's fees as damages. 6RR13-17. Appellants made no objection to the evidence on the basis of segregation. *Id.* Further, Appellants made no objection to the damage question in the charge based on segregation or on any other basis. 9RR94-95; App. L.

To preserve error on the failure to segregate attorney's fees, the challenging party must either object to the attorney's fees evidence on the basis of the failure to segregate or object to the charge, pointing out the failure to segregate attorney's fees; otherwise, the issue is waived. *Lesikar v. Rappeport*, 33 S.W.3d at 306; *Rice v.*

36

*Gregory*, 780 S.W.2d 384, 389 (Tex. App.—Texarkana 1989, writ denied); *see also*

*Matthews v. Candlewood Builders, Inc.*, 685 S.W.2d 649, 650 (Tex. 1985).

Appellants also waived their segregation argument on appeal. Appts. Br. at

28-29. Appellants' argument purports to refer to the record, but contains no record

citations. Instead, it states "(RR   )" and "(CR  )" with no page references. This is

waiver. TEX. R. APP. P. 38.1(i). This Court has no duty to review a voluminous

record without guidance from an appellant to determine if an issue raised constitutes

reversible error. *Keyes Helium Co. v. Regency Gas Servs., L.P.*, 393 S.W.3d at 861.

*Bullock v. American Heart Ass'n*, 360 S.W.3d at 665 (appellate court has no duty or

right to perform an independent review of the record and applicable law to determine

whether there was error). This is particularly true given that the record in this appeal

is over 9,000 pages.

**C.    Segregation of attorney's fees does not apply in an attorney's fees as damages case.**

Alternatively, even considering Appellants' waived argument, segregation of

attorney's fees has no application here. Segregation is based on some attorney's fees

being recoverable (by contract or by statute) and some attorney's fees being not

recoverable. Attorney's fees as damages, on the other hand, are based on a plaintiff

being involved in litigation with a third party because of defendant's tortious conduct

and incurring attorney's fees. *See Turner*, 385 S.W.2d at 234. Further, the Archers

did not seek their attorney's fees in this case. They only sought as damages their attorney's fees incurred in the prior litigation.

When recovering attorney's fees as damages from a prior lawsuit, the only issue is whether the attorney's fees were reasonable and necessary. *Lesikar v. Rappeport*, 33 S.W.3d at 306; *Powell v. Narried*, 463 S.W.2d 43, 46 (Tex. Civ. App.—El Paso 1971, writ ref'd n.r.e.); *see also Texas Beef Cattle Co. v. Green*, 883 S.W.2d at 430 (recovery of attorney's fees as damages does not require segregation when there are multiple parties involved). In an attorney's fees as damages case, courts do not address whether the underlying lawsuit involved a claim for attorney's fees under a contract or by statute. *Rice v. Gregory*, 780 S.W.2d at 389; *Lesikar*, 33 S.W.3d at 306. None of Appellants' cited authorities on segregation were attorney's fees as damages cases. Appts. Br. at 27-28.

Appellants' waived argument on segregation is refuted by the record. First, the Archers' witness on attorney's fees testified that the Archers' attorney's fees could not have been segregated because of the substantial overlap in the guardianship proceeding and related lawsuits. 6RR63-64. All of the legal work was intertwined. 6RR29; 12RRPlx211, Plx212. The Archers' ability to settle with the charities was based on the legal work performed in Jack's contested guardianship proceeding, during which the Archers developed their proof that Jack lacked mental capacity when he signed the post-stroke wills and trusts.

38

The core issue in all of the litigation was Jack's mental capacity when the various documents were signed and Ted's taking advantage of Jack's lack of capacity.

Second, Appellants' contention that some of the lawsuits the Archers pursued in the Bexar County guardianship did not involve Ted and thus supports segregation of fees, is also refuted by the record. As record reflects, Ted was the source for *all* of the litigation that the Archers were forced to pursue involving their uncle.

Ted's tortious conduct in having Jack change his estate plan pitted the Archers against the charities in what would have been a will contest. 6RR64-65; 11RRPlx23. Ted's tortious conduct caused Jack to sign three post-stroke wills and two trusts that disinherited the Archers in favor of the charities. 11RRPlx166, Plx171, Plx172, Plx192, Plx194. There would have been no dispute had Ted not gotten Jack to change his 1991 Will.

Ted's tortious conduct in having Jack sign the new wills and trusts also precipitated the other lawsuits that the Archers filed derivatively on Jack and his estate's behalf. The other litigation the Archer family pursed was a direct result of being disinherited. Ted hired and directed the attorneys (Leshin, Adami, and Hearne Sr.) and Hamilton, all of whom were sued and paid settlements in the Bexar County lawsuits. 6RR71-72; 11RRPlx119, Plx122, Plx142, Plx143, Plx146, Plx151, Plx154, Plx155, Plx157, Plx165, Plx167, Plx170, Plx172, Plx179, Plx183; 12RRPlx227, Plx241. App. C.

39

Ted wired $400,000 from Jack's bank account to Hearne Sr. to pay all of the attorney's fees. 6RR74. These fees were eventually reimbursed to Jack's estate as a result of the Archers' lawsuit. 6RR60-62. Ted instructed Leshin to put J.R. Hamilton in as trustee of Jack's Trust. 6RR71-72. Hamilton also settled and paid money back to Jack. That is, without Ted wanting to change Jack's estate plan, Leshin, Hearne, Sr., Adami, or J.R. Hamilton would not have been involved.

As Appellee Carol Archer Bugg testified, but for Ted's conduct, her family would not have been in years of litigation and been forced to pay millions in attorney's fees and settlement money simply to obtain what their Uncle Jack had always intended. 3RR176-178.

Appellants offered no evidence on the issue of segregation.

Every lawsuit the Archers were forced to pursue in the Bexar County guardianship was directly tied to Ted, and without Ted's tortious conduct, the Archers would not have been forced to pursue. Accordingly, there is no basis to segregate attorney's fees on the basis that Ted was not involved.

## D. Appellants waive their sufficiency of the evidence argument.

Appellants argue that the evidence was legally and factually insufficient to show the reasonableness and necessity of the Archers' attorney's fees. Appts. Br. at 29-31. Appellants' argument consists of two conclusory statements without citation to the record. A sufficiency of the evidence point must cite to the record or the issue

40

is waived. *Rendleman v. Clarke*, 909 S.W.2d 56, 58-59 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd as moot) (sufficiency point waived by failure to refer to reporter's record). This Court has no duty to perform an independent review of the record and applicable law to determine whether there was error. *Green v. Kaposta*, 152 S.W.3d 839, 841 (Tex. App.—Dallas 2005, no pet.); *Brandon v. Am. Sterilizer Co.*, 880 S.W.2d 488, 493-94 (Tex. App.—Austin 1994, no writ). Accordingly, Appellants waive their sufficiency argument. TEX. R. APP. P. 38.1(i).

> **E. The evidence is factually and legally sufficient as to the reasonableness and necessity of the Archers' attorney's fees.**

In the event the Court considers Appellants' waived argument, the evidence is legally and factually sufficient to show reasonableness and necessity of the Archers' attorney's fees.

Appellants do not attack the sufficiency of the evidence on the amount of the attorney's fees paid by the Archers or the amount of damages the jury found. Appts. Br. at 29-31. Instead, Appellants attack only the evidentiary foundation of the reasonableness and necessity of the Archers' attorney's fees.

This Court reviews a factual sufficiency point by considering all of the evidence to determine if there is some evidence supporting the finding, and then determines whether the finding is so weak or against the overwhelming weight of the evidence as to be manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). This Court can sustain a legal sufficiency challenge only if: "(a) there is a

complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004).

The evidence here is both legally and factually sufficient to support the Archers' attorney's fees as being reasonable and necessary. After the Archers presented extensive testimony on the amount of attorney's fees paid for the Bexar County litigation, (*see infra* II.F. at 51) Frank Ikard, one of the attorneys who represented the Archers throughout the Bexar County litigation, provided expert testimony as to the reasonableness and necessity for the attorney's fees. 7RR94-139.

Ikard testified that he had practiced law for more than 40 years and in the fiduciary litigation area for more than 20 years. 7RR108. Ikard explained the nature of the problems and issues in the case from the outset, as well as the strategies and work pursued on the Archers' behalf. 7RR96-97, 110-25.

Ikard went through the Texas Disciplinary Rules 1.04(b) to support the reasonableness and necessity of the attorney's fees. 7RR110-25. Ikard explained that the fee arrangement was originally hourly but then changed to a contingent fee. 7RR106-07. Ikard's firm represented the Archers for close to a decade. 7RR110.

Ikard testified about the number of hours spent on the case and the expenses incurred. 7RR110. Ikard explained the novelty and complexity of the issues, beginning with the difficulty in trying to serve Jack in the original guardianship proceeding because he was being moved from location to location to avoid service. 7RR110-11; 11RRPlx17. A further complicating and novel factor was that Jack had five attorneys agreeing in court that he needed a guardian. 7RR112-13. While the attorneys tried to memorialize the agreement, Ted fired the attorneys and hired another one to repudiate the agreement calling for a guardian. *Id.* This imposed additional expense and difficulty and forced the Archers to refile the guardianship. 7RR112, 114-15. According to Ikard, it was novel and unusual to have someone in Jack's position in an agreed guardianship and, when the guardianship agreement was repudiated, to have Jack put all of his assets in trust with Jack as trustee. 7RR112-13.

Another complicating factor in the case was the court-appointed temporary guardian of the estate, J.R. Hamilton, who eventually was removed because he failed to file statutory reports on the ward's estate. 7RR117-18. After Hamilton, there were a series of temporary guardians. 7RR120. Another unusual matter was that the court-appointed temporary guardian of Jack's person refused to allow the Archers to visit him. 7RR120-21. This forced the Archers to seek court-ordered visitation. 7RR121. Another complicating factor was that Hearne Sr. obtained $400,000 from

Jack's bank account through Ted and used the money to pay the attorneys representing Jack, without court approval. 7RR121-22. Hearne Sr. was eventually ordered to repay this money. *Id.*

Further, Ikard testified to the successes obtained by his firm's representation of the Archers. 7RR110-25. Ikard testified to the amount involved and the results obtained. 7RR95. In particular, the Archers were reunited with their uncle, the post-stroke wills were set aside, Bugg became Jack's guardian, and an independent third party became the guardian of Jack's estate. 7RR102-03. The Archers were also successful in recovering monies that had been wrongfully taken from Jack. 7RR105, 122-24.

Finally, Ikard testified that the attorney's fees incurred and paid by the Archers were both reasonable and necessary. 7RR110-26; 125-26. Ikard also testified that the forty-percent contingency fee was usual and customary in Travis County for the kind of legal worked performed on the Archers' behalf. 7RR125-26.

Appellants made no attempt to attack Ikard's credentials, credibility, or his opinions on the reasonableness of and necessity for the attorney's fees the Archers paid. 7RR126-39.

Further, Ikard's expert opinion was uncontroverted. Appellants offered no witness or other evidence on the issue of the attorney's fees that the Archers paid in the prior litigation.

Accordingly, the evidence was both legally and factually sufficient to support the reasonableness and necessity for the Archers' attorney's fees and litigation expenses paid in the prior litigation. Thus, this Court can affirm the damage award in the Final Judgment. As set out below, the Archers seek additional damages. This Court should overrule Issues 2, 3 and 4.

**F.      The district court erred in denying the Archers' motion for partial JNOV on the full amount of attorney's fees proved as a matter of law. [Cross Issue 1]**

By cross-issue, the Archers seek the full amount of their attorney's fees paid in the prior litigation as damages that were proved as a matter of law, but which were not awarded by the district court. The Archers seek the entire amount of attorney's fees paid in the prior litigation of $2,865,928, along with the $588,054 awarded by the district court in post-verdict motions. CR1461. App. K.

**The Archers' damage model:**

The following damage discussion relates to the arguments under II.F. and III.C. *See infra* III.C at 60. The Archers put on uncontroverted evidence of their total damages of $3,453,982. This amount consisted of the settlement with the charities of $588,054 and the $2,865,928 in attorney's fees paid. The jury's damage award reduced the Archers' attorney's fees damages by thirty percent and (as addressed in III. C. below) entirely omitted the $588,054 paid to settle with the charities. By making these two deductions, the resulting damages in the verdict are $2,006,150:

| Plaintiff's Uncontroverted Evidence of Damages | | Jury's Damage Award | |
|---|---|---|---|
| Attorney's fees & litigation expenses | $2,865,928 | Attorney's fees & litigation expenses | $2,865,928 – 30% = $2,006,150 |
| Settlement with charities | + $588,054 | Settlement with charities | $0 |
| **$3,453,982** | | **$2,006,150** | |

CR1470-71; 6RR42, 56-58, 11RRPlx24; 12RRPlx241. App. B, C.

Because their damages evidence was uncontroverted, the Archers filed a motion for partial JNOV and sought the entire amount of their attorney's fees and the settlement with the charities. After a hearing, on July 17, 2013, the district court denied the Archers' motion for partial JNOV.[8] CR1209; App. H.

This Court reviews a district court's ruling on a motion for JNOV under a legal sufficiency standard. *Helping Hands Home Care, Inc. v. Home Health of Tarrant County, Inc.*, 393 S.W.3d 492, 515 (Tex. App—Dallas 2013, pet. denied); *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). To sustain a legal sufficiency challenge, this Court must find: "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence

---

[8] The Archers also requested a partial directed verdict on damages and objected to the charge on this basis. 9RR73-76, 93-94.

conclusively establishes the opposite of the vital fact." *Volkswagen of America, Inc. v. Ramirez*, 159 S.W.3d at 903.

In reviewing a matter of law challenge, this Court first examines the record for evidence that supports the finding, while ignoring contrary evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). If there is no evidence to support the finding, this Court then examines the entire record to determine if the contrary proposition is established as a matter of law. *Id.*

In a legal sufficiency review, the jury is not free to disregard undisputed evidence. With undisputed evidence, the jury may draw whatever inferences they wish as long as more than one inference is possible. *City of Keller*, 168 S.W.3d at 821. If the evidence allows only one inference, neither the jury nor the reviewing court may disregard it. *Id.* at 822. The jury decides issues raised by conflicting evidence, "but where there is evidence upon an issue and there is no evidence to the contrary, then the jury has not the right to disregard the undisputed evidence and decide such issue in accordance with their wishes." *Texas Dept. of Transp. v. Guerra*, 858 S.W.2d 44, 47 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (quoting *Texas & N.O.R. Co. v. Burden*, 146 Tex. 109, 203 S.W.2d 522, 530 (1947)).

### 1. No evidence supports the jury's thirty-percent reduction of the attorney's fees the Archers paid in prior litigation.

The jury reduced the Archers attorney's fees paid in the Bexar County litigation of $2,865,928 by 30%. CR646-653, 651. App. A. This Court's first

47

inquiry is to consider the evidence that supports the jury's verdict that reduced the Archers' attorney's fees paid in prior litigation.

The jury was asked the following question for damages with the following instruction:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiffs for their damages, if any, proximately caused by the tortious interference?
>
> Consider the following element of damages and none other: the difference in value, if any, of the inheritance actually received by Plaintiffs and the value of the inheritance that Plaintiffs would have received from Jack Archer had there been no interference by the Defendant.

CR646-653, 651.[9]

The Archers presented uncontroverted evidence that the amount of attorney's fees and litigation expenses that they paid as a result of the Bexar County litigation was $2,865,928. 6RR42, 52-53, 57; 12RRPlx241. App. C. The Archers further presented expert testimony as to the reasonableness and necessity of those attorney's fees. *See supra* II.E. at 41.

In response to the Archers' evidence, Appellants had the burden to put on contradictory expert evidence. Appellants failed to do so. Instead, Appellants' evidence and entire case went to one issue—Jack's mental status when he signed

---

[9] This question also contained a definition of "proximate cause." CR646-653, 651. App. A.

multiple wills and trusts after his debilitating stroke. None of Appellants' witnesses or documentary evidence addressed the Archers' attorney's fees.

Appellants offered no expert witness on attorney's fees. Expert testimony is required to support an award of attorney's fees. *Woollett v. Matyastik*, 23 S.W.3d 48, 52 (Tex. App.—Austin 2000, pet. denied); *Cantu v. Moore*, 90 S.W.3d 821, 826 (Tex. App.—San Antonio 2002, pet. denied). Appellants had to present expert testimony that the Archers' attorney's fees in the prior litigation were *not* reasonable and necessary. Without expert testimony that the Archers' fees were not reasonable and necessary, Appellants have no basis to attack the amount of the attorney's fees.

Appellants offered no evidence to create a range of damages. *See Gulf States Utils. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (jury can award damages within the range of evidence presented at trial). Appellants offered no evidence to support a thirty-percent reduction in the Archers' attorney's fees paid or to set up a range of damages. Appellants did not adduce any evidence on cross-examination of the Archers' witnesses to support the jury's reduction of attorney's fees paid in the prior litigation. 3RR178-218; 4RR5-32, 51-63; 6RR59-68. Appellants also offered no evidence to support the jury's reduction of the Archers' total damages by approximately 58% ($3,453,982 total damages x 58% = $2,003,309.56).

Further, the jury is not free to arrive at a damages number on their own that is not supported by the evidence or to "pull figures out of a hat." *First State Bank v.*

*Keilman*, 851 S.W.2d 914, 930-31 (Tex. App.—Austin 1993, writ denied); *Mills v. Jackson*, 711 S.W.2d 427, 434 (Tex. App.—Fort Worth 1986, no writ).

In particular, with uncontradicted evidence of attorney's fees, the jury is not free to pick a number. *Smith v. Patrick W.Y. Tam Trust*, 235 S.W.3d 819, 828-29 (Tex. App.—Dallas 2007), *rev'd on other grounds*, 296 S.W.3d 545 (Tex. 2009). In *Smith*, the Trust sued the Smiths as guarantors on a lease when the lessee defaulted, and sought actual damages of $200,000 and $47,438.75 in attorney's fees. 235 S.W.3d at 828-29. The jury awarded $65,000 in damages and no attorney's fees. *Id.* at 822. The trial court rendered judgment on the damages amount and awarded $7,500 in attorney's fees.

The Dallas Court of Appeals vacated the $7,500 attorney's fees award and rendered judgment for the Trust's $47,438.75 in attorney's fees. *Id.* at 829. The Dallas Court of Appeals rejected the Smiths' argument that the jury was entitled to disregard the uncontroverted evidence and award no attorney's fees. In response to the Trust's uncontroverted evidence of its attorney's fees, the Smiths failed to present evidence that the attorney's fees were not necessary or that the Trust's attorney's legal work had no value. *Id.* Accordingly, the court of appeals concluded there was "no evidence to support the jury's finding of no attorney's fees." *Id.* The court of appeals rendered judgment for $47,438.75 in attorney's fees.

The court of appeals noted that the Smiths had ample opportunity to question or challenge the Trust's attorney's fees evidence. *Id.* at 828. The Smiths, however, did not challenge the amount of the fees charged, the nature of the services provided, or whether the amount reflected the nature and complexity of the case. *Id.*

The Texas Supreme Court reversed, but only on the remedy awarded by the court of appeals. *Smith*, 296 S.W.3d at 548. The supreme court recognized the same problem as the court of appeals: "no evidence supported the jury's refusal to award any attorney's fees (as the court of appeals correctly noted)." *Id.* The supreme court, however, concluded that the remedy had to be a remand to consider the amount of attorney's fees in light of the reduction in actual damages. *Id.*

Applying the reasoning in *Smith*, the jury was not free to disregard the Archers' uncontradicted evidence that they paid $2,865,928 in attorney's fees and litigation expenses in the prior litigation and arbitrarily pick another number with no evidentiary basis. Thus, no evidence supports the jury's 30% reduction of attorney's fees that the Archers paid in the earlier litigation in Bexar County by apportioning liability.

**2.      The Archers proved the entire amount of their attorney's fees paid in the Bexar County litigation as a matter of law.**

After reviewing the evidence in support of the jury's verdict, this Court must then consider all of the evidence to determine whether the Archers established their

51

damages as a matter of law. *Dow Chem. Co.,* 46 S.W.3d at 241; *Allman,* 314 S.W.3d at 673.

The Archers' attorney's fees paid in the prior litigation was uncontroverted. A jury may not disregard uncontroverted evidence. *Alice Leasing Corp. v. Castillo,* 53 S.W.3d 433, 445 (Tex. App.—San Antonio 2001, pet. denied).

Three witnesses testified about the amount of attorney's fees paid by the Archers. First, Bugg testified about the contentiousness of the litigation from its inception until its conclusion. 3RR140-147, 151-155, 157-164. According to Bugg, when the Archers could no longer pursue the litigation on an hourly basis, they converted to a contingency fee. 3RR155-156.

Mary Haught, one of the Archers' former attorneys, provided a detailed explanation of the attorney's fees and litigation expenses that the Archers paid to be reinstated as beneficiaries under Jack's will. 6RR26-53. Haught explained that the Archers converted from an hourly fee arrangement to a contingency fee after learning of the disinheritance. 6RR22-26. The contingency fee was based on getting the Archers reinstated as beneficiaries and then the law firm received a percentage of the value of Jack's estate, including monies brought into Jack's guardianship estate through lawsuits against Ted and the attorneys he had hired. 3RR155-56; 6RR23-26; 11RRPlx22 at 2-3. The law firm further agreed to sue the various people who had taken money from Jack and receive a percentage of any of that recovery.

6RR23-26. When the contingency fee contract was entered, the Archers knew they had been disinherited. 6RR24.

Haught then explained the contingency fee calculation. 12RRPlx241. App. C.[10] The calculation began with calculating the total value of Jack's estate. Using the estate tax return that valued Jack's estate at $3,848,678 and an agreed upon value for Jack's ranch of $3,730,866, the total estate value of Jack's estate was $7,579.544. 6RR26-29; 12RRPlx202, Plx241. Monies received as a result of the Bexar County guardianship lawsuits were added to the total estate value. 6RR29-32; 12RRPlx203 (Adami settlement), Plx204(Hearne Sr. settlement), Plx205, Plx206, Plx207 (Hamilton settlement), Plx241.

Because the calculation is based on money that was actually received by the Archer Family, monies that the Archers had to pay to probate Jack's will and the monies paid to settle with the charities were subtracted. 6RR32-35; 12RRPlx241. This left $7,256,058 as "litigation proceeds."

The firm's expenses of $538,096 and the fees paid the Archers of $118,454 were subtracted. 6RR36-39, 39-40; 12RRPlx209, Plx241. This calculation left $6,599,508 as the amount to which the contingency fee percentage was applied. 6RR40; 12RRPlx241. The firm's forty-percent contingency fee was $2,639,803.20

---

[10]  Plaintiffs' Exhibit 241 is not in numerical order in the Reporter's Record. App. C. It is found before Plx222.

plus expenses of $538,096, which came to a total fee due the law firm of $3,177,899. 6RR40-41; 12RRPlx241. App. C. The Archers and the law firm negotiated the total fee down to $2,865,928. 6RR42,52-53; 12RRPlx241. At the end of the day, the Archers paid $2,865,928 in attorney's fees to Ikard & Golden. 6RR53; 12RRPlx 241. Haught went on to explain how the firm was paid as set out on Plx241 page 2. 6RR29-32, 40-53.

Finally, as set out above, and incorporated here by reference to avoid repetition, Frank Ikard testified as the reasonable and necessity of the $2,865,928 in attorney's fees paid by the Archers. *See supra* II.E. at 41.

Through the testimony of Bugg, Haught, and Ikard, and the exhibits during their respective testimony, the Archers proved as a matter of law the amount of the attorney's fees the Archers paid in the prior litigation: $2,865,928. The evidence supports only one inference.

Appellants had every opportunity to challenge the Archers' evidence on the attorney's fees portion of damages. The Archers' evidence of damages was not called into question on cross-examination and was never controverted. "Clear, direct, and uncontroverted evidence of attorney's fees is taken as true as a matter of law, especially when the opposing party has the means and opportunity to disprove the testimony." *B&W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 20-21 (Tex. App.—

Houston [1st Dist.] 2009, pet. denied). Appellants do not challenge the amount of attorney's fees paid on appeal.

A reasonable juror could have disregarded the undisputed evidence of $2,865,928 as the amount the Archers paid in attorney's fees. Accordingly, the district court erred in denying the Archers' motion for partial JNOV.

Thus, in addition to seeking an affirmance of the Final Judgment of liability, the Archers request that the Court sustain their Cross Issue 1 and render judgment that the district court should have rendered on their total attorney's fees paid in the prior litigation and proved as a matter of law of $2,865,928, in addition to the $588,054 that the district court awarded post-verdict.

In the alternative, based on the legal and factual sufficiency of the evidence of attorney's fees discussed above, the Archers request that this Court affirm the Final Judgment on liability and damages.

## III. The district court properly granted Appellants' motion for partial JNOV and awarded the Archers the amount paid to settle with the charities. [Responsive to Issue 5]

Appellants complain of the district court's award of an additional $588,054 in damages to settle with the charities. As set out above in the damage model chart, the jury's award omitted the $588,054 that the Archers paid to settle with the charities. *Supra* II.F. at 45-46. Appellants have waived this issue. Even considering

the waived issue, the district court correctly modified the jury's damage award and awarded the Archers' additional damages.

## A.    Appellants' briefing error waives appellate review.

In Issue 5, Appellants cite no authority, make no cites to record, and offer no cogent arguments.  Appts. Br. at 31-32.  *See* TEX. R. APP. P. 38.1(i) (brief must contain a clear and concise argument with appropriate citation to authorities and to the record).  The failure to provide substantive analysis or cite authority waives the complaint.  *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 75.  Further, this Court has no duty to review a voluminous record without guidance from an appellant to determine if an issue raised constitutes reversible error.  *Keyes Helium Co. v. Regency Gas Servs., L.P.*, 393 S.W.3d at 861.  Accordingly, Issue 5 is waived.

## B.    Appellants' post-verdict motions waive appellate review.

Appellants' post-verdict motions, which unqualifiedly urged the district court to award the Archers the additional damages of $588,054, waive this Court's review.

In their motion for partial JNOV, Appellants agreed without reservation that the Archers proved their settlement with the charities cost them $588,054 and that the district court should revise the Jury's Verdict:

> For the reasons given above, Defendants respectfully urge the Court to grant their Motion for Partial Judgment Notwithstanding the Verdict, and modify the jury's finding on damages to reflect *the only element properly proved*, that is, $588,054.00, the amount paid by Plaintiffs in settlement with the charities in the prior litigation . . . . .

CR1210-18, 1217 (emphasis added); App. I

After the district court heard and denied the Archers' motion for partial JNOV on July 17, 2013 (CR1209), and after the Archers pointed out that Appellants had conceded the Archers were entitled to the $588,054 in additional damages on July 18, (CR1235-51), Appellants filed an amended motion for partial JNOV on July 25, but still affirmatively acknowledged that the Archers proved the settlement with the charities number:

> In the alternative [if the district court concluded tortious interference with inheritance is a valid cause of action], Defendants urge the Court to grant their Motion for Partial Judgment Notwithstanding the Verdict, and *reduce the jury's finding on damages to $588,054.00, the amount paid by Plaintiffs in settlement with the charities in the prior litigation* . . . .

CR1264, 1273 (emphasis added); App. J

When district court signed the Final Judgment, only Appellants' amended motion for JNOV remained pending (along with both parties' briefs in support of a prejudgment interest calculation). CR1276, 1278-1469, 1252, 1260. Accordingly, the district court implicitly granted Appellants' amended motion for JNOV when the court signed the Final Judgment and added $588,054 to the jury's $2,006,150. CR1470-71; *see* TEX. R. APP. P. 33.1(a)(A); *Allstate Prop. & Cas. Ins. v. Gutierrez,* 281 S.W.3d 535, 539 (Tex. App.—El Paso 2008, no pet.) (final judgment implicitly denied motion for leave to amend pleadings); *Mason v. Mason*, No. 07-12-00007,

57

2014 WL 199649 at \*6 (Tex. App.—Amarillo Jan. 13, 2014, no pet. (mem. op.) (final judgment implicitly granted post-verdict request for pre-judgment interest).

Applying settlement credits and prejudgment interest, the Final Judgment awarded the Archers $2,564,899.90 plus post-judgment interest. CR1235, 1461, 1470-71. App. B, K.

For several reasons, Appellants' post-verdict motions waive this Court's review of the district court's award of the $588,054 in damages.

First, Appellants failed to preserve their complaint in the trial court. In both motions for partial JNOV, Appellants requested, without qualification, the district court to award $588,054 to the Archers. CR1217, 1273. App. I, J. Appellants never preserved the argument they now raise on appeal. CR 1210-18, 1264-75; *see First Nat'l Bank v. Fojtik*, 775 S.W.2d 632, 633 (Tex. 1989); *Smith v. East*, 411 S.W.3d 519, 528-29 (Tex. App.—Austin 2013, pet. denied) (to preserve right to complain about judgment, motion must state its disagreement with the content and result of the judgment); *Bray v. Tejas Toyota, Inc.*, 363 S.W.3d 777, 787 (Tex. App.—Austin 2012, no pet.) (same). Appellants never stated in their motions for JNOV, as required by this Court in *Smith* and *Bray*, that they specifically reserved the right to complain on appeal about the $588,054 in damages. Accordingly, the failure to comply with the rule in *Fojtik/Smith/Bray* results in waiver of Issue 5.

Second, Appellants invited the alleged error of which they now complain. A party may not invite error by asking "something of a court and then complain that the court committed error in giving it to him." *Northeast Tex. Motor Lines, Inc. v. Hodges*, 138 Tex. 280, 158 S.W.2d 487, 488 (1942); *Bluestar Energy, Inc. v. Murphy*, 205 S.W.3d 96, 101 (Tex. App.—Eastland 2006, pet. denied). Appellants unqualifiedly requested the district court to award the Archers $588,054, and the district court did precisely what Appellants requested. Thus, the invited error doctrine bars this Court's review of Issue 5.

Finally, Appellants judicially admitted the $588,054 in damages. A judicial admission is a clear, deliberate, and unequivocal statement that "occurs when an assertion of fact is conclusively established in live pleadings, making the introduction of other pleadings or evidence unnecessary." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000). A judicial admission bars the party from disputing the admitted fact. *Id.*

The judicial admission doctrine applies not only to pleadings, but also to post-trial filings and even statements made in an appellate brief. *Jansen v. Fitzpatrick*, 14 S.W.3d 426, 431 (Tex. App.—Houston [14th Dist.] 2000, no pet); *City of San Antonio v. Hardee*, 70 S.W.3d 207, 212 (Tex. App.—San Antonio 2001, no pet.).

Appellants' statement in their motions for partial JNOV of the "amount paid," and "properly proved" damages of $588,054 are judicial admissions. CR1217, 1273. App. I, J. Accordingly, Appellants waive appellate review of Issue 5.

## C. The Archers proved the settlement with the charities amount as a matter of law. [Cross Issue 2]

Alternatively, even considering Appellants' waived Issue 5, the district court properly granted Appellants' JNOV and awarded the Archers the settlement with the charities amount. In the event this Court sustains Issue 5 and reverses the district court's award of $588,054, and to avoid rendition of judgment on the verdict, the Archers bring a cross issue on the amount of damages paid to settle with the charities. *See* TEX. R. APP. P. 38.2(b); TEX. R. CIV. P. 324(c).

This Court reviews a JNOV under a legal sufficiency standard. When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which the party had the burden of proof, it must show that the evidence establishes as a matter of law all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex. 2001); *Allman v. Butcher,* 314 S.W.3d 671, 673 (Tex. App.—Dallas 2010, no pet.). If there is no evidence to support the finding, the court of appeals then reviews the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem. Co.,* 46 S.W.3d at 241; *Allman,* 314 S.W.3d at 673.

60

In a legal sufficiency review, the jury is not free to disregard undisputed evidence. With undisputed evidence, the jury may draw whatever inferences they wish as long as more than one inference is possible. *City of Keller*, 168 S.W.3d at 821. If the evidence allows only one inference, however, neither the jury nor the reviewing court may disregard it. *Id.* at 822. The jury decides issues raised by conflicting evidence, "but where there is evidence upon an issue and there is no evidence to the contrary, then the jury has not the right to disregard the undisputed evidence and decide such issue in accordance with their wishes." *Texas Dept. of Transp. v. Guerra*, 858 S.W.2d at 47 (quoting *Texas & N.O.R. Co. v. Burden*, 146 Tex. 109, 203 S.W.2d 522, 530 (1947)). A jury may not disregard uncontroverted evidence. *Alice Leasing Corp. v. Castillo*, 53 S.W.3d at 445.

This Court may affirm the JNOV only if there is no evidence to support the jury's finding or as here, the evidence establishes a contrary answer as a matter of law. *Arlington Home, Inc. v. Peak Envtl. Consultants, Inc.*, 361 S.W.3d 773, 779 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Thus, this Court can affirm the district court's award of $588,054 if the evidence establishes that number as a matter of law.

### 1. No evidence supports awarding zero damages for the settlement with the charities.

This Court's first inquiry is to consider the evidence that supports the jury's verdict that reduced the Archers' damages by the amount of the settlement with the charities. *See Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003).

The Archers' settlement with the charities reinstated them as beneficiaries of Jack's estate. Had there been no settlement with the charities, the charities would have offered for probate the wills Jack signed in 2000 and 2001 that disinherited the Archers. 6RR64-65; 11RRPlx23 at 8. With multiple wills offered for probate, the Archers would have been forced into more costly litigation. 6RR64-65. By settling with the charities, however, the Archers insured that Jack's 1991 Will would be probated and that the post-stroke wills would not be offered for probate. 11RRPlx23 at 8.

The Archers paid the twelve charities $588,054, over and above what Jack's pre-stroke will gave them. 6RR34-35; 12RRPlx241. App. C. The pre-stroke will gave the charities sixty percent of Jack's oil and gas interests, valued at $93,522. 12RRPlx241. The Archers gave the charities Jack's coin collection valued at $510,028 and paid the charities' attorney's fees as part of the settlement. 3RR159-61; 11RRPlx24.

Appellants offered no evidence to assail the amount the Archers paid to settle with the charities and offered no evidence or argument to exclude the settlement with

the charities from the Archers' total damages. Appellants failed to refute Appellee Bugg's or Haught's explanation of the need to settle to avoid a will contest with the charities. 3RR178-218; 4RR5-32, 51-63; 6RR59-68. The evidence was uncontroverted. The jury cannot pick a number that was not supported by the evidence. *First State Bank v. Keilman*, 851 S.W.2d at 930.

Accordingly, no evidence supports excluding the amount of the settlement with the charities and awarding zero damages for that portion of the Archers' damages. The only evidence was that the Archers paid $588,054 to settle with the charities and avoid a will contest. Again, no evidence supported the jury's reduction of the Archers' total damages by approximately 58%.

### 2. The Archers proved as a matter of law that they paid $588,054 to settle with the charities.

After reviewing the evidence in support of the jury's omission of the settlement with the charities number, this Court must then consider all of the evidence to determine whether the Archers proved their settlement with the charities as a matter of law. *Dow Chem. Co.,* 46 S.W.3d at 241; *Allman,* 314 S.W.3d at 673.

Bugg testified extensively about the settlement with the charities. 3RR157-163. The Family Settlement Agreement and the copies of checks paying attorney's fees to the charities further substantiated the amounts the Archers paid to the twelve charities. 11RRPlx23, Plx24.

As Jack's 1991 Will provided, twelve named charities were to split sixty-percent of Jack's mineral interests. 11RRPlx9 at 3-4. Bugg testified that, with the additional wills Jack signed at Ted Anderson's insistence, the Archer family was disinherited entirely in favor of the charities, meaning that the charities would have received Jack's entire estate. 3RR156-157; 4RR33-34; 6RR64-66; 12RRPlx241. Bugg further testified that, because the Plaintiffs knew Jack's long-time estate plan had been to leave the bulk of his estate to his family and that he lacked any mental capacity to change that estate plan after his stroke, the family would have pursued a will contest after Jack's death. 3RR103. The family, however, chose to avoid waiting until Jack's death and instituted a declaratory judgment action to address the multiple wills and multiple trusts before Jack died. 6RR63, 70-71.

Haught also testified about the Archers' settlement with the twelve charities. 6RR53-58; 12RRPlx241. Jack's 1991 Will gave the charities $93,522. 6RR55; 12Plx241. App. C. In settlement with the Archers, the charities also received Jack's coin collection, valued at $510,028. 6RR55; 12RRPlx241. The Archers also paid the charities' attorney's fees in the declaratory judgment. 6RR55-58; 11RRPlx24. According to Haught, because Jack signed the post-stroke wills, the Archers were forced to settle with the charities and pay them the $588,054. 6RR58; CR1470-71. App. B.

64

All the evidence supports the opposite of the jury's finding to omit the charities' settlement amount from the damages awarded. The Archers' evidence of the amounts paid to settle with the twelve charities was uncontroverted and supported only one inference. A reasonable jury could not have disregarded the undisputed evidence of $588,054 as the damages paid to settle with the charities. Accordingly, the Archers proved the $588,054 settlement with the charities as a matter of law. The district court correctly granted Appellants' motion for partial JNOV.

Accordingly, whether based on Appellants' waiver of Issue 5 or the correct ruling of the district court, Appellants' Issue 5 should be overruled and the Archers' Cross Issue 2 sustained.

## IV. The district court properly calculated prejudgment interest. [Responsive to Issues 6 & 7]

The district court calculated prejudgment interest from August 4, 2003 through the date of the Final Judgment. CR1470-71, 1461. App. B, K. Appellants argue that the district court used an incorrect accrual date and that prejudgment interest should have been tolled. Appellants' first argument is waived, and their second argument is refuted by well-established law.

This Court reviews a prejudgment interest award, and in particular the accrual date, under an abuse of discretion standard. *Wilmer-Hutchins Indep. Sch. Dist. v. Smiley*, 97 S.W.3d 702, 707 (Tex. App.—Dallas 2003, pet. denied); *Brookshire*

65

*Grocery Co. v. Smith*, 99 S.W.3d 819, 823-25 (Tex. App.—Beaumont 2003, pet. denied).

## A. Appellants waived their prejudgment interest accrual date argument.

Without citing authority or to the record, Appellants contend that "Appellees should not collect prejudgment interest until after filing this suit on July 26, 2007." Appts. Br. at 33. Because Appellants fail to cite any authority, or to the record, and fail to offer any cogent argument, their first argument is waived. *See* TEX. R. APP. P. 38.1(i). Specifically, a party waives its challenge to the starting date for calculation of prejudgment interest by failing to cite "authority to support its calculation or its assertion of a different starting date." *Wilmer-Hutchins Indep. Sch. Dist.*, 97 S.W.3d at 707.

Alternatively, even considering Appellants' waived argument, the accrual date for a prejudgment interest calculation is clear. Prejudgment interest begins accruing the earlier of: (1) 180 days after receipt of written notice of a claim, or (2) the date suit was filed. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528-31, n. 9; TEX. FIN. CODE §§ 304.101; 304.104.

After learning that Jack's estate plan had been changed, the Archers filed suit for tortious interference with inheritance against Ted and others in the Bexar County Guardianship Proceeding on February 5, 2003. CR98-117. That filing put Ted on

notice of the Archers' claim for tortious interference with inheritance claim for purposes of the prejudgment interest calculation.

Without authority, Appellants argue that the Archers could not give notice of their claim until Jack died. Appts. Br. at 33. Contrary to Appellants' argument, the Archers tortious interference claim, and the time to file a lawsuit on the claim, arose long before Jack died.

If a will disinherits a person, a will contest can only be brought after a person dies. TEX. ESTATES CODE §§256.002 (probate of a will of a living person is void), 256.204 (will can only be contested after it is admitted to probate). The theory being that a will can be revoked or revised until a person dies.

The Archers, however, were disinherited in three wills and in a trust. 6RR24; 11RRPlx166, Plx171, Plx172, Plx192, Plx194. All of Jack's assets were placed in the Trust, and when it terminated on Jack's death, all of the assets were to be divided solely among the charities. 6RR153; 11RRPlx171 at 2-3. Because the Trust instrument disinherited the Archers, the Archers had to challenge the Trust's validity (because of Jack's lack of capacity to sign it) instead of waiting for Jack to die and bring a will contest. 6RR70-71.

The Archers discovered the Trust that disinherited them in early 2001. 3RR149; 11RRPlx171; 12RRPlx218. Tortious interference with inheritance has a two-year statute of limitations. *See Hawkins v. Walvoord*, 25 S.W.3d 882, 888 (Tex.

App.—El Paso 2000, pet. denied) (cause of action sounding in tort governed by two-year statute of limitations).

There was a further complicating fact. Jack's attorneys stipulated that Jack was incapacitated as of February 7, 2002. 11RRPlx34. After that date, Jack could not have validly signed a new will or trust. Thus, by February 7, 2002, Jack's estate plan was set.

The Archers faced two dates that started the statute of limitations on their tortious interference with inheritance claim running: the discovery of the Trust and the date of the stipulation of incapacity. The Archers filed suit within two years of the earlier date—the discovery the Trust that disinherited them. CR98-117.

The district court applied the well-established law and calculated prejudgment interest from August 4, 2003, 180 days after the Archers filed their original lawsuit against Ted in Bexar County for tortious interference with inheritance. Appellants offer no legal authority or argument for abandoning the well-established jurisprudence on accrual dates for prejudgment interest calculation. Appts. Br. at 33. Thus, even if not waived, the district court did not abuse its discretion in using August 4, 2003 as the accrual date.

## B. Prejudgment interest cannot be tolled.

Contrary to Appellants' argument, a trial court cannot toll prejudgment interest. The Texas Supreme Court has held that "the *trial court no discretion to*

*lessen or increase the interest amount for delays caused by either party.*" *Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex. 1986) (emphasis added).

Appellants cite four cases in support of their argument that the trial court has discretion to "consider periods of delay caused by the plaintiffs." Appts. Br. at 34. All four cases expressly relied on the since-repealed Finance Code §304.108 or its predecessor, TEX. REV. CIV. STAT. ART. 5069-1.05, §6. *Helena Chemical v. Wilkins*, 18 S.W.3d 744,760 (Tex. App.—San Antonio 2000), *affirmed,* 47 S.W. 3d 486 (Tex. 2001); *Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 242 (Tex. App.—San Antonio 2001, pet. denied); *Southwest Airlines v. Jaeger*, 867 S.W.2d 824, 837 (Tex. App.—El Paso 1993, writ denied); and *Johnson & Higgins of Texas Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 529-32 (Tex. 1998).

Under *former* Finance Code §304.108(b), a trial court could, in its discretion, toll prejudgment interest in wrongful death, personal injury, and property damage cases. *AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 511 (Tex. App.—Fort Worth 2009, no pet.). The legislature, however, repealed §304.108(b) in 2003. *Id.*[11] The 2003 repeal of Finance Code §304.108 stripped trial courts of any

---

[11] The legislature's action applies "in any case in which a final judgment is signed or subject to appeal on or after the effective date of this Act." Act of May 16, 2003, 78th Leg., R.S., ch. 204, § 6.04, 2003 TEX. GEN. LAWS 847, 862. The Act took effect on September 1, 2003, Act of June 2, 2003, 78 Leg., R.S., ch. 204, § 23.02(a), 2003 TEX. GEN. LAWS 847, 898-99.

discretion to toll prejudgment interest during periods of delay. *Id.* Trial courts also have no equitable power to toll prejudgment interest. *Id.*

The repeal of the repeal of Finance Code §304.108(b) leaves the common law in place. *Pilgrim's Pride Corp. v. Burnett*, No. 12-10-00037, 2012 WL 381714, at *14-15 (Tex. App.—Tyler Feb. 3, 2012, no pet.) (mem. op.). Under the common law, "the trial court has no discretion to lessen or increase the interest amount [or otherwise toll the accrual of prejudgment interest] for delays caused by either party." *Id.* (citing *Matthews v. DeSoto*, 721 S.W.2d at 287).

Accordingly, the district court properly refused to toll prejudgment interest. This Court should overrule Appellants' Issues Six and Seven.

## PRAYER FOR RELIEF

For these reasons, Appellees/Cross-Appellants respectfully request that this Court:

- affirm the Final Judgment as to liability;

- sustain their Cross Issue 1, and render judgment for their total attorney's fees paid in the prior litigation of $2,865,928, as proved as a matter of law, in addition to the $588,054 awarded by the district court in post-verdict motions, for a total damages of $3,453,982; and

- direct the district court (by mandate or remand) to recalculate the judgment in light of the new damage amount awarded on appeal.

Alternatively, Appellees/Cross-Appellants request that the Court affirm the district court's Final Judgment on liability and damages. Appellees/Cross-Appellants pray for all other and further relief to which they may be entitled.

Respectfully submitted,

IKARD GOLDEN JONES, P.C.

/s/ *Laurie Ratliff*
Laurie Ratliff
State Bar No. 00784817
Frank N. Ikard, Jr.
State Bar No. 10386000
Lauren Davis Hunt
State Bar No. 24059657
400 West 15th Street, Suite 975
Austin, Texas 78701
Telephone: (512) 472-6695
Telecopier: (512) 472-3669
Laurieratliff@igjlaw.com

ATTORNEYS FOR APPELLEES
RICHARD T. ARCHER, DAVID R. ARCHER, CAROL ARCHER BUGG, JOHN V. ARCHER, KAREN ARCHER BALL AND SHERRI ARCHER

## CERTIFICATE OF COMPLIANCE WITH TRAP 9.4(i)(3)

I hereby certify that this *Appellees/Cross-Appellants' Brief* contains a total of 16,033 words excluding the parts exempted under TEX. R. APP. P. 9.4(i)(1), as verified by Microsoft Word 2013. This brief is therefore in compliance with TEX. R. APP. P. 9.4(i)(2)(B) as modified by this Court's August 7, 2014 order that granted Appellee/Cross-Appellant's motion to file a combined brief with the page limits applicable to both briefs.

Dated: February 6, 2015

*/s/ Laurie Ratliff*

Laurie Ratliff
*Counsel for Appellees*

**CERTIFICATE OF SERVICE**

In accordance with the Texas Rules of Appellate Procedure, I hereby certify that a true and correct copy of the *Appellees' Brief*, was served on the following counsel of record on this 6th day of February 2015:

***By e-service and email***
Gerald D. McFarlen
THE LAW OFFICE OF GERALD D. MCFARLEN, P.C.
28 Fabra Oaks Road
Boerne, Texas 78006
gmcfarlen@mcfarlenlaw.com

*Attorneys for Appellants/Cross-Appellees*

*/s/ Laurie Ratliff*

# APPENDIX

| Tab | Document Description |
|-----|--------------------|
| A | Charge to the Jury CR646-53 |
| B | Final Judgment CR1470-71 |
| C | Damages calculation exhibit Plx241[12] |
| D | Timeline of events Plx223 |
| E | July 29, 1999 "Switch and Turn" letter from Anderson to Adami Plx151 |
| F | King v. Acker, 725 S.W.2d 750 (Tex. App. —Houston [1st Dist.] 1987, no writ) |
| G | Turner v. Turner, 385 S.W.2d 230 (Tex. 1964) |
| H | Order Denying Plaintiffs' Motion for Partial Judgment Notwithstanding the Verdict on the Jury's Damage Finding CR1209 |
| I | Defendants, T. Mark Anderson, Individually and as Co-Executor of Estate of Ted Anderson, and Christine Anderson, as Co-Executor of the Estate of Ted M. Anderson's Motion for Partial Judgment Notwithstanding the Verdict CR1210-1218 |
| J | Defendants, T. Mark Anderson, Individually and as Co-Executor of Estate of Ted Anderson, and Christine Anderson, as Co-Executor of the Estate of Ted M. Anderson's Motion for Judgment Notwithstanding the Verdict, and in the Alternative, Amended Motion for Partial Judgment Notwithstanding the Verdict CR1264-1275 |
| K | Prejudgment interest calculation CR1461 |
| L | Charge Conference, 9RR1-2, 87-95, 177. Defendant's Objections. |

---

[12] Plx241 is found before Exhibit 222.

# App. A

## Cause No. D-1-GN-07-002328

| | | |
|---|---|---|
| RICHARD T. ARCHER, DAVID R. ARCHER, CAROL ARCHER BUGG, JOHN V. ARCHER, KAREN ARCHER BALL, AND SHERRI ARCHER, Plaintiffs | § § § § § § § | IN THE DISTRICT COURT |
| v. | § § § | OF TRAVIS COUNTY, TEXAS |
| T. MARK ANDERSON and CHRISTINE ANDERSON, as co-Executors of the estate of Ted Anderson, Defendants. | § § § § § § § § | |
| | § | 345TH JUDICIAL DISTRICT |

## CHARGE TO THE JURY

MEMBERS OF THE JURY:

1.     This case is submitted to you by asking questions about the facts, which you must decide from the evidence admitted in this trial.

2.     In arriving at your answers, consider only the evidence, including exhibits, admitted in this trial.

3.     In considering this evidence, you are bound to follow the law set forth in this charge, as well as all instructions concerning jurors' conduct that you have been given.

4.     You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

5.     Do not let bias, prejudice, or sympathy play any part in your deliberations.

6.     Do not become a secret witness by telling other jurors about other incidents, experiences, or lawsuits. Do not tell other jurors about any special knowledge, information, or expertise that you may have. You must confine your deliberations to the evidence admitted in the trial.

Filed in The District Court
of Travis County, Texas

MAY 22 2013

At_____3:00 p_____M.
Amalia Rodriguez-Mendoza, Clerk

Filed in The District Court
of Travis County, Texas

MAY 22 2013

At_____2:30 p_____M.
Amalia Rodriguez-Mendoza, Clerk

1

646

7.      This charge includes all legal instructions and definitions that are necessary to assist you in reaching your verdict, so do not seek out any information in law books or dictionaries.

8.      All of the questions and answers are important. No one should say that any question or answer is not important.

9.      Do not decide who you think should win and then try to answer the questions accordingly. Simply answer the questions, and do not concern yourselves with the effect of your answers.

10.      Do not decide the questions by any method of chance.

11.      Do not answer the questions by adding together each juror's figure and dividing by the number of jurors to get an average.

12.      Do not do any trading on your answers. That is, one juror must not agree to answer one question a certain way if other jurors will agree to answer another question another way.

13.      After you retire to the jury room, you will select a presiding juror. You will then deliberate upon your answers.

14.      It is the duty of that presiding juror:
   a.      to preside during the deliberations and to provide order and compliance with the charge;
   b.      to write, sign, and deliver to the court clerk any communication to me;
   c.      to conduct the vote and to participate in that vote; and,
   d.      to write your answers in the spaces provided.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

15.      The answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every part of an answer, including subparts, unless otherwise instructed. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

2

16.     If the verdict is reached by unanimous agreement, the presiding juror will sign the verdict on the certificate page for the entire jury.

17.     If 10 jurors agree on every answer, those 10 jurors sign the verdict. If 11 jurors agree on every answer, those 11 jurors sign the verdict. If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

18.     During your service as jurors, if you observe a violation of my instructions outside the jury room, by either a juror or any other person, you must report that to me.

19.     In your deliberations, any juror who observes a violation of my instructions shall point out the violation and caution the offending juror not to violate the instructions again.

20.     You must not discuss the case with anyone, including other members of the jury, unless all of the jurors are present and assembled in the jury room. If anyone other than a juror tries to talk to you about the case before you reach a verdict, tell me immediately.

21.     When all required questions have been answered, the presiding juror has written your answers on the charge, and the verdict has been signed, you will summon the court clerk and be returned to court with your verdict.

When words are used in this charge in a sense which varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No".

The term **"PREPONDERANCE OF THE EVIDENCE"** means the greater weight and degree of credible testimony or evidence introduced before you and admitted in this case. A preponderance of the evidence is not measured by the number of witnesses or by the number of

3

documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not.

A fact may be established by **"DIRECT EVIDENCE"** or by **"CIRCUMSTANTIAL EVIDENCE"** or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

May 22, 2013
DATE

JUDGE ORLINDA L. NARANJO,
Presiding Judge

4

## QUESTION NO. 1

Did Ted Anderson tortiously interfere with the Plaintiffs' inheritance from Jack Archer?

"Tortious interference" occurs when one, who by undue influence, duress, breach of fiduciary duties, or other wrongful means, intentionally prevents another from receiving an inheritance or gift that they would otherwise have received.

"Undue influence" means that an influence existed and was exerted, the influence undermined or overpowered the mind of the person executing the documents at the time of their execution, and the person would not have executed the documents but for the influence.

"Duress" is any coercion, whether mental, physical, or otherwise, which causes another person to act contrary to his own free will or to submit to a situation or a condition against his own volition or interest.

"Breach of fiduciary duty" occurs where influence has been acquired and abused, and confidence has been reposed and betrayed.

An attorney and an attorney-in-fact owe fiduciary duties. Fiduciary duties may also arise out of an informal relationship, whether the relationship is a moral, social, domestic, or purely personal one, such as where a person that is of advanced age and in poor health relies on and trusts another person for support.

Answer "Yes" or "No." _YES_____

5

If you answered "Yes" to Question No. 1, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 2

What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiffs for their damages, if any, proximately caused by the tortious interference?

> "Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause.
>
> Consider the following element of damages and none other: the difference in value, if any, of the inheritance actually received by Plaintiffs and the value of the inheritance that Plaintiffs would have received from Jack Archer had there been no interference by the Defendant.

Answer in dollars and cents, if any.

Answer: _2,006,150.00_

6

## Cause No. D-1-GN-07-002328

| | | |
|---|---|---|
| RICHARD T. ARCHER, DAVID R. ARCHER, CAROL ARCHER BUGG, JOHN V. ARCHER, KAREN ARCHER BALL, AND SHERRI ARCHER, **Plaintiffs** | § § § § § § | IN THE DISTRICT COURT |
| v. | § § § | OF TRAVIS COUNTY, TEXAS |
| T. MARK ANDERSON and CHRISTINE ANDERSON, as co-Executors of the estate of Ted Anderson, **Defendants.** | § § § § § § § § § | 345TH JUDICIAL DISTRICT |

## CERTIFICATE

We, the jury have answered the above and foregoing questions as herein indicated, and herewith return same into Court as our verdict.

*(To be signed by the presiding juror, if unanimous:)*

_____
Presiding Juror

_____
Printed name of Presiding Juror

*(To be signed by those rendering the verdict, if not unanimous:)*

Jurors' Signatures:                   Jurors' Printed Names:

Mónica Osegueda

Diana Petaia

Rachel Smith

Hanney Dao

Sheryl Fielder

Tonya Woods

7

_____    Betty Austin
_____    Tyler Bybee
_____    FRED WOODWARD
_____    Leslie Villasenor
_____

_____

DATE: _____5/23/13_____

8

# App. B

DC      BK13241 PG398

**CAUSE NO. D–1-GN-07-002328**

| | | |
|---|---|---|
| RICHARD T. ARCHER, DAVID R. ARCHER, CAROL ARCHER BUGG, JOHN V. ARCHER, KAREN ARCHER BALL, AND SHERRI ARCHER, Plaintiffs | § § § § § | IN DISTRICT COURT |
| | § | 345th JUDICIAL DISTRICT |
| v. | § § | |
| DOUGLASS HEARNE, T. MARK ANDERSON, Individually and as co-Executor of the estate of Ted Anderson, CHRISTINE ANDERSON, as co-Executor of the estate of Ted Anderson, And RICHARD LESHIN, Defendants | § § § § § § § | TRAVIS COUNTY, TEXAS |

Filed in The District Court
of Travis County, Texas

ES AUG 1 5 2013

At____9 L1 9___M.

Amalia Rodriguez Mendoza, Clerk

## Final Judgment

On May 13, 2013, the above-styled case was called to trial. Plaintiffs David R. Archer, Carol Archer Bugg, John V. Archer, Karen Archer Ball, and Sherri Archer appeared through their attorneys of record and announced ready for trial. Defendants T. Mark Anderson and Christine Anderson, as Co-Executors of the Estate of Ted Anderson, appeared through their counsel of record and announced ready for trial.

After the jury was impaneled and sworn, it heard the evidence and arguments of counsel from May 13 to May 22, 2013. In response to the Jury Charge, the jury made findings on May 23, 2013, that the Court received, filed, and entered of record. The questions submitted to the jury and the jury's findings are attached as Exhibit A and incorporated by reference.

The Court modifies the jury's damage award to reflect, as additional actual damages, the amount of $588,054.

Final Judgment – page 1

The Court renders judgment for Plaintiffs David R. Archer, Carol Archer Bugg, John V. Archer, Karen Archer Ball, and Sherri Archer.

Therefore, applying settlement credits, the Court orders that Plaintiffs recover damages from Defendants in the sum of $2,564,899.90; prejudgment interest on that sum at an annual rate of 5%, in the sum of $70,272; post-judgment interest on the total sum at an annual rate of 5%, and court costs.

*(handwritten: $80,812.80)*

This judgment disposes of all claims and all parties and is, therefore, a final and appealable judgment.

The Court orders execution to issue for this judgment.

Signed this __15__ day of __August__, 2013.

_____
The Honorable Orlinda Naranjo
Judge Presiding

AGREED TO AS TO FORM ONLY:


_____
Laurie Ratliff
Attorneys for Plaintiffs


AGREED TO AS TO FORM ONLY:


_____
Gerald McFarlen
Attorneys for Defendants


t:\archer 3 2007 tortious interference\trial\final judgment\final judgment on jury verdict & charities # july 18 2013.docx


Final Judgment – page 2



# 419TH DISTRICT COURT

## HEMAN MARION SWEATT TRAVIS COUNTY COURTHOUSE
### P.O. BOX 1748

**ORLINDA L. NARANJO**
Judge
(512) 854-4023

AUSTIN, TEXAS 78767

FAX: (512) 854-2224

**DORA CANIZALES**
Official Court Reporter
(512) 854-9329

**DIANA CAPUCHINO**
Court Operations Officer
(512) 854-4023

**TRENT HIGHTOWER**
Staff Attorney
(512) 854-4029

# FAX COVER SHEET

**Date:**   8/15/13

**To:**   Laurie Ratliff
      Gerald D. McFarlen

**Fax No.:**    *(512) 472-3669*
         *(210) 568-4305*

**From:** Diana Capuchino, Court Operations Officer to Judge Orlinda Naranjo

**Fax No.: 512-854-2224**

**Message:**

_____
_____
_____
_____
_____

**Number of Pages: 4** *Including Fax Cover)*

     **If there is a problem with the transmission of this facsimile, please contact the Court Coordinator, Diana Capuchino at 512-854-4023.**

\*\*\*\*\*\*\*\*\* -5128542224- - \*\*\*\*\* - -TRAVIS CO D.J.- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

- -TRAVIS CO. DIST. JDGS. -

| STN NO. | COMM. | ONE-TOUCH/ABBR NO. | STATION NAME/TEL NO. | PAGES | DURATION |
|---|---|---|---|---|---|
| 002 | OK | ☎ | 85124723669 | 004/004 | 00:00:40 |
| 001 | OK | ☎ | 81210568430S | 004/004 | 00:01:0S |

FILE NO.=102

MODE = MEMORY TRANSMISSION     START=AUG-15 10:03     END=AUG-15 10:0S

\*\*\*\*\*\*\* -COMM. JOURNAL- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE AUG-15-2013 \*\*\*\*\* TIME 10:0S \*\*\*\*\*\*\*



# 419TH DISTRICT COURT

### HEMAN MARION SWEATT TRAVIS COUNTY COURTHOUSE
P.O. BOX 1748

**ORLINDA L. NARANJO**
Judge
(512) 854-4023

AUSTIN, TEXAS 78767

FAX: (512) 854-2224

**DORA CANIZALES**
Official Court Reporter
(512) 854-9329

**DIANA CAPUCHINO**
Court Operations Officer
(512) 854-4023

**TRENT HIGHTOWER**
Staff Attorney
(512) 854-4029

# FAX COVER SHEET

**Date:**   8/15/13

**To:**    **Laurie Ratliff**
       **Gerald D. McFarlen**

**Fax No.:**    *(512) 472-3669*
          *(210) 568-4305*

**From:**   Diana Capuchino, Court Operations Officer to Judge Orlinda Naranjo

**Fax No.: 512-854-2224**

**Message:**

**Number of Pages: 4** *Including Fax Cover)*

     **If there is a problem with the transmission of this facsimile, please contact the Court Coordinator, Diana Capuchino at 512-854-4023.**



**ORLINDA NARANJO**
**Judge**
(512) 854-4023

**DIANA CAPUCHINO**
Court Operations Officer
(512) 854-4023

**TRENT HIGHTOWER**
Staff Attorney
(512) 854-4029

**DORA CANIZALES**
Official Court Reporter
(512) 854-9329

**STEPHANIE WILLIAMS**
Court Clerk
(512) 854-5854

# 419TH DISTRICT COURT

HEMAN MARION SWEATT TRAVIS COUNTY COURTHOUSE
P. O. BOX 1748
AUSTIN, TEXAS 78767
FAX: (512) 854-2224

August 15, 2013

*Via Facsimile (512) 472-3669*
Laurie Ratliff
Attorney for Plaintiffs
Ikard Golden Jones, PC
400 W. 15h St. Suite 975
Austin, Texas, 78701

*Via Facsimile (210) 568-4305*
Gerald D. McFarlen
Attorney for Defendants
The Law Office of Gerald D.
McFarlen, PC
1001 South Main
Boerne, Texas, 78006

**Re:**     **Cause No. D-1-GN-07-2328; Richard T. Archer et al v. Douglass Hearne et al, In the 345th Judicial District Court, Travis County, Texas**

Dear Counsel:

Enclosed is a Final Judgment in the above-referenced matter. The Final Judgment has been stamped and filed with the District Clerk's Office.

If you have any questions regarding this matter, please contact our Court Operations Officer, Diana Capuchino, at (512) 854-4023.

Sincerely,

Trent Hightower
Staff Attorney to Judge Orlinda L. Naranjo
419th District Court, Travis County

Enclosures (1)
xc: Ms. Amalia Rodriguez-Mendoza, District Clerk

# App. C

# CONTINGENCY FEE CALCULATION

<u>"LITIGATION PROCEEDS"</u>

|  |  |
|---|---|
| ESTATE TAX RETURN ASSETS: | $3,848,678 |
| RANCH VALUE: | +<u>$3,730,866</u> |
| TOTAL ESTATE: | $7,579,544 |
| DAMAGES RECOVERED | +$229,000 (Hearne Bexar County settlement) |
|  | +$125,000 (Adami Bexar County settlement) |
|  | +$104,104 (Hamilton Bexar County settlement) |

DEDUCTIONS:

|  |  |
|---|---|
| PROBATE ESTATE COSTS: | -$178,040 |
| PAID TO CHARITIES: | -$93,522   (minerals) |
|  | <u>-$510,028 (coin collection)</u> |
| "LITIGATION PROCEEDS"    = | $7,256,058 |

--------------------------------------------------------------------------------

<u>"FEE CALCULATION"</u>

|  |  |
|---|---|
| LITIGATION PROCEEDS | $7,256,058 |
| LESS:          EXPENSES | -$538,096 (paid by Ikard & Golden) |
|  | <u>-$118,454 (paid by Archers)</u> |
| AMOUNT FOR CONTINGENCY: | $6,599,508 |
| 40%   GROSS CONTINGENCY | $2,639,803.20 [40% of 6,559,508] |
| CONTINGENT FEE PAYABLE | $2,639,803.20 |
| EXPENSES PAYABLE | <u>$538,096</u> |
| TOTAL <u>DUE</u> TO LAW FIRM | $3,177,899 |


PLAINTIFF'S EXHIBIT
241

CONTINGENCY FEE AND EXPENSES <u>DUE</u>: $3,177,899

CONTINGENCY FEE AND EXPENSES ACTUALLY <u>PAID</u>: $2,865,928

    + 16% of oil and gas interests transferred to Ikard & Golden


BREAKDOWN OF HOW FEES WERE PAID:

FEES PAID OR CREDITED BEFORE JACK'S DEATH;

| | |
|---|---|
| PAYMENTS OF FEES AND EXPENSES ON HOURLY BASIS | $307,823.69 |
| HEARNE FEES AWARDED | $229,000 |
| ADAMI FEES CREDITED AS AWARDED | $125,000 |
| HAMILTON FEES AWARDED | $104,104 |
| ARCHER RANCH | <u>$900,000</u> |

TOTAL FEES CREDITED AS PAID
BEFORE JACK ARCHER'S DEATH                        $1,665,928.07


PAID IN CASH AFTER JACK ARCHER'S DEATH      $1,200,000

    +16% of estate's oil & gas interests

TOTAL PAID IN CASH                      $2,865,928

    +16% of estate's oil & gas interests

# App. D

| Timeline | Event |
|---|---|
| 12/30/1982 | Archer Annual Demand Irrevocable Trust |
| 2/28/1991 | Jack Archer's Last Will & Testament |
| 8/25/1998 | Jack Archer's Stroke |
| 8/25/98-10/21/1998 | ICU & Rehab hospital |
| 9/24/1998 | 1st Powers of Attorney Signed (durable & health care) appointing Ted |
| 12/2/1998 | Ted acquires Jack's original 1991 will |
| 12/8/1998 | Ted hires Leshin to draft Archer limited partnership |
| 2/3/1999 | Letter to Dick and Jean |
| 2/15/1999 | Ted meets with Dr. May to discuss Dick |
| 3/30/1999 | Dr. May letter to Dick |
| 4/8/1999 | Ted letter to Jack re: selling ranch |
| 6/11/1999 | Codicil to Jack's will adding 2 new co-executor |
| 6/21/1999 | Ted resigns law license |
| 7/26/1999 | Adami letter to Corpus Christi Judges |
| 7/29/1999 | Ted's letter to Adami re: Jack "may switch and turn" |
| 8/20/1999 | Ikard & Golden engagement letter with Dick Archer |
| 10/12/1999 | Dr. Faulk initial evaluation |
| 10/18/1999 | Dick Archer Application for Appointment of Temp. Guardian in Blanco Cnty |
| 11/4/1999 | Ted and Peggy resign as Jack's attorneys-in-fact under durable PoA |
| 11/10/99-11/19/1999 | Dr. May, Dr. Faulk & Dr. Hines letters to Adami |
| 12/3/1999 | Ted letter to Dick re: evicting Jack |
| 12/29/1999 | Blanco County Guardianship hearing - parties agree to temporary g'ship |
| 2/17/2000 | Kathy Viesca sends proposed order on temporary g'ship |
| 3/15/2000 | Doug Hearne hired as Jack's attorney |
| 3/16/2000 | Ted fires Jack's attorneys Viesca, Adami, Leshin and Mayne |
| 3/19/2000 | Jack executes new will |
| 3/28/00-4/19/00 | Jack admitted to pscyh unit of MS&T hospital |
| 4/25/2000 | Hearne withdraws consent to 12/29/99 Agreement |
| 4/25/2000 | Dr. May interviews Jack re: "testamentary capacity" |
| 4/26/2000 | Dr. Hines examines Jack |
| 4/26/2000 | Jack executes new will, trust, etc. - disinheriting family |
| 5/1/2000 | Jack executes document transfering oil and gas |
| 5/9/2000 | David Archer & Carol Bugg file Bexar County G'ship Application |
| 5/13/2000 | Jack executes 2d financial PoA to Ted; new g'ship directive; healtchare PoA |
| 6/15/00-6/30/00 | Jack admitted to pscyh unit of MS&T hospital |
| 6/20/2000 | Dr. Faulk letter re: Jack has no need for a guardian |
| 7/3/2000 | Assignment, Bill of Sale to Trust |
| 9/16/2000 | Dr. Lichtenstein's 1st report |
| 1/23/2001 | Hearing - Jack examined by Judge in chambers |
| 1/31/01 - 2/8/01 | Jack admitted to MS&T hospital |
| 2/1/2001 | Pam Rucker appointed temporary guardian of Jack's person |
| 2/5/2001 | J.R. Hamilton appointed temporary guardian of Jack's estate |
| 5/16/2001 | Jack signs amended trust, new will, new guardianship directed |
| 6/25/2001 | Dr. Lichtenstein's 2d report |
| 6/27/2001 | Dr. Faulk letter: Jack is incapacitated |
| 7/15/2001 | Jack's deposition |
| 12/31/2002 | Robert McIntyre appointed guardian of Jack's estate |
| 7/21/2003 | Agreement w. Pam Rucker - David & Carol become guardian of Jack's person |



PLAINTIFF'S EXHIBIT 233

Exhibits

| | |
|---|---|
| 4/17/2006 | Jack dies |

# App. E

July 29, 1999   668-8106

Fax 361 — 668-8106

Mr. A. G. Adami, Jr.   668-8101
P. O. Box 331
Alice, Texas 78333

Dear Buster:

The letter to the judges was excellent and I started to fax them the enclosed letter from Dr. Hines, but it was so weak that I didn't think it would be of much help to them.

The thing that I had called you about was in talking to Jack he was coming around to the position that he was about ready consider putting his property into some sort of foundation for the benefit of his favorite charities, concerning which I believe I sent a list to you.

He may switch and turn but I hope that we can continue to encourage him in this direction and since Richard helped me with the limited partnership for the ranch Jack might feel comfortable with suggestions from Richard.

I don't know the size of Jack's estate but over and over the $2,000,000.00 for the ranch, in the limited partnership, probably there is at least another million or so hanging around. I will just wait to hear from you after you have talked to Jack and thought about this.

Best regards.

Sincerely,

Ted M. Anderson

TMA/bdm

TMA 1532



PLAINTIFF'S
EXHIBIT
151

PLF 025385

# App. F



725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

▷

Court of Appeals of Texas,
Houston (1st Dist.).

Lorraine KING, Appellant,
v.
Kendra K. ACKER & Kimberly Jackson, Appellees.

No. 01–86–0227–CV.
Jan. 22, 1987.

Widow appealed from order of the Probate Court No. 3, Harris County, Jim Scanlan, J., entered in favor of children and mother of decedent in action for tortious interference with inheritance. The Court of Appeals, Sam Bass, J., held that: (1) cause of action for tortious interference with inheritance exists under Texas law; (2) findings of tortious interference and conspiracy was supported by the evidence; (3) award of exemplary damages was supported; but (4) plaintiffs could not recover fees paid to handwriting experts, as those were litigation expenses.

Affirmed as reformed.

West Headnotes

**[1] Torts 379 ☞289**

379 Torts
   379III Tortious Interference
      379III(C) Wills, Inheritances, Trusts and Gifts
         379k289 k. In General. Most Cited Cases
(Formerly 379k27)

Finding that decedent's widow tortiously inter-
fered with inheritance of others was supported by finding that she received property pursuant to power of attorney which decedent had not in fact signed.

**[2] Torts 379 ☞295**

379 Torts
   379III Tortious Interference
      379III(C) Wills, Inheritances, Trusts and Gifts
         379k295 k. Evidence. Most Cited Cases
(Formerly 379k27)

Finding that decedent's widow acted with malice in tortiously interfering with inheritance of others was supported by evidence that decedent had not executed power of attorney which widow attempted to use to obtain property.

**[3] Conspiracy 91 ☞19**

91 Conspiracy
   91I Civil Liability
      91I(B) Actions
         91k19 k. Evidence. Most Cited Cases

Finding that decedent's widow conspired with others to tortiously interfere with inheritance rights under will was supported by evidence that decedent had not signed purported power of attorney or will and that widow's attorney had participated in the complained of transactions.

**[4] Equity 150 ☞55**

150 Equity
   150I Jurisdiction, Principles, and Maxims
      150I(C) Principles and Maxims of Equity
         150k55 k. Equity Suffers No Right to Be Without a Remedy. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

Law affords remedy for every invasion of legal right and, under maxim "where there is a right, there is a remedy," equity will not suffer right to be without remedy.

**[5] Torts 379 🔑289**

379 Torts
   379III Tortious Interference
      379III(C) Wills, Inheritances, Trusts and Gifts
         379k289 k. In General. Most Cited Cases
   (Formerly 379k11)

Cause of action exists under Texas law for tortious interference with inheritance rights.

**[6] Damages 115 🔑103**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k103 k. Mode of Estimating Damages in General. Most Cited Cases

In awarding damages for tortious interference with inheritance rights, jury could award amount representing commission paid by temporary administrator to redeem stock which would allegedly not have needed to be redeemed absent the tortious interference.

**[7] Costs 102 🔑187**

102 Costs
   102VII Amount, Rate, and Items
      102k183 Witnesses' Fees
         102k187 k. Experts. Most Cited Cases

Plaintiffs in action for tortious interference with inheritance rights could not recover cost of hand-writing experts, as those were litigation expenses.

**[8] Damages 115 🔑91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(1) k. In General. Most Cited Cases
   (Formerly 115k91(3), 115k91(1))

Upon showing in tort action that defendant acted willfully, maliciously, fraudulently, or with great negligence, there may be recovery of exemplary damages in addition to compensatory damages.

**[9] Conspiracy 91 🔑6**

91 Conspiracy
   91I Civil Liability
      91I(A) Acts Constituting Conspiracy and Liability Therefor
         91k1 Nature and Elements in General
            91k6 k. Damage Caused. Most Cited Cases
   (Formerly 91k1)

Gist of civil conspiracy is wrong that injures another and not conspiracy itself.

**[10] Conspiracy 91 🔑19**

91 Conspiracy
   91I Civil Liability
      91I(B) Actions
         91k19 k. Evidence. Most Cited Cases

Proof of conspiracy can be made by circumstantial evidence.

**[11] Damages 115 🔑15**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
          115III(A)1 In General
            115k15 k. Nature and Theory of Compensation. Most Cited Cases

It is purpose of law, in awarding compensatory damages, to repair wrong that has been done.

**[12] Damages 115 &#8734;151**

115 Damages
    115VIII Pleading
        115k151 k. Grounds for Exemplary Damages. Most Cited Cases

Complaint which alleged that tortious conduct resulting in interference with inheritance rights and specified costs was willfully, unlawfully, and maliciously done adequately pled claim for legal damages sufficient to support award of punitive damages.

**[13] Damages 115 &#8734;94.10(1)**

115 Damages
    115V Exemplary Damages
        115k94 Measure and Amount of Exemplary Damages
          115k94.10 Amount Awarded in Particular Cases
            115k94.10(1) k. In General. Most Cited Cases
    (Formerly 115k94)

Award of $76,096.82 in punitive damages in action for tortious interference with inheritance was supported by evidence that plaintiffs incurred attorney fees in that amount.

**[14] Damages 115 &#8734;94.5**

115 Damages
    115V Exemplary Damages
        115k94 Measure and Amount of Exemplary Damages
          115k94.5 k. Costs of Litigation. Most Cited Cases
    (Formerly 115k94)

Although attorney fees do not ordinarily constitute element of actual damages, jury may consider those fees in fixing amount of exemplary damages.

**[15] Courts 106 &#8734;472.4(4)**

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(A) Courts of Same State
        106VII(A)1 In General
          106k472 Exclusive or Concurrent Jurisdiction
            106k472.4 Probate Courts
              106k472.4(2) Decedents' Estates, Administration of
                106k472.4(4) k. Claims and Proceedings Against Estates and Representatives. Most Cited Cases

Probate court has concurrent, if not exclusive, jurisdiction in actions by or against personal representative. V.A.T.S. Probate Code § 5A(b).

**\*751** William H. Scott, Jr., Houston, for appellant.

William E. Wylie, William E. Wylie, P.C., Tyler, for appellees.

Before SAM BASS, COHEN and DUNN, JJ.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

OPINION

SAM BASS, Justice.

This is an appeal from a jury trial that found the appellant maliciously conspired to tortiously interfere with the inheritance of appellees. Damages awarded were $28,275.00 actual and $76,096.82 exemplary.

We reform and affirm.

Fred T. King, Jr. ("King") had two children, appellees Dahse and Jackson, born to his first wife, Louise King. Appellant, Lorraine King, later married King. King and Lorraine had separated many times and had filed for divorce on one occasion.

In January 1982, King was admitted to a hospital with a severe headache. Dr. Posey saw King on January 4, 1982. King was stable, mentally alert, and had full comprehension. On January 5, 1982, King had surgery for an aneurysm near his brain. Six days later, he became lethargic. On January 13, 1982, some neurological signs showed some deterioration of his **\*752** brain. King lapsed into a coma and passed away on February 4, 1982.

On January 18, 1982, while King was in a coma, Mercurio, appellant's attorney, and appellant attempted to assign 500 shares of Petro-Chem Technical Services stock from King to appellant, using a power of attorney purportedly signed by King on January 4, 1982. Later, this stock was redeemed for $400,000 by a temporary administrator of the estate. The power of attorney was found by the jury *not* to have been signed by King.

In February 1982, Mercurio, attorney for appellant at that time, filed a purported will of King dated January 4, 1982, for probate. Previously, Brad Wright was appointed temporary administrator of King's estate pending a will contest. This will of January 4, 1982, was found by the jury *not* to have been signed by King. Based upon the jury's findings, a final judgment was entered admitting King's will dated June 13, 1977, to probate and appointed appellees as co-independent administratrices.

Lucille Lacy, a documents examiner, was paid $8,275 in connection with examining the 1982 will.

William E. Wylie, a board certified attorney in estate planning and probate law, was paid $76,096.82 in legal fees and expenses.

Appellees, Dahse, Jackson, and Aline L. King, King's mother, brought suit against appellant, Mercurio, Nancy Miller and Frank L. Saye, who witnessed the 1982 will. The cause of action against Mercurio, Miller, and Saye was severed.

Appellees' suit complained that if the 1982 will and the power of attorney had not been forged and filed for probate, there would have been no reason to have a temporary administrator appointed and the $20,000 statutory commission for the sale of the stock by the temporary administrator would not have been paid.

The findings of the jury were that:

1. King did not sign the power of attorney;

2. Appellant tortiously interfered with the inheritance of appellees with malice;

3. Appellees suffered actual damages in the amount of $28,275;

4. Appellant conspired to tortiously interfere with appellees' inheritance; and

5. Exemplary damages in the amount of $76,096.82 were awarded against appellant.

725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

The court entered judgment for $104,371.82 plus interest of 10% per annum.

Appellant appeals upon 23 points of error, 12 of which rely upon no evidence, insufficiency of evidence, or against the great weight of the evidence.

In deciding "insufficiency of evidence" points of error, this Court is required to look at all of the evidence but may find error only if the evidence supporting the contested finding is so weak or the evidence to the contrary is so overwhelming that the finding should be set aside and a new trial ordered. *Dixon v. Van Waters & Rogers,* 674 S.W.2d 479 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.).

In deciding "no evidence" points of error, this Court will consider only that evidence and inferences from the evidence that tend to support the jury's findings, and will disregard all evidence and inferences to the contrary. *Shell Oil Co. v. Waxler,* 652 S.W.2d 454 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). A "no evidence" point is properly sustained only if there is a complete absence of evidence, or no more than a scintilla of evidence to support the contested finding. *Tower View, Inc. v. Hopkins,* 679 S.W.2d 632 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.).

Appellant complains in points of error 1, 2, and 3, that there is no evidence, insufficient evidence, and that the evidence is so contrary to the overwhelming weight and preponderance of the evidence that it will not support the answer to issue 2, which found that appellant had tortiously interfered with the inheritance of appellees to receive property under the 1977 will.

Appellant testified that King called Mercurio to write the 1982 will and the power of attorney; however, the record reveals conflicting testimony from Mercurio and Miller, his secretary, concerning the time **\*753** she was called to type the power of attorney. The testimony shows that appellant used the 1982 power of attorney to enter a safe deposit box to look for the 1982 will. Appellant, under the alleged authority granted by the power of attorney, signed deceased's name to assign 500 shares of stock of Petro-Chem Technical Services to herself while the deceased was in a coma.

[1] Because the jury found that King did not sign the power of attorney, there is sufficient evidence to support the jury's findings that appellant tortiously interfered with the inheritance of appellees to receive property under the 1977 will.

Appellant's first three points of error are overruled.

[2] In points of error 5, 6, and 7, appellant contends that there is no evidence, insufficient evidence, and that the evidence is so contrary to the overwhelming weight and preponderance of the evidence that it will not support issue 4, which found that appellant acted with malice in tortiously interfering with appellees.

The jury obviously did not believe appellant's proffered testimony that King had executed the power of attorney. Thus, the evidence is sufficient to support the finding of issue 4, that appellant acted with ill will, spite, and evil motive in transferring the stock and causing injury by tortiously interfering with appellees.

Appellant's points of error 5, 6, and 7 are overruled.

[3] In points of error 9, 10, and 11, appellant contends that there is no evidence, insufficient evidence, and that the evidence is so contrary to the overwhelming weight and preponderance of the evidence to support issue 5, which found that appellant conspired with one or more persons to tortiously interfere with the inheritance of appellees.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

Mercurio testified that he was present when the 1982 will and the power of attorney were executed, and that he, with the power of attorney, began the process to transfer the 500 shares of Petro-Chem Technical Services stock to appellant. Miller and Saye testified that they observed the execution of the 1982 will. Miller stated that she typed the 1982 will and power of attorney.

The record is full of inconsistencies between the testimony of appellant and that of the other alleged conspirators' testimony. A significant conflict exists in their answers to what, if anything, Mercurio said after the signing of the 1982 will. Miller testified at trial that Mercurio read the self-proving affidavit; however, in her previous deposition, she answered that Mercurio said nothing. Saye testified that Mercurio did not ask him any questions after he signed the 1982 will.

Because of the conflicts and inconsistencies in the testimony of the witnesses to the preparation and execution of the 1982 will, the evidence is sufficient to support issue 5, that appellant and one or more persons conspired to tortiously interfere with appellees' inheritance. It was the prerogative of the jury to accept or reject the testimony. *See Royal v. Cameron,* 382 S.W.2d 335, 339 (Tex.Civ.App.—Tyler 1964, writ ref'd n.r.e.).

Appellant's points of error 9, 10, and 11 are overruled.

In point of error 4, appellant contends that the answer to issue 2, which found that appellant did tortiously interfere with the inheritance of appellees, is not supported by sufficient pleadings upon which a recovery may be had.

Paragraphs I and III of plaintiff's second amended original petition sought recovery for damages from appellant for her tortious conduct and fraud in sub-

mitting the 1982 will and in using the power of attorney to transfer 500 shares of stock to herself. Appellees claimed recovery from appellant and her co-conspirators for: their tortious and fraudulent conduct; malicious action toward appellees; the 1982 forged will and power of attorney; and those documents' use. All of these acts caused damage to appellees for which they are entitled to seek compensation. Appellees also prayed for exemplary damages based on appellant's conduct.

**\*754** Although Texas has never addressed this exact issue, such a cause of action for damages lies in other states for interference where there is an expected inheritance. Annot., 22 A.L.R. 4th 1234, § 3 (1983). The Supreme Judicial Court in Maine, for example, held that a person's opportunity to receive a benefit as a prospective legatee will be protected from tortious interference and that such a cause of action may be maintained even before the testator's death. *Harmon v. Harmon,* 404 A.2d 1020 (Me.1979).

Courts in other jurisdictions have held that a cause of action exists where the actor interfered with the inheritance by independent tortious conduct. *McGregor v. McGregor,* 101 F.Supp. 848 (D.Colo.1951), *aff'd,* 201 F.2d 528 (Cir.1953); *Allen v. Leybourne,* 190 So.2d 825 (Fla.1966).

The *Restatement (Second) of Torts,* sec. 774B (1979) provides:

One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.

The commentary to this section provides in part: Thus the rule stated here applies when a testator has been induced by tortious means to make his first will or not to make it; and it applies also when he

725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

has been induced to change or remake it. It applies also when a *will is forged,* altered or suppressed. [Emphasis added.]

The *Restatement (Second) of Torts,* sec. 774A (1977), provides that one who is liable to another for tortious interference with a contract or a prospective contractual relation is liable for:

(a) *the pecuniary loss of the benefit* of the contract of the prospective relation;

(b) *consequential losses* for which the interference is the legal cause; and

(c) *emotional distress* or actual harm to reputation, if they are reasonably to be expected to result from the interference.

The commentary further provides for recovery of punitive damages as well.

[4] It is well understood that the law affords a remedy for every invasion of a legal right. Under the maxim "where there is a right, there is a remedy," equity will not suffer a right to be without a remedy. *Chandler v. Welborn,* 156 Tex. 312, 319, 294 S.W.2d 801, 807 (1956).

It is well settled in Texas that "[a]ny intentional invasion of, or interference with, property, property rights, personal rights or personal liberties causing injury without just cause or excuse is an actionable tort." *Cooper v. Steen,* 318 S.W.2d 750, 757 (Tex.Civ.App.—Dallas 1958, no writ) (citing 86 C.J.S. *Torts,* § 40).

[5] Texas seems to recognize a cause of action for tortious interference. *See Tippett v. Hart,* 497 S.W.2d 606 (Tex.Civ.App.—Amarillo 1973, writ ref'd n.r.e.); *Cooper,* 318 S.W.2d 750. Appellant's counsel, in oral argument, conceded that prior Texas cases imply that

Texas does recognize a tortious interference with inheritance rights. *See Pope v. Garrett,* 204 S.W.2d 867, 871 (Tex.Civ.App.—Galveston 1947), *rev'd on other grounds,* 211 S.W.2d 559 (Tex.1948). We hold that a cause of action for tortious interference with inheritance rights exists in Texas.

Appellant's fourth point of error is overruled.

In points of error 13, 14, and 15, appellant contends that there is no evidence, insufficient evidence, and that the evidence is so contrary to the overwhelming weight and preponderance of the evidence to support issue 3, which found that actual damages were sustained by appellees in the amount of $28,275.

The record shows that Lacy and Green each received $8,275 and $1,250, respectively, as handwriting experts. Also, supporting the actual damage award is the $20,000 commission (i.e. 5% of $400,000) received by the temporary administrator from the redemption of 500 shares of Petro-Chem Technical Services stock, which the appellant received by the use of the forged power of attorney.

**\*755** [6] We hold that the trial court properly permitted the jury to consider the $20,000 commission in computing appellees' actual damages. This expense would not have been incurred but for appellant's malicious and tortious interference.

[7] The appellees, however, cannot recover the cost of the handwriting experts. These are litigation expenses and are not recoverable. *See City of Houston v. Biggers,* 380 S.W.2d 700 (Tex.Civ.App.—Houston 1964, writ ref'd n.r.e.).

Appellant's points of error 13, 14, and 15 are overruled as to the $20,000 commission paid, but are sustained as to the $8,275 paid for the handwriting experts.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

In point of error 8, the appellant complains that issue 4, which found that appellant acted with malice in tortiously interfering with appellees, is not supported by sufficient pleadings upon which a recovery may be had.

Appellees, in paragraph IV of their second amended original petition, pled that the conduct of appellant and her alleged co-conspirators was "willfully, intentionally, unlawfully and maliciously done...." and that as a result of such pleadings, the appellees were entitled to exemplary damages. *See Tippett v. Hart* 497 S.W.2d 606, 611–612 (Tex.Civ.App.—Amarillo 1973, writ ref'd n.r.e.).

[8] On a showing in a tort action that a defendant acted willfully, maliciously, fraudulently, or with gross negligence, there may be a recovery of exemplary damages, in addition to compensatory damages. *National Bank of Commerce v. May,* 583 S.W.2d 685, 691 (Tex.Civ.App.—Eastland 1979, writ ref'd n.r.e.); *see also* 28 Tex.Jur.3d *Damages* § 172 (1983).

Appellant's eighth point of error is overruled.

In point of error 12, appellant claims that issue 5, which found that appellant conspired with one or more persons to tortiously interfere with the inheritance of appellees, is not supported by sufficient pleadings upon which a recovery could be had.

[9][10] A civil conspiracy is a separate actionable tort and has been defined by the Texas Supreme Court "as a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 856 (Tex.1968). The gist of a civil conspiracy is the wrong that injures another, and not the conspiracy itself. *Id.* Proof of the conspiracy can be made by circumstantial evidence. *Id.* at 858; *see also Carr v. Hunt,* 651 S.W.2d 875 (Tex.Civ.App.—Dallas 1983, writ ref'd n.r.e.).

The pleadings in paragraph IX through XVI in appellees' second amended original petition, which alleged civil conspiracy, tortious interference, and damages, was legally sufficient to support issue 5. Appellant's twelfth point of error is overruled.

In point of error 16, appellant claims that issue 3, which found that actual damages were sustained by appellees in the amount of $28,275, is not supported by sufficient pleadings upon which recovery may be had.

Paragraphs XIV, XV, and XVI of appellees' second amended original petition sought recovery for the actual damages resulting from the costs incurred in the payment of a temporary administrator's commission, which would not have been required to be paid except for the tortious conduct of appellant and her co-conspirators. Paragraph XIV sues for attorney's fees and costs as a result of the forged will and forged power of attorney. Paragraph XV sues for administrator's fees as a result of the forged will and forged power of attorney. Paragraph XVI sues for loss income from the shares of the Petro-Chem Technical Services, and stock as a result of the forged will and forged power of attorney. There are sufficient pleadings upon which recovery was made.

Appellant's sixteenth point of error is overruled.

In points of error 17 and 18, appellants contend that the court committed a material error in instructing the jury regarding issue 3. They allege that the jury was erroneously permitted to consider the cost **\*756** of appointing the temporary administrator and the expert's testimony when these damages should be considered only for a willful tort. Additionally, in point of error 19, the appellant contends that the court committed a material error in instructing the jury regarding issue 3 that they could consider consequential loss,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

alleging that the proof is absolutely void of any consequential loss by plaintiffs, and inclusion of any such portion in the instruction represents a comment by the trial court on the weight of the evidence.

The testimony of Wright, the temporary administrator, was that he received a commission equal to five percent of the $400,000 redemption price paid for the Petro-Chem Technical Services stock, because the stock had been taken from the bank with the forged power of attorney by the appellant or her attorney. Thus, but for the tortious acts of appellant in the forged 1982 will and the forged power of attorney, no such commission would have been paid to a temporary administrator, and the deceased's estate would not have been depleted by the $20,000 commission.

[11] The appellant is liable for both the actual and exemplary damages for the consequential losses for which her tortious interference caused. *Restatement (Second) of Torts* § 774A (1977). It is the purpose of the law, in awarding compensatory (i.e. actual) damages, to repair the wrong that has been done. 28 Tex.Jr.3d *Damages* § 6 (1983). Each suit for damages should be determined on its own facts and a reasonable measure of recovery applied as the facts dictate.

The commission paid to the temporary administrator in this case is analogous to the expenses paid a receiver. In Texas, the expenses of a receivership must come from the party whose wrongful act brought about the appointment of the receiver. *Theatres of America, Inc. v. State,* 577 S.W.2d 542 (Tex.Civ.App.—Tyler 1979, no writ). The $20,000 commission was directly caused by the unneeded appointment of the temporary administrator and was a part of the consequential damages resulting from the tortious conduct of appellant.

Thus, the trial court correctly instructed the jury, in connection with issue 3, that in determining actual damages, the jury could consider consequential

damages, including the cost of appointing a temporary administrator for the purpose of redeeming the illegal transfer of the 500 shares of stock.

The trial court was incorrect, however, in instructing the jury that the cost of obtaining expert testimony, regarding the genuineness of the deceased's signature, could be considered. However, this error is not fatal in view of our holding upon points of error 13, 14, and 15, and that the appellant has not been prejudiced by the instruction. Appellant's points of error 17, 18, and 19 are overruled.

In point of error 20, appellant complains that the trial court committed a material error in instructing the jury to answer issue 6, regarding exemplary damages, because there were no pleadings or proof of any legal damages, which is necessary for an award of punitive damages.

[12] Paragraph XVII of appellees' second amended original petition alleged that appellant's tortious conduct was "willfully, unlawfully and maliciously done," and the elements necessary to support the award by the jury of exemplary damages were pled. Actual damages were proved, as discussed above. The record reflects that the forged will and forged power of attorney required the appellees to pay out a large sum of money for administrator's fees and attorney's fees.

Appellant's twentieth point of error is overruled.

In point of error 21, the appellant claims that the trial court erred in entering judgment on issue 6 for punitive damages in the sum of $76,096.82, because there was no pleading or proof as to actual damages.

[13] As previously discussed, there is sufficient evidence in the record to support the actual damage award of $20,000. The pleadings, as previously discussed and set forth, was sufficient upon each element

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

725 S.W.2d 750
**(Cite as: 725 S.W.2d 750)**

of this cause of action. As set forth in point of error 22 below, there was proof of the **\*757** payment of attorney's fees, which may be considered in awarding exemplary damages. Thus, the $76,096.82 in exemplary damages, which was the exact amount of the attorney's fees incurred by appellees, is upheld.

Appellant's point of error 21 is overruled.

Appellant's twenty-second point of error contends that the trial court committed a material error in instructing the jury that they might find, in determining punitive damages, that exemplary damages may include reasonable compensation for inconvenience and expense, such as attorney's fees, because attorney's fees are not a proper element of actual or exemplary damages.

[14] Although attorney's fees ordinarily do not constitute an element of actual damages (and were not so considered in this case), the jury may consider such fees in fixing the amount of exemplary damages. *Hofer v. Lavender,* 679 S.W.2d 470 (Tex.1984); *Pan American Petroleum Corp. v. Hardy,* 370 S.W.2d 904 (Tex.Civ.App.—Waco 1963, writ ref'd n.r.e.); *Allison v. Simmons,* 306 S.W.2d 206 (Tex.Civ.App.—Waco 1957, writ ref'd n.r.e.); *see also* 28 Tex.Jur.3d *Damages* § 181. The *Hofer* court cited *Allison,* 306 S.W.2d 206, for the proposition "that exemplary damages [exist] as an example for the good of the public and to compensate for inconvenience and attorney's fees." 679 S.W.2d at 474.

Thus, the trial court correctly instructed the jury, regarding issue 6, that exemplary damages may include reasonable compensation for inconvenience and expenses, such as attorney's fees.

Appellant's twenty-second point of error is overruled.

In appellant's last point of error, she contends that

Probate Court No. 3 of Harris County was without jurisdiction to hear and determine this cause.

[15] In 1985, Section 5A(b) of the Texas Probate Code was amended by adding the following as the last sentence thereof:

In actions by or against a personal representative, the statutory probate courts have concurrent jurisdiction with the district courts. Acts 1985, 69th Leg., p. 6429, ch. 875 § 1, eff. Aug. 25, 1985. [Emphasis added.]

The legislature stated that the Act would apply "*to all cases filed under Section 5A(b), Texas Probate Code, on or after January 1, 1973.* " [Emphasis added.] Acts 1985, ch. 875, § 2, 1985 Tex.Gen.Laws, 6429. The 1985 amendment to Section 5A(b) of the Texas Probate Code allows the probate court to have concurrent jurisdiction, if it did not previously have exclusive jurisdiction. Therefore, since this cause of action was brought by the personal representatives of the deceased's estate, jurisdiction was proper. *First State Bank v. Bishop,* 685 S.W.2d 732 (Tex.App.—Houston [1st Dist.] 1985, no writ).

Appellant's last point of error is overruled.

The judgment is reformed by reducing the actual damage award to $20,000. In all other respects, the judgment is affirmed.

Tex.App.–Hous. [1 Dist.],1987.
King v. Acker
725 S.W.2d 750

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Date of Printing: Feb 06, 2015

**KEYCITE**

▷ **King v. Acker, 725 S.W.2d 750 (Tex.App.-Hous. (1 Dist.), Jan 22, 1987) (NO. 01-86-0227-CV)**

**History**

**Direct History**

=>       1 **King v. Acker,** 725 S.W.2d 750 (Tex.App.-Hous. (1 Dist.) Jan 22, 1987) (NO. 01-86-0227-CV)

**Negative Citing References (U.S.A.)**

*Declined to Follow by*

▷      2 Estate of Hollywood v. First Nat. Bank of Palmerton, 859 A.2d 472, 54 UCC Rep.Serv.2d 343, 2004
        PA Super 321 (Pa.Super. Aug 19, 2004) (NO. 2071 EDA 2003), reargument denied (Oct 27, 2004) ★

*Distinguished by*

H     3 Zeigler v. Fisher-Price, Inc., 261 F.Supp.2d 1047, Prod.Liab.Rep. (CCH) P 16,618 (N.D.Iowa May 08,
        2003) (NO. C01-3089-PAZ) ★ ★

© 2015 Thomson Reuters. All rights reserved.

# App. G



385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**



Supreme Court of Texas.
Mozelle Corley TURNER et vir, Petitioners,
v.
Genevieve J. TURNER et al., Respondents.

No. A-9803.
Nov. 25, 1964.
Rehearing Denied Jan. 13, 1965.

Suit for alienation of affections. The 133rd District Court, Harris County, Wilmer B. Hunt, J., entered judgment against defendant wife and for defendant husband who was awarded attorney's fee against his wife and she appealed. The Waco Court of Civil Appeals of the Tenth Supreme Judicial District, 369 S.W.2d 675, affirmed, and she brought error. The Supreme Court, Griffin, J., held that defendant in alienation of affection suit wherein jury found that her then husband had not induced plaintiff to file suit and had not aided plaintiff in prosecution thereof could not recover from his former wife, active defendant in suit, for his attorney's fee.

Affirmed in part and reversed in part.

Smith, J., dissented.

West Headnotes

**[1] Husband and Wife 205 268(9)**

205 Husband and Wife
    205VII Community Property
        205k268 Community and Separate Debts
            205k268(9) k. Torts. Most Cited Cases

The alienation of affections of plaintiff's husband caused by conduct of married defendant, who was not aided or abetted by her husband, was a tort against plaintiff and defendant's husband was not individually liable for the torts of his wife but the community estate of defendant and her husband would be liable. Vernon's Ann.Civ.St. art. 4613.

**[2] Husband and Wife 205 205(2)**

205 Husband and Wife
    205VI Actions
        205k205 Rights of Action Between Husband and Wife
            205k205(2) k. Rights of action in general. Most Cited Cases

Husband had no right of action against his wife for her wrongful conduct against him as result of her alienating the affections of another married man.

**[3] Husband and Wife 205 205(2)**

205 Husband and Wife
    205VI Actions
        205k205 Rights of Action Between Husband and Wife
            205k205(2) k. Rights of action in general. Most Cited Cases

Husband cannot sue his wife for damages resulting from torts of wife committed against him.

**[4] Divorce 134 1357**

134 Divorce
    134VI Operation and Effect of Divorce, and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

Rights of Divorced Persons
      134k1356 Rights and Liabilities in General
        134k1357 k. In general. Most Cited Cases
(Formerly 134k313.1, 134k313)

Defendant husband in alienation of affections suit, wherein jury had found that he had not induced plaintiff to file suit against his former wife and had not aided plaintiff in prosecution thereof, could not recover from his former wife, the active defendant in suit, for his attorney's fee.

**[5] Damages 115 &#128273;72**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
      115III(D) Expenses of Litigation
        115k70 Attorney Fees, Costs, and Expenses of Litigation
          115k72 k. Litigation between person injured and wrongdoer. Most Cited Cases

Unless provided by statute or contract between parties, attorney's fees incurred by party to litigation are not recoverable against his adversary either in an action in tort or by suit upon a contract.

**[6] Divorce 134 &#128273;1133**

134 Divorce
    134V Spousal Support, Allowances, and Disposition of Property
      134V(H) Counsel Fees, Costs, and Expenses
        134k1133 k. Stipulations and agreements. Most Cited Cases
  (Formerly 205k279(1))

Under divorce settlement provision stating that any liability for pending alienation of affections suit was not affected by property settlement agreement, wife was not liable for husband's attorney's fees for

defense of alienation of affections suit in which defendant wife had been found to have alienated the affections of another unaided by her then husband who was also made a defendant.

**[7] Divorce 134 &#128273;1357**

134 Divorce
    134VI Operation and Effect of Divorce, and Rights of Divorced Persons
      134k1356 Rights and Liabilities in General
        134k1357 k. In general. Most Cited Cases
  (Formerly 134k313.1, 134k313)

**Indemnity 208 &#128273;65**

208 Indemnity
    208III Indemnification by Operation of Law
      208k63 Particular Cases and Issues
        208k65 k. Torts, in general. Most Cited Cases
  (Formerly 208k13.2(4.1), 208k13.2(4), 208k13(2))

Husband could not recover from former wife for her tort in alienating affections of another man and could not claim indemnity from her for expenses incurred in defending alienation of affections suit brought against both.

**[8] Attorney and Client 45 &#128273;21**

45 Attorney and Client
    45I The Office of Attorney
      45I(B) Privileges, Disabilities, and Liabilities
        45k20 Representing Adverse Interests
          45k21 k. Interests of former clients. Most Cited Cases

An attorney after accepting and enjoying confidence of one client, though afterwards discharged by client without cause, cannot in general, with propriety,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

accept employment by opposite party in same case.

**[9] Attorney and Client 45 ☞21.10**

45 Attorney and Client
   45I The Office of Attorney
      45I(B) Privileges, Disabilities, and Liabilities
        45k20 Representing Adverse Interests
          45k21.10 k. Disclosure, waiver, or consent. Most Cited Cases
    (Formerly 45k21)

Former wife being sued, along with former husband, for alienation of affections had, by her failure to timely file a motion to disqualify attorney representing her husband, also a defendant in case, and by securing a continuance of cause prior to filing a motion to disqualify such attorney, waived any complaint she might have had relative to propriety of attorney, who at one time had represented both the husband and wife, in representing husband.

**[10] Appeal and Error 30 ☞925(3)**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
        30k925 Conduct of Trial or Hearing, and Rulings in General
          30k925(3) k. Arguments of counsel. Most Cited Cases

Supreme Court must presume that trial judge, on proper objections being made, had he considered attorney's argument unfair or vicious would have sustained objections and given appropriate instructions to the jury to disregard the same.

**[11] Appeal and Error 30 ☞207**

30 Appeal and Error

30V Presentation and Reservation in Lower Court of Grounds of Review
      30V(B) Objections and Motions, and Rulings Thereon
        30k207 k. Arguments and conduct of counsel. Most Cited Cases

Argument which could be properly cured by objection by opposing counsel and by instructions is not reversible error in absence of such objection, and unless argument is incurable, litigant will not be permitted to complain for first time of improper argument in motion for new trial.

**[12] Appeal and Error 30 ☞207**

30 Appeal and Error
   30V Presentation and Reservation in Lower Court of Grounds of Review
      30V(B) Objections and Motions, and Rulings Thereon
        30k207 k. Arguments and conduct of counsel. Most Cited Cases

Party could not complain, for first time on appeal, regarding argument of attorney to which no objection was made at the time, where argument was clearly of type that any harm that may have been done could have been corrected by timely objection and by giving of instructions to jury to disregard argument.

**[13] Appeal and Error 30 ☞1043(6)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
        30XVI(J)6 Interlocutory and Preliminary Proceedings
          30k1043 Interlocutory Proceedings
            30k1043(6) k. Discovery and depositions. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

On record as a whole, there was not such error in admitting deposition testimony regarding hearsay and deponent's conclusion as amounted to such a denial of right as was reasonably calculated to cause and probably did cause rendition of improper judgment in alienation of affections suit.

**[14] Jury 230 ⚷136(3)**

230 Jury
    230V Competency of Jurors, Challenges, and Objections
        230k134 Peremptory Challenges
            230k136 Number
                230k136(3) k. As affected by joinder of parties or actions. Most Cited Cases

Where there was a common ground of liability against both husband and wife sued for wife's conduct in allegedly alienating affections of plaintiff's husband, fact that defendant husband and wife might have actions against the others as to extent of their own liability would not entitle each to six peremptory challenges as against plaintiff's cause of action, and court properly granted six peremptory challenges to both husband and wife.

**[15] Husband and Wife 205 ⚷333(7)**

205 Husband and Wife
    205X Enticing and Alienating
        205k333 Evidence
            205k333(7) k. Admissibility of evidence of financial condition or earning capacity. Most Cited Cases

Where defendant wife in alienation of affections suit had pleaded property settlement between her and her husband showing that she was a wealthy woman and all the parties, including herself, had testified without objection as to her wealth, there was no error permitting evidence to be introduced as to her wealth.

**[16] Limitation of Actions 241 ⚷55(4)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k55 Torts
                241k55(4) k. Injuries to person. Most Cited Cases

Period of limitation for alienation of affections suit began to run from time of loss of consortium and not from time that person whose affections have been alienated felt a lessening of his affections for his spouse.

**[17] Judgment 228 ⚷208**

228 Judgment
    228VI On Trial of Issues
        228VI(A) Rendition, Form, and Requisites in General
            228k208 k. Relief as between coparties. Most Cited Cases

Judgment which had effectively disposed of defendant's request for judgment against codefendant was sufficient even though it did not in so many words dispose of defendant's cross action against her codefendant.

**\*231** Fred W. Moore and Lew W. Harpold, Fred C. Brigman, Jr. and Brigman, Martin & Smith, Houston, for respondent Genevieve J. Turner.

**\*232** Fred Parks and Ruby Sondock, Houston, for responent J. F. Corley.

GRIFFIN, Justice.

This is an alienation of affections suit brought in a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

district court of Harris County, Texas, by respondent Genevieve J. Turner, against Mozelle Corley and husband, Pat Corley, as defendants. The original petition was filed June 6, 1960.

The cause was tried to a jury in May, 1962, and on the answer of the jury to special issues, the trial court entered judgment in favor of Genevieve Turner against Mozelle Corley Turner for $150,000.00 actual damages, plus $29,000.00 exemplary damages and in favor of respondent Pat Corley against his former wife, Mozelle Corley Turner, for $30,000.00 as attorney's fees. Petitioner appealed to the Court of Civil Appeals, which affirmed the trial court's judgment. 369 S.W.2d 675.

Mozelle and Pat Corley had been married some eighteen years when they permanently separated December 30, 1959. Genevieve J. Turner and Harry A. Turner were married in 1938 and were divorced August 2, 1960. The Corleys were divorced March 27, 1961. Mozelle Corley and Harry Turner married April 7, 1961.

Until the filing of the alienation of affections suit in June, 1960, or a few months prior thereto, the Turners and Corleys were very close friends. They took trips together and spent a great deal of time together.

The Court of Civil Appeals has set out in its opinion a full statement of the facts of this unfortunate litigation between former friends and we will not restate the facts.

Mozelle Corley Turner and her present husband, Harry Turner, as petitioners herein, complain of the action of the trial court-affirmed by the Court of Civil Appeals-in awarding to Pat Corley a judgment for $30,000.00 as reasonable attorney's fees, because it is contended this suit is not one in which attorney's fees may be awarded to Pat Corley.

Pat Corley answers that in view of the jury findings that he did not induce the plaintiff to file this suit, and that he did not aid the plaintiff in the prosecution of the suit, he is an innocent party to the suit and is entitled to be indemnified by Mozelle, the active defendant. Therefore, he is entitled to recover his attorney's fees.

We sustain the assignment of the petitioner, Mozelle Corley Turner, that she cannot be charged with attorney's fees in this suit.

[1] The alienation of the affections of Harry A. Turner, caused by the conduct of Mozelle Corley Turner, is a tort against plaintiff Genevieve J. Turner. Pat Corley is not individually liable for the torts of his wife not aided and abetted by him. The community estate of Mozelle and Pat Corley would be liable. Art. 4613, Vernon's Ann.Civ.St.

[2] Pat Corley had no right of action against Mozelle Corley Turner for her wrongful conduct against him, resulting in the alienation of the affections of Harry A. Turner from the plaintiff.

[3][4] That the husband cannot sue his wife for damages resulting from the torts of his wife committed against him was settled by the case of Nickerson and Matson v. Nickerson, 65 Tex. 281, 1886. It is true that this was a case where the wife was seeking recovery against the husband for a tort committed by the husband and a third party against the wife. Nickerson and his wife had been divorced after the commission of the tort, but prior to the trial of the wife's suit. The court said:

'The tort inflicted upon the wife by the husband and another, gave no right of action to the wife against the husband.' **233** Again:

'Whatever cause of action the wife had, accrued

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

when the acts of which she complains were committed; and the fact of divorce subsequently granted, can not make that a cause of action which was not so at the time the facts transpired.'

The Nickerson case had been followed by many cases, and an examination of Shepard's Texas Citations discloses that the rules of law laid down as quoted above have never been questioned. See also Gowin v. Gowin, Tex.Civ.App., 264 S.W. 529, 1924, affirmed Tex.Civ.App., 292 S.W. 211, 1927; Latiolais v. Latiolais, 361 S.W.2d 252, 253, Tex.Civ.App.1962, writ ref., n. r. e.; 30 Tex.Jur.2d, p. 234, s 145.

[5] The general rule of law in this state is that, unless provided for by statute or by contract between the parties, attorney's fees incurred by a party to litigation are not recoverable against his adversary either in an action in tort or by suit upon a contract. Van Zandt v. Ft. Worth Press, 359 S.W.2d 893, 896(5), Tex.Sup.1962; Perry v. Leuttich, 132 Tex. 159, 121 S.W.2d 332, 333 (2-4), 1938; Wm. Cameron & Co. v. American Surety Co. of New York, 55 S.W.2d 1032, 1035(3), Tex.Com.App., 1932; Sherrick v. Wyland, 14 Tex.Civ.App. 299, 37 S.W. 345, 1896.

All parties to this litigation agree that there is no legislative enactment permitting recovery of attorney's fees in cases of this character.

[6] Mozelle Corley Turner claims that the property settlement agreement between her and Pat Corley in the divorce suit prevents any recovery by Pat against her of his attorney's fees. Pat answers that this is not a correct construction of such settlement agreement and a re sume of the terms of the agreement, relied on herein, is that (1) each party to the agreement shall be liable for his respective attorney's fees, (2) that any obligation incurred by either party after February 1, 1961, would be the separate obligation of the party incurring the same. Pat claims that if he is forced to have his share of the community property applied to the payment of this judgment by virtue of the separation agreement, he should be indemnified by Mozelle. He claims that having the right to indemnity from Mozelle, this right should include the right to his attorney's fees for defending Genevieve Turner's suit against him for damages by virtue of the alienation of Harry Turner's affections. The settlement agreement between Mozelle and Pat Corley specifically provided, 'Any liability for the alienation of affections suit now pending against First Party and Second Party is expressly not assumed by either of the parties hereto, and the satisfaction of any judgment which might be incurred by reason thereof shall be left open and unaffected by this property settlement agreement.'

By virtue of this provision, we hold the separation agreement has no application to our problem herein, and does not afford any basis for recovery or denial of attorney's fees.

Pat Corley cites some cases where attorney's fees have been allowed in suits for indemnity. These cases are not in point here. None of them involve suits between husband and wife, or a former husband and wife for wrongs arising during the existence of the marriage relationship. Also, these cited cases are suits upon indemnity bonds or suits by one joint tortfeasor to collect indemnity because of the payment of a joint judgment against the parties to these suits. Pat Corley and Mozelle Corley were not joint tort-feasors in this cause, and it was so stipulated by the parties to this suit.

[7] Pat Corley could not recover against Mozelle Corley for her tort, therefore he cannot claim indemnity from Mozelle for the expenses incurred by him in defending Genevieve J. Turner's suit against both parties.

**\*234** Pat Corley quotes from Sec. 914, Vol. 4, Restatement of the Law: Torts, as follows:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

'A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees and other expenditures thereby suffered or incurred.'

The comment under this Sec. 914 refers to Restatement of Restitution, Sections 86-102, for the rule applicable to cases such as the one we have here. Under Sec. 96 of Restitution it is stated that, 'The restatement of this subject does not deal with rights dependent upon special relationships, such as husband and wife and parent and child * * *.'

There is a very exhaustive annotation in 45 A.L.R.2d 1184 et seq. as to recovery of attorney's fees which a plaintiff is obligated to pay in a litigation of his claim.

It is there stated that the general rule is that such attorney's fees are not recoverable in the absence of some statutory or contract provision permitting their recovery, but that there are exceptions and modifications to this general rule. One exception is that where a plaintiff has been involved in litigation with a third party as a result of the tortious act of another, plaintiff may recover in a separate suit for his reasonable and necessary expenses of the prior litigation. In order that such recovery may be had there are certain requisites prescribed, the first of which is that the present plaintiff (Pat Corley in his cross-action) must have incurred attorney's fees in the prosecution or the defense of a prior action. Another, the litigation must have involved a third party and not against the defendant (Mozelle Corley) in the present action. These requisites are not met by the cross-action of Pat Corley against Mozelle for his attorney's fees.

This annotation discusses Sec. 914 of Restatement of the Law: Torts, relied upon by Pat Corley and

it is shown such section does not cover our case.

That part of the judgment of both courts below which permits recovery by Pat Corley from Mozelle Corley Turner of any attorney's fees is reversed and Pat Corley shall recover no attorney's fees herein.

We now come to the contention of Mozelle Corley Turner that the trial court committed error in not sustaining her motion to enjoin Pat Corley's attorney, Fred Parks, Esquire, from appearing as counsel in this case because he was disqualified by virtue of having in the beginning of the litigation represented Pat and Mozelle Corley.

As to any harm resulting to Mozelle by virtue of Mr. Parks representing Pat in this litigation, we have given Mozelle relief in our reversal and rendition of Pat's judgment for attorney's fees. This relief was all the relief she sought against Pat.

Mozelle seeks to reverse Genevieve's judgment against her for the alienation of Harry Turner's affections on several points of error, one of which is based on the disqualification of Mr. Parks to represent Pat. Mozelle claims that Mr. Parks brought out in his questions to her confidential information which he had gained by virtue of having been her attorney at the beginning of the litigation.

In this litigation Genevieve was plaintiff, and as such sued both Mozelle and Pat. They were co-defendants. Mr. Parks never was the attorney of Genevieve, and Genevieve in no way relied on Mr. Parks as her attorney. At all times she had her own counsel to represent her.

A short re sume of this litigation and the pleadings filed therein will be helpful in disposing of the question of Mr. Parks' disqualification as it affects Genevieve's judgment against Mozelle.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

**\*235** Pet Corley and his then wife, Mozelle, permanently separated December 30, 1959. Efforts were made by mutual friends to effect a reconciliation, but these efforts were unsuccessful.

In January of 1960, plaintiff herein, Genevieve J. Turner, then married to Harry A. Turner, wrote a letter to Pat Corley demanding damages from Pat and Mozelle by virtue of Mozelle's actions and conduct having alienated the affections of Harry A. Turner. Upon receipt of the letter, Pat Corley employed Fred Parks, Esq., an attorney at the Houston, Texas bar, to represent both him and his then wife, Mozelle, in this suit. No settlement was reached of Genevieve's claim for damages and she filed this suit against Pat and Mozelle, June 3, 1960. In her original petition she alleged that the acts and conduct of Mozelle had alienated the affections of her husband, Harry A. Turner, and had resulted in a breaking up of Genevieve's home and the filing of a divorce action between Genevieve and Harry. In this suit Genevieve sought recovery of actual and exemplary damages against Mozelle, but sought recovery against Pat only to the extent of the community estate of Pat and Mozelle. To this suit attorney Parks filed an answer on behalf of both Pat and Mozelle.

No reconciliation having been effected between Pat and Mozelle, Mozelle employed her present counsel to file a divorce suit between her and Pat. This divorce suit was filed about September 1, 1960. September 16, 1960, Mozelle notified Pat and attorney Parks and the court that she had discharged Parks as her attorney effective September 1, 1960, and had employed her present counsel to represent her interests in both the divorce suit and the alienation of affections suit.

Genevieve and Harry were divorced August 2, 1960. Thereafter, Genevieve on October 25, 1960, filed her first amended petition herein, and again limited her prayer for recovery against Pat, as she had done in her original petition.

A demand that this cause be tried by a jury was made and the cause placed on the jury docket. In Harris County, Texas, there is a time lag of from fifteen months to two years between the placing of the case on the jury docket and it reaching a trial.

In the meantime, depositions of all parties were taken, various motions were made by all parties, hearings were had on various preliminary matters, etc. etc.

November 8, 1961, Mozelle filed her second amended answer and for the first time filed a cross-action against Genevieve and Pat, alleging they had conspired to bring this suit, and asked for recovery of damages against both Pat and Genevieve, jointly and severally, resulting from the conspiracy. Also, in this answer, showing the conspiracy, Mozelle made allegations that Pat's counsel was antagonistic, acted adversely to her, hindered her in her proper defense, and that actions on the part of Pat's counsel showed the existence of the conspiracy between Genevieve and Pat, but filed no motion to disqualify attorney Parks. December 4, 1961, Pat Corley represented by attorney Parks, filed an answer to Mozelle's cross-action against him, seeking only his costs and general relief.

Various pleadings were filed by all parties and December 29, 1961, Mozelle for the first time by her cross-action against Pat, asked for indemnity against Pat to the extent of any judgment which Genevieve might recover against her, or in the alternative for contribution by Pat of one-half of such judgment. She continued her charge of conspiracy.

January 5, 1962, the trial court set the case for trial before a jury March 12, 1962.

March 1, 1962, Mozelle filed a motion for continuance of the trial of the case until May, 1962. March 20, 1962, Mozelle recast her pleadings and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

again plead a conspiracy between Pat and his counsel and **\*236** Genevieve, and asked for recovery against Pat as theretofore plead.

March 21, 1962, the trial court continued the case and made a preferential setting for trial on May 21, 1962.

April 14, 1962, Pat filed his second amended answer to both Genevieve's suit and Mozelle's suit, and by cross-action asked for indemnity against Mozelle for any sums he might be required to pay out of the part of the community estate of him and Mozelle which was set aside to him in the property settlement between them which was approved in the judgment divorcing Pat and Mozelle on March 27, 1961.

April 16, 1962, Mozelle filed her fourth amended original answer in which, among other things, she alleged collusion between Pat and Genevieve to bring this alienation of affections suit and asked for relief against Pat for any judgment Genevieve might recover against her.

April 23, 1962, Mozelle for the first time filed a motion to disqualify Pat's attorney, Parks, on the ground of his having represented her in 1960. The trial court set this motion for hearing on May 2, 1962, and after a lengthy hearing, overruled Mozelle's motion to disqualify attorney Parks.

May 12, 1962, Mozelle filed her fifth amended answer in substance the same as her fourth amended answer and again alleged collusion between Pat and Genevieve and sought recovery against Pat.

May 18, 1962, Pat filed his third amended answer to Genevieve's and Mozelle's suits against him and asked for indemnity or in the alternative contribution against Mozelle for any amounts he might be forced to pay Genevieve. He also asked for costs and for $35,000.00 as a recoverable attorney's fee.

May 21, 1962, on the call of the case for trial Mozelle renewed her motion for disqualification of Pat's counsel, attorney Parks, and the court overruled the same. The case then proceeded to trial, with the results set out in the first part of this opinion.

[8] We recognize the rule that an attorney, after accepting employment and enjoying the confidence of one client, though afterwards discharged by his client without cause, cannot in general, with propriety, accept an employment by the opposite party in the same case. Myers v. Crockett, 14 Tex. 257 (1855, no writ history); Crye v. O'Neal & Allday, 135 S.W. 253 (Tex.Civ.App., 1911, no writ history); Lamb v. Isley, 114 S.W.2d 673 (Tex.Civ.App., 1938, no writ history).

[9] Without deciding the question of Mr. Parks' disqualification to represent Pat Corley in this suit and its effect on Genevieve's judgment, we hold that Mozelle, by her failure to timely file a motion to disqualify Mr. Parks and by securing a continuance of the cause prior to filing a motion to disqualify Mr. Parks, has waived any complaint she may have had on this ground.

Mozelle cites certain instances in which she claims that Pat's attorney, in his cross-examination of her, developed very damaging testimony. We have carefully examined the statement of facts, and find no objections lodged by Mozelle to the questions and answers on the ground of Mr. Parks' disqualification or that the answers would divulge confidential information obtained by Mr. Parks when he was representing Mozelle and Pat.

Also, we find that such questions by Mr. Parks did not elicit any information or evidence not placed in the record by either Genevieve's or Mozelle's attorneys. Mozelle cannot be heard to complain of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

cross-examination under such circumstances.

There is nothing in the record to support a reversal of Genevieve's judgment agaisnt Mozelle on the ground that the court failed to disqualify Mr. Parks to represent Pat.

**\*237** Mozelle cites the cases as Barreda Corp. v. Ballenger, 116 S.W.2d 442, Tex.Civ.App., 1938, writ dismissed; Cochran v. Cochran, 333 S.W.2d 635, Tex.Civ.App.1960, writ refused n. r. e.; Lamb v. Isley, 114 S.W.2d 673, Tex.Civ.App., 1938, no writ history; Bryant v. Lewis et al., 27 S.W.2d 604, Tex.Civ.App., 1930, writ dismissed; and certain canons of the State Bar Act, as authority for the reversal of Genevieve's judgment. In none of these cases was a third party involved. In each of these cases, the attorney sought to be disqualified from representing one of the parties had theretofore been the attorney representing the party moving for the disqualification, but who now represented his present client in a suit against a former client.

None of these cases are in point on Mozelle's attempt to reverse Genevieve's judgment against her on her allegations that Mr. Parks was disqualified to represent Pat.

We therefore overrule this point of error urged by Mozelle.

Mozelle makes complaint of attorney Parks' argument in the submission of the cause. Mozelle made no objection to the argument at the time it was made.

[10] The argument was clearly of the type that any harm it may have done could have been corrected by timely objection and request for instructions by the court and the giving of such instructions to the jury to disregard such argument. We must presume that the trial judge, on proper objection being made, had he considered the argument unfair or vicious would have sustained objections and given appropriate instructions to the jury to disregard the same.

[11][12] Argument which could be properly cured by objection by opposing counsel and instruction by the trial judge is not reversible error in the absence of such objection. Unless the argument is incurable, a litigant will not be permitted to lie in wait, taking a chance on a favorable verdict, and, being disappointed, complain for the first time of improper argument in a motion for new trial. See Wade v. Texas Emp. Ins. Ass'n, 150 Tex. 557, 244 S.W.2d 197 (1951). See also Younger Bros. Inc. v. Myers, 159 Tex. 585, 324 S.W.2d 546 (3, 4) (1959); Texas Emp. Inc. Ass'n v. Haywood, 153 Tex. 242, 266 S.W.2d 856(1).

Petitioner Mozelle Corley assigns error to the admission of certain testimony given by deposition and on the stand, by the late Col. Joe Ed Winfree.

Parts of Col. Winfree's deposition were introduced by counsel for Mozelle. Objections were made by Genevieve's counsel to the deposition. After Mozelle's counsel had finished with her offer, attorney Parks offered certain other parts of the deposition.

On an objection that the answers to certain questions were hearsay, the trial court sustained the objection and instructed the jury:

'Ladies and Gentlemen of the jury, you will not consider as evidence in this case anything that Mr. Winfree said in this deposition about his knowledge about what somebody else did.'

At the end of offer by all parties of Col. Winfree's deposition, and just prior to the time he was called to the stand by Mozelle's counsel, the court again instructed the jury:

'Ladies and Gentlemen of the jury, in this depo-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

sition of Mr. Winfree you all were permitted to hear what he was told about, what Mrs. Corley had told Mr. Corley and what Mrs. Turner had told Mr. Turner, and what Mr. Corley had told Mrs. Corley and what Mr. Turner had told Mrs. Turner.

'Now, you will not consider the statements, you will not consider Mr. Winfree's recitations of what he was told on that hearsay testimony as proof of the truth of these conversations between**\*238** Mr. and Mrs. Corley and Mr. and Mrs. Turner.'

Mozelle makes no complaint of any testimony given by Col. Winfree in person in open court.

As to the complaints of what Col. Winfree testified in his deposition that he told the parties to this suit as to his conclusions about their conduct, we have examined the five large volumes of the statement of facts, and find that the various parties in their testimony gave similar testimony without objection.

[13] Looking at the record as a whole, we do not find such error in admitting Col. Winfree's deposition testimony as to hearsay and the Colonel's conclusions as amounted to such a denial of the right of the petitioner as was reasonably calculated to cause and that probably did cause the rendition of an improper judgment in the case.

We therefore overrule this assignment of error.

[14] Mozelle also seeks to reverse Genevieve's judgment against her on the ground that the trial court refused to grant six peremptory challenges to Mozelle rather than only six to both Pat and Mozelle.

The suit against Mozelle brought by Genevieve also included Pat as a defendant, but the recovery sought against Pat was limited to his part of the community property which had belonged to Pat and Mozelle. Recovery was first sought against Mozelle

and if any deficit remained, then, and only then, was recovery sought against Pat's interest in the community. As far as the plaintiff Genevieve was concerned, there was a common ground of liability against both defendants and the issues between plaintiff and each defendant were the same. fees as against Mozelle Corley have actions against the other as to the extent of their own liability would not entitle each to six peremptory challenges as against plaintiff's cause of action. Hargrave v. Vaughn, 82 Tex. 347, 18 S.W. 695 (1891); Wolf v. Perryman, 82 Tex. 112, 17 S.W. 772 (1891); Retail Credit Co. v. Hyman, 316 S.W.2d 769(1-4), Tex.Civ.App.1958, writ refused.

The trial court offered to permit Mozelle and her attorney to be with Pat and his counsel while both parties were making their challenges to the jury. Pat and his counsel agreed to this procedure, but Mozelle and her counsel would not agree.

Mozelle argues that there was jury misconduct requiring a reversal of Genevieve's judgment. Upon the hearing of the motion for new trial, it developed that the alleged misconduct complained of had been promptly corrected by the foreman of the jury immediately upon its happening, and no further mention was made of the matters. Also, the evidence sustained the trial court's finding that the jury did not arrive at their answers to the amount of damages by means of a quotient verdict.

[15] Mozelle complains that the trial court erred in permitting evidence to be introduced as to her wealth. Mozelle had pleaded the property settlement between her and Pat. This showed that Mozelle was a wealthy woman. All parties, including Mozelle, testified, without objection, as to her wealth. Also, Genevieve, as a part of her cause of action, had pleaded that Mozelle had used her greater wealth as a means of alienating Harry's affections. This being true, no error is shown. Cramer v. Cramer, 106 Wash. 681, 180 P. 915 (1919); Baltzly v. Gruenig, 127 Neb. 520, 256 N.W. 4 (1934); 27 Am.Jur. 167; 42

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

385 S.W.2d 230
**(Cite as: 385 S.W.2d 230)**

C.J.S. Husband and Wife s 688, p. 341, and authorities cited in each text.

Mozelle urges error in the action of the trial court and Court of Civil Appeals in holding that the two-year statute, and alternatively the four-year statute of limitations did not bar this action. The separation of Genevieve and Harry Turner occurred**239** December 30, 1959, when Harry for the first time told Genevieve that he no longer loved her, but loved Mozelle and wanted a divorce so he could marry Mozelle. This suit was filed in June, 1960.

[16] The period of limitation begins to run from the time of the loss of consortium and not from the time that Harry Turner felt a lessening of his affection for Genevieve. 27 Am.Jur. p. 140; Smith v. Smith, 225 S.W.2d 1001(5-12), Tex.Civ.App., no writ history. See also, Collier v. Perry, 149 S.W.2d 292 Tex.Civ.App., dismissed correct judgment; 173 A.L.R. 776 et seq. and authorities there cited.

Mozelle has assignments as to certain paragraphs of the court's charge. We have carefully examined the charge, and do not find it subject to the objections urged. These assignments are overruled.

[17] Mozelle claims the judgment entered is not a final judgment, because it does not in so many words dispose of her cross-action against Pat. The judgment sets out a recovery for Pat of his attorney's fees against Mozelle, and also specifically denies Mozelle's motion for judgment non obstante veredicto. In this motion Mozelle had requested judgment over against Pat, and a denial of this relief effectively disposes of this issue. This assignment is overruled.

The judgment of the Court of Civil Appeals in so far as it allows Pat to recover an attorney's fee from Mozelle is reversed and judgment here rendered that Pat take nothing against Mozelle as to this item.

In all other respects the judgment of the Court of Civil Appeals is affirmed.

SMITH, Justice (dissenting).

I disagree with the holding that Pat Corley is not entitled to a recovery of his attorney's fees as afainst Mozelle Corley Turner.

TEX. 1965.
Turner v. Turner
385 S.W.2d 230

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Date of Printing: Feb 06, 2015

**KEYCITE**

⚑ **Turner v. Turner,** 385 S.W.2d 230 (Tex., Nov 25, 1964) (NO. A-9803)

**History**

**Direct History**

1 Turner v. Turner, 369 S.W.2d 675 (Tex.Civ.App.-Waco Jun 20, 1963) (NO. 4107), writ granted (Jan 15, 1964)

*Judgment Affirmed in Part, Reversed in Part by*

=> 2 **Turner v. Turner,** 385 S.W.2d 230 (Tex. Nov 25, 1964) (NO. A-9803)

**Negative Citing References (U.S.A.)**

*Overruling Recognized by*

3 Commissioners Court of Dallas County v. Buster, 2003 WL 22810455 (Tex.App.-El Paso Nov 25, 2003) (NO. 08-02-00048-CV), review denied (May 07, 2004) ★ ★ **HN: 9 (S.W.2d)**

4 Aspen Technology, Inc. v. M3 Technology, Inc., 569 Fed.Appx. 259, 2014 Copr.L.Dec. P 30,611 (5th Cir.(Tex.) May 29, 2014) (NO. 12-20388, 13-20268) ★ **HN: 5 (S.W.2d)**

*Distinguished by*

5 Chaffin v. Transamerica Ins. Co., 731 S.W.2d 728 (Tex.App.-Hous. (14 Dist.) May 28, 1987) (NO. C14-86-393-CV), writ refused n.r.e. (Sep 16, 1987) ★ ★ **HN: 7 (S.W.2d)**

6 Industrial Acc. Bd. of State of Tex. v. Spears, 790 S.W.2d 55 (Tex.App.-San Antonio Apr 25, 1990) (NO. 04-90-00007-CV), motion to file mandamus granted (Jun 13, 1990) ★ ★ **HN: 9 (S.W.2d)**

© 2015 Thomson Reuters. All rights reserved.

# App. H

Notice sent: Final Interlocutory None

Disp Parties:_____

Disp code: CVD / CLS _____

Redact pgs:_____

Judge OLH    Clerk RH

DC          BK13199 PG840

**CAUSE NO. D–1–GN–07–002328**

| | | |
|---|---|---|
| RICHARD T. ARCHER, DAVID R. ARCHER, CAROL ARCHER BUGG, JOHN V. ARCHER, KAREN ARCHER BALL, AND SHERRI ARCHER, Plaintiffs | §§§§§§ | **IN DISTRICT COURT** |
| **v.** | §§§ | **345ᵗʰ JUDICIAL DISTRICT** |
| DOUGLASS HEARNE, T. MARK ANDERSON, Individually and as co-Executor of the estate of Ted Anderson, CHRISTINE ANDERSON, as co-Executor of the estate of Ted Anderson, And RICHARD LESHIN, Defendants | §§§§§§§§ | **TRAVIS COUNTY, TEXAS** |

Filed in The District Court
of Travis County, Texas
JL JUL 17 2013 M.
At 2:30 ___
Amalia Rodriguez-Mendoza, Clerk

**Order ~~Granting~~ Denying Plaintiffs' Motion for Partial Judgment Notwithstanding the Verdict on the Jury's Damage Finding**

On the _17_ day of June 2013, came on for hearing, *Plaintiffs' Motion for Partial Judgment Notwithstanding the Verdict on the Jury's Damage Finding*. Having considered the motion, the trial evidence, response if any, and arguments of counsel, the Court is of the opinion that the motion is well-taken and should in all things be ~~GRANTED~~. Denied. (?)

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that *Plaintiffs' Motion for Partial Judgment Notwithstanding the Verdict on the Jury's Damage Finding* is ~~GRANTED~~. Denied.

©

Signed July 17, 2013

Judg Orlene [signature]

1209

# App. I

Filed
13 July 17 A9:16
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-07-002328

CAUSE NO. 1-GN-07-002328

| | | |
|---|---|---|
| Richard T. Archer, David | § | IN THE DISTRICT COURT |
| B. Archer, Carol Archer | § | |
| Bugg, John V. Archer, | § | |
| Karen Archer Ball, and | § | |
| Sherri Archer, | § | |
| *Plaintiffs* | § | |
| | § | |
| V. | § | 345th JUDICIAL DISTRICT |
| | § | |
| Douglass Hearne, T. Mark Anderson, | § | |
| Individually and as co-executor | § | |
| of Estate of Ted Anderson, Christine | § | |
| Anderson, as co-executor of the | § | |
| Estate of Ted M. Anderson; and | § | |
| Richard Leshin, | § | TRAVIS COUNTY, TEXAS |
| *Defendants* | | |

## <u>DEFENDANTS, T. MARK ANDERSON, INDIVIDUALLY AND AS CO-EXECUTOR OF ESTATE OF TED ANDERSON, AND CHRISTINE ANDERSON, AS CO-EXECUTOR OF THE ESTATE OF TED. M ANDERSON'S MOTION FOR PARTIAL JUDGMENT NOTWITHSTANDING THE VERDICT</u>

TO THE HONORABLE JUDGE OF THE COURT:

Defendants, T. Mark Anderson, Individually and as co-executor of the Estate of Ted Anderson, and Christine Anderson, as co-executor of the Estate of Ted M. Anderson file this their Motion for Partial Judgment Not Withstanding the Verdict, respectfully showing the Court the following:

### PROCEDURAL AND FACT SUMMARY

This case was submitted to the jury on two issues, liability for tortious interference with inheritance, and damages. The jury found for Plaintiffs on liability and in the single blank under the question on damages wrote in the amount of $2,006,150.

Plaintiffs evidence on damages consisted of their claim for $588,054 which testimony

<span style="color:blue">1210</span>

indicated was the amount paid by Plaintiffs to certain charities to secure a settlement with those charities to avoid a will contest, and their claim for $2,865,928 in attorneys' fees and expenses paid in all the prior litigation in the guardianship proceedings which included the litigation with the charities. Defendants asserted from the outset that Plaintiffs have no viable claim for recovery of attorneys' fees as damages in this action, sought to exclude testimony on such damages, objected to such testimony and sought a partial directed verdict on the issue. Because Defendants assert that Texas law does not permit the recovery of attorneys' fees as damages in a tort case like this one, and in the alternative, Defendants assert Plaintiffs' evidence is legally insufficient to support the jury's award of attorneys' fees as part of the Plaintiffs' damages, Defendants bring this motion.

## ARGUMENT AND AUTHORITIES

### 1. Standard for granting a partial judgment notwithstanding the verdict.

A partial judgment notwithstanding the verdict is proper if a directed verdict would have been proper. TEX. R. CIV. P. 301. If, as a matter of law, the claimant's evidence does not describe a cause of action recognized in Texas, the court may grant a motion for partial summary judgment. Further the court may disregard any jury finding on a question that has no support in the evidence. *Id.*

### 2. Texas has not adopted the "tort of another" exception to the general rule on recovery of attorneys' fees as damages.

In *Turner v. Turner,* the case relied upon by Plaintiffs, the supreme court discussed, without expressly adopting, that exception to the general rule that attorney's fees are not available as actual damages. *Turner v. Turner,* 385 S.W. 2d. 230, 234 (Tex. 1965). In Turner, the court that the claimant did not meet the criteria of the theory upon which he was

2

expressly relying, and therefore denied his claim for attorneys' fees, without any comment on whether the theory was valid. *Id.* In 2009, the Texas Supreme Court clarified its earlier opinion in *Turner* by stating, "...we need not and do not address whether the ['tort of another'] exception set out in section 914(2) of the Second Restatement should be adopted as Texas law. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. and Research Corp.,* 299 S.W.3d 106, 119 (Tex. 2009).

Texas intermediate appellate courts are divided on whether section 914(2) is the law in Texas. *Compare Naschke v. Gulf Coast Conference,* 187 S.W.3d 653, 655 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (declining to adopt tort of another exception in section 914(2)); *Peterson v. Dean Witter Reynolds, Inc.,* 805 S.W.2d 541, 549 (Tex.App.-Dallas 1991, no writ); *Cupples Coiled Pipe, Inc. v. Esco Supply Co.,* 591 S.W.2d 615, 619 (Tex.Civ.App.-El Paso 1979, writ ref'd n.r.e.); *Dalton Steamship Corp. v. W.R. Zanes & Co.,* 354 S.W.2d 621, 624 (Tex.Civ.App.-Fort Worth 1962, no writ), with *Lesikar v. Rappeport,* 33 S.W.3d 282, 306 (Tex. App .-Texarkana 2000, pet. denied) (adopted tort of another exception under Restatement section 914(2)); *Estate of Arlitt v. Paterson,* 995 S.W.2d 713, 721 (Tex.App.-San Antonio 1999, pet. denied), overruled on other grounds, *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.,* 192 S.W.3d 780 (Tex.2006); *Standard Fire Ins. Co. v. Stephenson,* 963 S.W.2d 81, 90-91 (Tex.App.-Beaumont 1997, no pet.); *Baja Energy, Inc. v. Ball,* 669 S.W.2d 836, 839 (Tex.App.-Eastland 1984, no writ); *Powell v. Narried,* 463 S.W.2d 43, 46 (Tex.Civ.App.-El Paso 1971, writ ref'd n.r.e.).

3

As the 14th District Court of Appeals declared in declining to adopt an equitable exception to the general rule against recovery of attorneys' fees from prior litigation with others as damages, "Because we are bound to follow the existing laws of the State, we are not at liberty to adopt a theory of recovery that has not been enacted by the Legislature or adopted by the Texas Supreme Court." *Naschke*, 187 S.W.3d at 655. Defendants respectfully assert that the clearest and strongest authority is that the "tort of another" exception, embodied in Restatement of Torts § 914(2) (1979), the Legislature or the Supreme is not the law of the State of Texas. For that reason alone, Plaintiffs' Motion for Partial Judgment NOV must fail.

**3. Plaintiffs did not discharge their burden of proof for recovery of attorneys' fees as damages.**

Even is the Court determines that attorneys' fees are an available element of damages, which Defendants deny, Plaintiffs failed to meet their burden of proof.

**A. Plaintiffs had a duty to segregate recoverable from non-recoverable fees.**

The Texas Supreme Court has repeatedly held that "a prevailing party must segregate recoverable from unrecoverable attorney's fees in all cases." *Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) (per curiam); *A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006); *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991); *Matthews v. Candlewood Builders, Inc.*, 685 S.W.2d 649, 650 (Tex. 1985). An attorney may segregate either by (1) proving time spent on a

4

recoverable claim and excluding time spent on a non-recoverable claim, or (2) subtracting a percentage of the time from the total time expended on the case to account time spent on the unrecoverable claim. *Tony Gullo Motors I, L.P.* at 314.

Plaintiffs argue they are exempt from the need to segregate because of the recognized exception for so called inextricably intertwined legal services. Defendants assert Plaintiffs do not qualify for the exception in this case. The Texas Supreme Court has held that when discrete legal services advance both a recoverable and unrecoverable claim, and the claims are so intertwined that it is impossible to determine which part of the attorney's work is attributable to a non-recoverable claim, no segregation is required. *Id* at 313-14. But where attorney's fees "relate solely to a claim for which ... fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Id*. The Supreme Court explained that a common set of underlying facts is insufficient to make all claims arising therefrom 'inseparable' and all legal fees recoverable. *Id*.

### B. Plaintiffs failed as a matter of law to meet their burden to segregate.

In our case, Plaintiffs' evidence showed they brought claims against a number of individuals in the guardianship action which had nothing to do with their claim of tortious interference with inheritance rights against Ted Anderson. For example, they spent a great deal of time in pursuit of legal malpractice claims against many defendants, for which the probate court and the court of appeals ruled they had no standing. Also, Plaintiffs sought damages on behalf of Jack Archer's estate for alleged negligence by Mr. J. R. Hamilton, the

5

temporary guardian of his estate. In addition, they pursued and settled claims for the estate against Mr. Doug Hearne for his handling of funds in his law firm's trust accounts which they claimed should have administered by the guardian of the estate. They sued Mr. Buster Adame, another attorney for Jack Archer; and they sued Ms. Pamela Rucker, the temporary guardian of the person of Jack Archer. None of these claims involved Mr. Anderson. Plaintiffs presented no evidence of, and did not seek jury findings of a conspiracy between Mr. Anderson and any other persons they pursued in the probate court.

**C. Plaintiffs evidence is legally insufficient to show reasonableness and necessity.**

Plaintiffs had the burden to prove the attorneys fees sought were reasonable and necessary. *Stewart Title Guaranty Company v. Sterling,* 822 S.W.2d 1, 10 (Tex. 1992). Texas follows the lodestar method for awarding attorneys' fees. *El Apple I, Ltd. v. Olivas,* 370 S.W.3d 757, 760 (Tex.2012). This method is required in cases involving contingent fee contracts. *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818-19 (Tex. 1997). In Arthur Andersen, a DTPA case, the Texas Supreme Court made clear that a party seeking attorneys' fees must do more than present a contingent fee contract and make conclusory statements regarding the reasonableness and necessity of the fees. Factors that a factfinder should consider when determining the reasonableness of a fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Id.* at 818, citing Tex. Disciplinary R. Prof. Conduct 1.04, *reprinted in* Tex. Gov't Code, tit. 2, subtit. G app. (State Bar Rules, art. X, § 9); *see also Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990); *cf. General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 960–961 (Tex.1996) (discussing the relative strengths and weaknesses of the contingent fee and lodestar methods of awarding attorneys fees in the context of a court-approved class action settlement). "In other words, the plaintiff cannot simply ask the jury to award a percentage of the recovery as a fee because without evidence of the factors identified in Disciplinary Rule 1.04, the jury has no meaningful way to determine if the fees were in fact reasonable and necessary." *Id.*

Here, Plaintiffs failed to put on sufficient evidence of all the factors listed above. There is no evidence at all in the record regarding the matters covered in numbers (1), (2),

7

(3), (5), (7) and (8). As a result, Plaintiffs are not entitled to an award of attorneys' fees as part of their damages.

## CONCLUSION

For the reasons given above, Defendants respectfully urge the Court to grant their Motion for Partial Judgment Notwithstanding the Verdict, and modify the jury's finding on damages to reflect the only element properly proved, that is, $588,054.00, the amount paid by Plaintiffs in settlement with the charities in the prior litigation, and grant Defendants any further relief to which they may show themselves justly entitled.

Respectfully submitted,

**THE LAW OFFICE OF GERALD D. MCFARLEN, PC**
1001 South Main # 2
Boerne, TX 78006
Phone: (830) 331-8554
Fax: (210) 568-4305

BY: *Gerald D. McFarlen*
    GERALD D. McFARLEN
    State Bar No. 13604500

ATTORNEYS FOR DEFENDANTS,
T. MARK ANDERSON, INDIVIDUALLY
AND AS CO-EXECUTOR OF THE ESTATE
OF TED ANDERSON, AND CHRISTINE
ANDERSON, AS CO-EXECUTOR OF THE
ESTATE OF TED M. ANDERSON

8

1217

## CERTIFICATE OF SERVICE

I do hereby certify that on the 16th of July, 2013,  a true and correct copy of Defendants' Designation of Testifying Experts was furnished to all counsel of record in accordance with the Texas Rules of Civil Procedure.

Frank N. IKard, Jr.
Laurie Ratliff
Lauren Davis
IKARD  GOLDEN JONES, P.C.
400 West 15th Street, Suite 975
Austin, Texas 78701-1646
ATTORNEYS FOR PLAINTIFFS

*Gerald D. McFarlen*
GERALD D. McFARLEN

9

# App. J

Filed
13 July 25 A10:28
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-07-002328

CAUSE NO. 1-GN-07-002328

| | | |
|---|---|---|
| Richard T. Archer, David | § | IN THE DISTRICT COURT |
| B. Archer, Carol Archer | § | |
| Bugg, John V. Archer, | § | |
| Karen Archer Ball, and | § | |
| Sherri Archer, | § | |
| *Plaintiffs* | § | |
| | § | |
| V. | § | 345th JUDICIAL DISTRICT |
| | § | |
| Douglass Hearne, T. Mark Anderson, | § | |
| Individually and as co-executor | § | |
| of Estate of Ted Anderson, Christine | § | |
| Anderson, as co-executor of the | § | |
| Estate of Ted M. Anderson; and | § | |
| Richard Leshin, | § | TRAVIS COUNTY, TEXAS |
| *Defendants* | | |

## DEFENDANTS, T. MARK ANDERSON, INDIVIDUALLY AND AS CO-EXECUTOR OF ESTATE OF TED ANDERSON, AND CHRISTINE ANDERSON, AS CO-EXECUTOR OF THE ESTATE OF TED. M ANDERSON'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, AND IN THE ALTERNATIVE, AMENDED MOTION FOR PARTIAL JUDGMENT NOTWITHSTANDING THE VERDICT

TO THE HONORABLE JUDGE OF THE COURT:

Defendants, T. Mark Anderson, Individually and as co-executor of the Estate of Ted Anderson, and Christine Anderson, as co-executor of the Estate of Ted M. Anderson file this their Motion for Judgment Notwithstanding the Verdict, and in the alternative, Amended Motion for Partial Judgment Not Withstanding the Verdict, respectfully showing the Court the following:

### PROCEDURAL AND FACT SUMMARY

This case was submitted to the jury on two issues, liability for tortious interference with inheritance, and damages. The jury found for Plaintiffs on liability and in the single blank under the question on damages wrote in the amount of $2,006,150.

Plaintiffs' alleged damages consisted of their claim for $588,054 which testimony indicated

1264

was the amount paid by Plaintiffs to certain charities to secure a settlement with those charities to avoid a will contest, and their claim for $2,865,928 in attorneys' fees and expenses paid in all the prior litigation in the guardianship proceedings which included the litigation with the charities. Defendants assert that Texas law does not recognize a cause of action for tortious interference with inheritance, as it has never been adopted by the Legislature or the Texas Supreme Court. In the alternative, and without waiving their right to challenge the legal basis for Plaintiffs' cause of action, Defendants would show that Plaintiffs have no viable claim for recovery of attorneys' fees as damages in this action.

## STANDARD FOR GRANTING MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT

1.. If a plaintiff asserts a claim based on a cause of action which is not recognized in Texas, the trial court is authorized to grant a summary judgment against the plaintiff as to such a claim. Helena Labs. v. Snyder, 886 S.W.2d 767, 768-69 (Tex. 1994) (affirming summary judgment against plaintiff who asserted a cause of action for negligent interference with family relationship), the court may grant a motion for summary judgment. The standard is the same for a motion for judgment notwithstanding the verdict. A judgment notwithstanding the verdict is proper if a directed verdict would have been proper. Tex. R. Civ. P. 301. Further the court may disregard any jury finding on a question that has no support in the evidence. *Id.*

## ARGUMENT AND AUTHORITIES

### Motion for Judgment Notwithstanding the Verdict

**2. As a matter of law, Texas does not recognize tortious interference with inheritance as a cognizable cause of action.**

2

It is respectfully submitted that the Supreme Court of Texas not only has thus far failed to recognize a cause of action for tortious interference with inheritance rights, but that it never will. . Neither the Texas Supreme Court nor the Texas Legislature has adopted RESTATEMENT (SECOND) OF TORTS §774B (1979). Plaintiffs' only authorities for the submission of this cause are cases decided by intermediate courts of appeals and not considered by the Supreme Court. See *King v. Acker*, 725 S.W 2d 750 (Tex App.-Houston [1st Dist.] 1987, no writ; and Meduna v. Holder, No. 03-06-00484-CV, 2008 WL 2 (Tex. App.-Austin April 30, 2008, pet. denied), the latter case not reported in Southwest Reporter.

Even if the Supreme Court of Texas were to deem it advisable to permit plaintiffs to sue certain classes or types of defendants for tortious interference with inheritance, it would not do so as to attorneys at law. Texas has a bright line privity rule with respect to claims which can be asserted against an attorney who, like this Defendant, has prepared trusts or wills for a client. In *Barcelo v. Elliott*, 923 S.W.2d 575 (Tex. 1996), the Supreme Court of Texas extensively analyzed the public policy considerations involved in permitting persons who were intended beneficiaries under a will or trust to file a negligence claims against the attorney who represented the testator or settlor in drafting the will or trust. Our Supreme Court held that:

"In sum, we are unable to craft a bright-line rule that allows a lawsuit to proceed where alleged malpractice causes a will or trust to fail in a manner that casts no real

3

doubt on the testator's intentions, while inhibiting actions in other situations. **We believe the greater good is served by preserving a bright-line privity rule that denies a cause of action to all beneficiaries whom the attorney did not represent. This will ensure that attorneys may in all causes zealously represent their clients without the threat of suit from third parties compromising that representation.**" *Id.* at 579 (emphasis added).

While the evidence showed that Ted Anderson and Jack Archer had been friends for over 35 years, and that Mr. Anderson did not request or receive any compensation or benefits for assisting his friend Mr. Archer after his stroke, Plaintiffs repeatedly characterized him as acting in the capacity of an attorney at laws, and presented an expert to criticize his conduct under the standard of care of attorneys at law. Under the circumstances, Mr. Anderson should be accorded the protections of the rule laid down in *Barcelo.*

### 3. Texas has <u>not</u> adopted the "tort of another" exception to the general rule on recovery of attorneys' fees as damages.

In the event the Court is persuaded that Plaintiffs have pleaded and proved a cause of action recognized in Texas law, which Defendants deny, in the alternative, and without waiving their rights to appeal either the viability of Plaintiffs legal theories of this case, or the method of its submission to the jury, Defendants would respectfully show the court that a significant portion of the damages found by the jury is fatally flawed and lacks

4

support in the law. Plaintiffs are not entitled to claim their attorneys fees and expenses from the Bexar County Probate Court as damages in this case.

In *Turner v. Turner,* the case relied upon by Plaintiffs, the supreme court discussed, without expressly adopting, that exception to the general rule that attorney's fees are not available as actual damages. *Turner v. Turner,* 385 S.W. 2d. 230, 234 (Tex. 1965). In Turner, the court that the claimant did not meet the criteria of the theory upon which he was expressly relying, and therefore denied his claim for attorneys' fees, without any comment on whether the theory was valid. *Id.* In 2009, the Texas Supreme Court clarified its earlier opinion in *Turner* by stating, "...we need not and do not address whether the ['tort of another'] exception set out in section 914(2) of the Second Restatement should be adopted as Texas law. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. and Research Corp.,* 299 S.W.3d 106, 119 (Tex. 2009).

Texas intermediate appellate courts are divided on whether section 914(2) is the law in Texas. *Compare Naschke v. Gulf Coast Conference,* 187 S.W.3d 653, 655 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (declining to adopt tort of another exception in section 914(2)); *Peterson v. Dean Witter Reynolds, Inc.,* 805 S.W.2d 541, 549 (Tex.App.-Dallas 1991, no writ); *Cupples Coiled Pipe, Inc. v. Esco Supply Co.,* 591 S.W.2d 615, 619 (Tex.Civ.App.-El Paso 1979, writ ref'd n.r.e.); *Dalton Steamship Corp. v. W.R. Zanes & Co.,* 354 S.W.2d 621, 624 (Tex.Civ.App.-Fort Worth 1962, no writ), with *Lesikar v. Rappeport,* 33 S.W.3d 282, 306 (Tex. App .-Texarkana 2000, pet. denied) (adopted tort of another exception under Restatement section 914(2)); *Estate of Arlitt v. Paterson,* 995 S.W.2d 713, 721 (Tex.App.-San Antonio 1999,

5

pet. denied), overruled on other grounds, *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.,* 192 S.W.3d 780 (Tex.2006); *Standard Fire Ins. Co. v. Stephenson,* 963 S.W.2d 81, 90-91 (Tex.App.-Beaumont 1997, no pet.); *Baja Energy, Inc. v. Ball,* 669 S.W.2d 836, 839 (Tex.App.-Eastland 1984, no writ); *Powell v. Narried,* 463 S.W.2d 43, 46 (Tex.Civ.App.-El Paso 1971, writ ref'd n.r.e.).

As the 14th District Court of Appeals declared in declining to adopt an equitable exception to the general rule against recovery of attorneys' fees from prior litigation with others as damages, "Because we are bound to follow the existing laws of the State, we are not at liberty to adopt a theory of recovery that has not been enacted by the Legislature or adopted by the Texas Supreme Court." *Naschke,* 187 S.W.3d at 655. Defendants respectfully assert that the clearest and strongest authority is that the "tort of another" exception, embodied in Restatement of Torts § 914(2) (1979), the Legislature or the Supreme is not the law of the State of Texas. For that reason alone, Plaintiffs' Motion for Partial Judgment NOV must fail.

**4. Plaintiffs did not discharge their burden of proof for recovery of attorneys' fees as damages.**

Even is the Court determines that attorneys' fees are an available element of damages, which Defendants deny, Plaintiffs failed to meet their burden of proof.

**A. Plaintiffs had a duty to segregate recoverable from non-recoverable fees.**

The Texas Supreme Court has repeatedly held that "a prevailing party must segregate recoverable from unrecoverable attorney's fees in all cases." *Varner v. Cardenas,*

6

218 S.W.3d 68, 69 (Tex. 2007) (per curiam); *A.G. Edwards & Sons, Inc. v. Beyer,* 235 S.W.3d 704, 710 (Tex. 2007); *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 313-14 (Tex. 2006); *Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 73 (Tex. 1997); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex. 1991); *Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649, 650 (Tex. 1985). An attorney may segregate either by (1) proving time spent on a recoverable claim and excluding time spent on a non-recoverable claim, or (2) subtracting a percentage of the time from the total time expended on the case to account time spent on the unrecoverable claim. *Tony Gullo Motors I, L.P.* at 314.

Plaintiffs argue they are exempt from the need to segregate because of the recognized exception for so called inextricably intertwined legal services. Defendants assert Plaintiffs do not qualify for the exception in this case. The Texas Supreme Court has held that when discrete legal services advance both a recoverable and unrecoverable claim, and the claims are so intertwined that it is impossible to determine which part of the attorney's work is attributable to a non-recoverable claim, no segregation is required. *Id* at 313-14. But where attorney's fees "relate solely to a claim for which ... fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Id*. The Supreme Court explained that a common set of underlying facts is insufficient to make all claims arising therefrom 'inseparable' and all legal fees recoverable. *Id*.

**B. Plaintiffs failed as a matter of law to meet their burden to segregate.**

7

In our case, Plaintiffs' evidence showed they brought claims against a number of individuals in the guardianship action which had nothing to do with their claim of tortious interference with inheritance rights against Ted Anderson. For example, they spent a great deal of time in pursuit of legal malpractice claims against many defendants, for which the probate court and the court of appeals ruled they had no standing. Also, Plaintiffs sought damages on behalf of Jack Archer's estate for alleged negligence by Mr. J. R. Hamilton, the temporary guardian of his estate. In addition, they pursued and settled claims for the estate against Mr. Doug Hearne for his handling of funds in his law firm's trust accounts which they claimed should have administered by the guardian of the estate. They sued Mr. Buster Adame, another attorney for Jack Archer; and they sued Ms. Pamela Rucker, the temporary guardian of the person of Jack Archer. None of these claims involved Mr. Anderson. Plaintiffs presented no evidence of, and did not seek jury findings of a conspiracy between Mr. Anderson and any other persons they pursued in the probate court.

### C. Plaintiffs evidence is legally insufficient to show reasonableness and necessity.

Plaintiffs had the burden to prove the attorneys fees sought were reasonable and necessary. *Stewart Title Guaranty Company v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1992). Texas follows the lodestar method for awarding attorneys' fees. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex.2012). This method is required in cases involving contingent fee contracts. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818-19 (Tex. 1997).

8

In Arthur Andersen, a DTPA case, the Texas Supreme Court made clear that a party seeking attorneys' fees must do more than present a contingent fee contract and make conclusory statements regarding the reasonableness and necessity of the fees. Factors that a factfinder should consider when determining the reasonableness of a fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Id.* at 818, citing Tex. Disciplinary R. Prof. Conduct 1.04, *reprinted in* Tex. Gov't Code, tit. 2, subtit. G app. (State Bar Rules, art. X, § 9); *see also Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990); *cf. General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 960–961 (Tex.1996) (discussing the relative strengths and weaknesses of the contingent fee and lodestar methods of awarding attorneys fees in the context of a court-approved class action settlement). "In other words, the plaintiff

9

cannot simply ask the jury to award a percentage of the recovery as a fee because without evidence of the factors identified in Disciplinary Rule 1.04, the jury has no meaningful way to determine if the fees were in fact reasonable and necessary." *Id.*

Here, Plaintiffs failed to put on sufficient evidence of all the factors listed above. There is no evidence at all in the record regarding the matters covered in numbers (1), (2), (3), (5), (7) and (8). As a result, Plaintiffs are not entitled to an award of attorneys' fees as part of their damages.

## CONCLUSION

For the reasons given above, Defendants respectfully urge the Court to grant their Motion for Judgment Notwithstanding the Verdict, and enter a Judgment that Plaintiffs take nothing by their suit against these Defendants, and that costs be taxed against Plaintiffs; In the alternative, Defendants urge the Court to grant their Motion for Partial Judgment Notwithstanding the Verdict, and reduce the jury's finding on damages to $588,054.00, the amount paid by Plaintiffs in settlement with the charities in the prior litigation, and grant Defendants any further relief to which they may show themselves justly entitled.

Respectfully submitted,

10

**THE LAW OFFICE OF GERALD D. MCFARLEN, PC**
1001 South Main # 2
Boerne, TX 78006
Phone: (830) 331-8554
Fax: (210) 568-4305


BY: *Gerald D. McFarlen*
      GERALD D. McFARLEN
      State Bar No. 13604500

ATTORNEYS FOR DEFENDANTS,
T. MARK ANDERSON, INDIVIDUALLY
AND AS CO-EXECUTOR OF THE ESTATE
OF TED ANDERSON, AND CHRISTINE
ANDERSON, AS CO-EXECUTOR OF THE
ESTATE OF TED M. ANDERSON

# CERTIFICATE OF SERVICE

I do hereby certify that on the 25th of July, 2013, a true and correct copy of Defendants' Designation of Testifying Experts was furnished to all counsel of record in accordance with the Texas Rules of Civil Procedure.

Frank N. Ikard, Jr.
Laurie Ratliff
Lauren Davis
IKARD GOLDEN JONES, P.C.
400 West 15th Street, Suite 975
Austin, Texas 78701-1646
ATTORNEYS FOR PLAINTIFFS

*Gerald D. McFarlen*
GERALD D. McFARLEN

12

# App. K

## Prejudgment interest calculation - Verdict as modified by settlement with charities damages:

Actual damages:          **$2,594,204**          $2,006,150 + $588,054

Interest Calculation:    $2,594,204
                         ____x 5%
                         **$129,710.20**          **Interest per year**
                         __/365
                         **$355.37**              **Interest per day**

Prejudgment accrual date:  180 days after suit was filed on Feb. 5, 2003 is Aug. 4, 2003

Prejudgment interest period:  August 4, 2003 – July 25, 2013

From August 4, 2003 – June 17, 2011 (date of first settlement)

> 2875 days of interest:
> Total prejudgment interest
> when first settlement rec'd          $1,021,688.75
>
> Less settlement amount:              - $637,500
> Interest as of June 17, 2011         $384,188.75

From June 18, 2011 –Dec 28, 2012 (date of second settlement)

> 560 days of interest                 + $199,007.20
> Total prejudgment interest
> when second settlement rec'd:        $583,195.95
> Less settlement amount               - $612,500
>                                      <$29,304.05>

Reduction in actual damages:
$2,594,204 - $29,304.05 = **$2,564,899.95**

Dec 29, 2012 – July 25, 2013 (day before judgment signed)
209 days of interest:  $2,564,899.95 x 5%, /365 = $351.36 interest per day

Total prejudgment interest:          **$73,433.44**

t:\archer 3 2007 tortious interference\trial\jnov\prejudgment int calc on verdict & charities july 26 2013.docx

# App. L

REPORTER'S RECORD
VOLUME 9 OF 12 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-07-002328

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/29/2014 3:37:23 PM
JEFFREY D. KYLE
Clerk

RICHARD T. ARCHER, DAVID ) IN THE DISTRICT COURT
B. ARCHER, CAROL ARCHER )
BUGG, JOHN V. ARCHER, )
KAREN ARCHER BALL, AND )
SHERRI ARCHER )
)
vs. ) TRAVIS COUNTY, TEXAS
)
DOUGLASS HEARNE, T. MARK )
ANDERSON, INDIVIDUALLY AND)
AS CO-EXECUTOR OF THE )
ESTATE OF TED ANDERSON, )
CHRISTINE ANDERSON, AS )
CO-EXECUTOR OF THE ESTATE )
OF TED M. ANDERSON ) 345TH JUDICIAL DISTRICT

_____

**JURY TRIAL**

VOLUME 9 OF 12 VOLUMES

_____

On the 22nd day of May, 2013, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Orlinda Naranjo, Judge Presiding, held in Austin, Travis County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

Laurie Ratliff
State Bar No. 00784817
Lauren Davis
State Bar No. 24059657
Ikard & Golden PC
400 West 15th Street
Suite 975
Austin, Texas   78701
Telephone:   512-472-4601
E-mail:   Laurieratliff@iglaw.com.
COUNSEL FOR PLAINTIFFS


Gerald D. McFarlen
State Bar No. 13604500
The Law Office of Gerald McFarlen, PC
1001 South Main #2
Boerne, Texas   78006
Telephone:   830-331-8554
E-mail:   vwheeler@ktanda.com
COUNSEL FOR DEFENDANTS

THE COURT: Okay.

MS. RATLIFF: I didn't want to e-file something that wasn't allowed to be filed.

THE COURT: All right. Anything else?

MS. RATLIFF: No, Your Honor.

THE COURT: All right. Let's talk about the charge.

(Informal Charge Conference.)

MR. McFARLEN: I believe the evidence in this case is that at all times when he was acting as his attorney -- in fact, when he -- from everything they did in regard to supervising paying his bills or helping somebody on board to take care of his oil and gas and including hiring attorneys to assist him and represent him in resisting the guardianship that he was acting either as a friend or as his attorney, in fact, pursuant to his power of attorney, and not because they had an existing attorney-client relationships.

THE COURT: Well, and that's -- and for the plaintiff, it would seem to me we have to look at, you know, the one factor is, of course, is the length of the relationship is one factor that the courts look at, you know.

If you look at the places, they had a long relationship and they included an attorney

relationship -- attorney-client relationship.

Your position is that at the time in question, you know, when they are saying that he used undue influence, it would have been at the time that he changed his will, he disinherited.

MR. McFARLEN:  He certainly wasn't an attorney.

THE COURT:  That's what I am saying.

MR. McFARLEN:  My position actually on -- including breach of fiduciary duty is the state of the evidence is that, you know, it's -- that the actual breach testified to is the exact, same evidence.  Again, it goes to undue; influence.

Essentially, there are witnesses saying -- aside from -- when you said -- two things.  And he said, breach his fiduciary duty by taking the power of attorney, because I don't think that that's within the standard of care for a lawyer to take a power of attorney from a client -- in this case, his former client.  I think that's not very credible.

But he -- part of his assumption or one of his assumptions, part of his basis for that opinion is that Mr. Archer, he accepted the assumption, the testimony of plaintiffs' expert medical witnesses, that Mr. Archer never had capacity after he suffered the

stroke.

And I think -- that evidence is, of course, very much in dispute.

So other than that, which is is that -- and that, in and of itself, cannot possibly be a proximate cause of Mr. Archer changing his will.

There really -- it looks to me like they are just seeking a second bite at the same apple and an opportunity to use the same bite that they got of the expert witness about breach of fiduciary duty.

Because the only other testimony -- the rest of his testimony regarding breach of fiduciary duty had to do with his assertion that my client was orchestrating a change of the will and that that -- you know, that that -- those actions, which the Court is already submitting it is undue influence, also amounted to a breach of fiduciary duty.

THE COURT: We have.

I have struggled with submitting and I am concerned about submitting it this way just as a result of -- you know, depending on what the jury does. And then if it goes up on appeal, how we can correct it without having to retry it all over again.

That's my concern about all of this.

MR. McFARLEN: I understand.

MS. RATLIFF: On the breach of fiduciary duty question, I mean, that definition, I mean, throughout this time, Ted Anderson, Jack Archer had a fiduciary relationship. Whether it was under attorney-client or power of attorney, or just an informal relationship. And that's something that Mr. Boyce went into detail about, the three different kinds of -- whether you have your law license or whether you don't or whether you have power of attorney.

At the time he drafted the power of attorney, Ted was an attorney, a licensed attorney at that point. It's inescapable to me how he can say, I drafted a document and I took it over there and had somebody sign it, that I don't have an attorney-client relationships right there.

Also, how many medical records do we see where it says Ted Anderson, attorney, Ted Anderson, attorney. Even when he was not licensed. All those hospital admittance, Pam Rucker, Ted Anderson. How did they list him as? Attorney.

He was very loose with that and how he got represented. To me, it is his duty when he is no longer not a licensed attorney, he should have said, "Don't call me that anymore."

But the evidence is replete that he was an

attorney and that they had that relationship.  To support --

THE COURT:  Just because he's an attorney doesn't mean he is his attorney, I mean, but --

MS. RATLIFF:  But why would you list him that way?

THE COURT:  You know, a judge -- but they still call me judge in the State of California.  I'm still a judge.  It doesn't mean I can go over there and be a judge.

MS. RATLIFF:  I think it's a little different when you are talking about attorney-client relationships.

THE COURT:  And I understand that.  But that -- for our purposes here, though, the only reason I was saying that is we've got an attorney and an attorney, in fact, of fiduciary duties.

And so that was why I was asking, was there any dispute that he was either an attorney or an attorney in fact.  And see, that's why I was asking Mr. McFarlen that point.

MS. RATLIFF:  Or had a close relationship.  And that's the second part of that because you have an informal relationship with somebody just, you know, my daughter and I, my husband and I.  That would be an

informal relationship that would rise to the level of some fiduciary -- maybe not my husband, but -- that's a bad example.

But it was clear that he was in such a -- in a mental state that he was and everybody has testified they were close friends and they relied on each other. I mean, that's right there, your informal relationship to support -- I mean, a fiduciary duty.

Your Honor, I hear your comment about how you submit this. But, you know, every case that I read on tortuous interference, and there are actually a lot of them, they all list those -- I mean, fraud, duress.

THE COURT: I realize that.

MS. RATLIFF: It's very broad. The courts of appeals continue to say that. That's what they mean. They mean for it to be submitted that way.

And the Austin court of appeal in Medina actually quoted a little bit of what was in that charge. I realize that was in Blanco County. But, I mean, that -- they put it all together. They didn't try to, you know, cut that apart.

THE COURT: Well, I was just concerned for purposes of an appeal. And if the court of appeals thinks I was incorrect in submitting it at all, then we have to retry the whole case.

Unless we have them answer yes or no to undue influence -- no, that's not going to work either.

MS. RATLIFF: I think -- I thought about that, too. Castillo. It doesn't raise Castillo because it is one cause of action. It is tortuous interference with inheritance. Period.

We don't have three different causes of action. It's one. To me, those have to be defined. It means X, Y, Z. You have to tell them what Y,X and Z mean.

THE COURT: Okay. For our purposes here, we've got the charge of the Court. And let's go into formal charge conference. I am going to submit it as set out on the proposed charge.

Who is going to assert any objections on behalf of the plaintiff?

**OBJECTIONS TO JURY CHARGE BY MS. RATLIFF**

MS. RATLIFF: Your Honor -- are we on the record?

THE COURT: Yes.

MS. RATLIFF: Plaintiffs -- and this is only for purposes of preserving what we raised in our partial instructed verdict.

We would submit an objection to Question 2 only that it doesn't need to be in the charge because

there is no evidence for the jury to address a damage question when it has been uncontroverted as we set out earlier in our motion for partial instructed verdict.

We have no objection to the form. It's been submitted in Question No. 2.

THE COURT: Okay. Objection overruled.

**OBJECTIONS TO THE CHARGE BY MR. McFARLEN**

MR. McFARLEN: Yes, Your Honor. Defendants would object to the Court's charge on the following grounds.

Number one, that we would object to the failure to include the issue on testamentary capacity.

We will -- defendants object to the wording of the definition of "tortuous interference," one, because it includes -- well, it includes duress.

And actually because it includes undue influence, which has not been held to be an independent tort for which compensatory damages are awarded as opposed to supporting the initiation of a will.

We also object to it for including "breach of fiduciary duty."

And, further, defendants object to the -- including a definition of "undue influence" for the same reason.

I'm going to object also to the inclusion

of the definition of "duress" for the reason that there is absolutely no evidence of coercion, mental, physical or otherwise, no evidence of duress to support the inclusion of that element.

And we would further object to inclusion of a definition of "breach of fiduciary duty" because the breaches for which there is alleged evidence are the same as for undue influence.  So it constitutes a second bite at the apple.

Those are all our objections, Your Honor.

THE COURT:  Okay.  The objections will be overruled.  Okay.

Counsel, you've got the questions that I'm submitting to the jury.  And let's just try to save a tree or at least a branch, so I am not making any changes other than taking the word "draft" out and the typo.  And I think there was a typo.

What was the typo?

MR. HIGHTOWER:  It said, "tortuously interfered."

THE COURT:  Oh, okay.

MS. RATLIFF:  Actually, is it going to be changed with the "I"?

THE COURT:  Yes.

MS. RATLIFF:  We actually got a board made

STATE OF TEXAS        )
                      )
COUNTY OF TRAVIS      )

     I, Dora M. Canizales, Official Court Reporter in and for the 419th District Court of Travis, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by _____.

     WITNESS MY HAND on this the 2nd day of May, 2014.

                              /s:/Dora M. Canizales
                              Dora M. Canizales, CSR #5360
                              Official Court Reporter
                              419th District Court
                              Travis County, Texas
                              1000 Guadalupe, Room 325
                              Austin, Texas 78701
                              Telephone:  512-854-9329
                              Expiration:  12/31/2015